# 17-3691(L)-cr
## 17-3758(CON)-cr

---

## United States Court of Appeals

### for the Second Circuit

_____

UNITED STATES OF AMERICA,

*Appellee,*

--against--

MICHAEL J. MURGIO, JOSE M. FREUNDT, and RICARDO HILL, AKA RICO,

*Defendants,*

ANTHONY R. MURGIO, AKA SEALED DEFENDANT 1 (FEDERAL PRISONER: 62770-018), YURI LEBEDEV, and TREVON GROSS,

*Defendants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

**BRIEF FOR DEFENDANT-APPELLANT YURI LEBEDEV**

_____

CREIZMAN PLLC
747 Third Avenue, Suite 2000
New York, New York 10017
(212) 972-0200
*Attorneys for Defendant-Appellant,*
*Yuri Lebedev*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………..iv

JURISDICTIONAL STATEMENT ........................................................... 1

ISSUES PRESENTED .............................................................................. 1

STATEMENT OF THE CASE ................................................................... 2

PRELIMINARY STATEMENT ................................................................. 3

STATEMENT OF FACTS ......................................................................... 4

ARGUMENT ............................................................................................. 8

I.      The Court's limitations on the scope of the examination of Special Agent Beyer impeded counsel from presenting Lebedev's defense. ......... 8

    A.      Applicable Facts ....................................................................... 8

        1.     Jose Freundt's credibility was absolutely critical to proving the government's case on the bribery and multi-object conspiracy counts. ................................................................................ 8

        2.     Freundt's shocking testimony that a federal agent "suggested" that he withdraw his salary and take "a nice little bonus" from an illegal Bitcoin operation. ............................................................... 9

3. The Government's interviews of establish that Freundt perjured himself at trial and lied to the government in a proffer session. ................................................................................................ 11

4. Defense counsel establishes the necessity of calling Agent Beyer as a witness to present their defenses to the jury. .............. 12

5. Agent Beyer's testimony unwarrantedly rehabilitates Freundt's credibility. .................................................................... 13

6. The District Court unduly restricts counsel's ability to establish Freundt's clear perjury. ................................................. 13

B. Lebedev is entitled to a new trial because the district court's restriction on the scope of cross-examination inhibited counsel's ability to present critical arguments to the jury in his defense. ......... 15

II. Lebedev's convictions for Wire Fraud and Bank Fraud, and Conspiracy to commit both offenses should be reversed. ....................... 23

A. Applicable Facts ................................................................. 23

1. The purpose of the fraudulent scheme. .............................. 23

2.      The scheme did not present any risk of economic loss to the

banks....................................................................................... 24

B.      Argument.................................................................................... 26

1.      The government failed to prove that Lebedev committed wire

fraud or conspiracy to commit wire fraud. .................................. 26

2.      The government failed to prove that Lebedev committed bank

fraud or conspiracy to commit bank fraud................................... 29

CONCLUSION.................................................................................... 32

CERTIFICATE OF COMPLIANCE.......................................................... 33

iii

# TABLE OF AUTHORITIES

**Cases**

*Drake v. Portundo*,

  530 F.3d 230 (2d Cir. 2009)...................................................................... 21

*Jenkins v. Artuz,*

  294 F.3d 284 (2d Cir. 2002)...................................................................... 17

*Loughrin v. United States*,

  134 S.Ct. 2384 (2014)................................................................................ 30

*Shaw v. United States,*

  137 S. Ct. 462 (2016)........................................................................... 29, 30

*United States v. Brechner,*

  99 F.3d 96 (2d Cir. 1996).......................................................................... 22

*United States v. Certified Environmental Services*,

  735 F.3d 72 (2014) .................................................................................... 21

*United States v. Dinome,*

  86 F.3d 277 (2d Cir. 1996)........................................................................ 27

*United States v. D'Amato,*

  39 F.3d 1249 (2d Cir. 1994)...................................................................... 26

*United States v. Finazzo,*

  850 F.3d 94 (2d Cir. 2017)........................................................................ 28

*United States v. Novak,*

443 F.3d 150 (2d Cir. 2006)...................................................................... 27

*United States v. Salerno,*

  937 F.2d 797 (2d Cir. 1991).....................................................22, 23, 24

*United States v. Shellef,*

  507 F.3d 82 (2d Cir. 2007)...................................................................... 27

*United States v. Stofsky,*

  527 F.2d 237 (2d Cir. 1975)..................................................................... 15

*United States v Starr,*

  816 F.2 94 (2d Cir. 1987)......................................................................... 26

**Statutes**

18 U.S.C. §1343................................................................................................ 2

18 U.S.C. §1344.......................................................................................... 2, 29

18 U.S.C. §1349................................................................................................ 2

18 U.S.C. §3231................................................................................................ 1

18 U.S.C. §3742................................................................................................ 1

18 U.S.C. § 215(a)(1)...................................................................................... 2

18 U.S.C. §1960............................................................................................... 4

28 U.S.C. §1291............................................................................................... 1

**Rules**

Fed. R. App. P. 32(a)(5) ................................................................................. 33

Fed. R. App. P. 32(a)(6) ................................................................................. 33

Fed. R. App. P. 32(a)(7)(C) ........................................................................... 33

Fed. R. Crim. P. 29 ........................................................................................ 23

Fed. R App. P. 32(a)(7)(B)(iii)…………………………………………… 33

## JURISDICTIONAL STATEMENT

This appeal follows from a judgment rendered by the Honorable Alison J. Nathan, United States District Court Judge, Southern District of New York, sentencing defendant-appellant Yuri Lebedev to 16 months in prison following a jury trial.  Judgment was entered on November 1, 2017. (SPA001-SPA008).  Lebedev timely filed a notice of appeal on November 15, 2017.  (SPA013-SPA014)

The district court had jurisdiction under 18 U.S.C. §3231.  This Court has jurisdiction under 28 U.S.C. §1291 and 18 U.S.C. §3742.

## ISSUES PRESENTED

**Issue 1:      Lebedev's Cross-Examination was Unduly Restricted**

Is Lebedev entitled to a new trial because the district court restricted defense counsel from asking questions on cross-examination of a Secret Service Agent that would have substantially undermined the credibility of the government's principal cooperating witness against Lebedev?

**Issue 2:      The Wire and Bank Fraud Counts Should Be Reversed**

Should Lebedev's convictions for Wire Fraud, Bank Fraud, and Conspiracy to Commit Wire Fraud and Bank Fraud be reversed because the government failed to present evidence sufficient to establish beyond a reasonable doubt: (i) with respect to the alleged wire fraud, that Lebedev

contemplated any harm or injury to the purported victims of the offense—commercial banks—or sought to deprive those banks of the "right to control" their property; (ii) with respect to the alleged bank fraud, that Lebedev sought to obtain funds under the custody and control of those banks.

## STATEMENT OF THE CASE

After a jury trial, Yuri Lebedev was convicted of: (1) three counts based on a conspiracy to defraud financial institutions—wire fraud (18 U.S.C. §1343), bank fraud (18 U.S.C. §1344), conspiracy to commit wire fraud and bank fraud (18 U.S.C. §1349)—(2) one count based on paying bribes to an officer of a federal credit union—making corrupt payments to influence an officer of a financial institution (18 U.S.C. § 215(a)(1))—and (3) one count charging a multi-object conspiracy based on the scheme to pay bribes to the officer of the federal credit union, as well as the separate objectives of obstructing an investigation by the National Credit Union Administration ("NCUA") and of making false statements to the NCUA. (SPA001-SPA008). On October 20, 2017, Lebedev was sentenced to 16 months' imprisonment. (*Id.*).

Co-defendant Anthony Murgio pleaded guilty before trial, and thus, the operative indictment—Superseding Indictment S-6 (A050-A078)—was

2

presented to the jury in redacted form agreed upon by the parties (the "Redacted Indictment"). (A079-A098).

Lebedev is currently serving his sentence.

### PRELIMINARY STATEMENT

Lebedev is entitled to a new trial because the district court unduly restricted defense counsel's cross-examination of Secret Service Special Agent Emily Beyer. Had counsel not been so restricted, Beyer's testimony would have exposed that the principal cooperating witness against Lebedev, Jose Freundt, had perjured himself at trial and that he also had materially lied to the government in one of his proffer sessions. The agent's testimony would thus have established that the prosecution—which repeatedly emphasized to the jury Freundt's obligation to "tell the truth" under his cooperation agreement—had erroneously relied on Freundt's account of the alleged crimes. In addition, the agent's testimony would have revealed that Freundt did not believe that his obligation under the cooperation was to be truthful, but, rather, it was to implicate Lebedev. By unduly limiting defense counsel's cross-examination of Agent Beyer, the district court deprived Lebedev of his ability to present a defense.

In addition, Lebedev's convictions on charges of wire fraud, bank fraud, and conspiracy to commit wire fraud and bank fraud should be

3

reversed because the government failed to prove those charges beyond a reasonable doubt. Here, Lebedev participated in a conspiracy to deceive banks into processing credit card and debit card purchases of Bitcoin from an online exchange called Coin.mx by misleading the banks as to the true nature of the transactions since the banks would not knowingly have processed transactions for a Bitcoin exchange. The evidence at trial, however, established that the Coin.mx co-conspirators merely lied to the banks in order to enable the bank's debit and credit card customers to purchase Bitcoin, but did not seek to obtain money or property belonging to the banks or under the custody of the banks. Accordingly, as a matter of law, the government failed to prove an essential element of each of the wire and bank fraud charges.

## STATEMENT OF FACTS

The charges in this case relate to several interrelated schemes concerning the operation of an online Bitcoin exchange named Coin.mx that enabled customers to purchase Bitcoins with debit and credit cards over the internet. *See* Superseding Indictment S-6 (the "Indictment") (A050-A054, ¶¶3-11).[1] According to the Indictment, Anthony Murgio, Lebedev, and their

---

[1] The Indictment alleges that Coin.mx did not comply with federal and state registration and licensing requirements under 18 U.S.C.§1960, and

4

co-conspirators deceived banks into authorizing debit and credit card purchases of Bitcoins through Coin.mx. *Id.* ¶¶6-9. Although the purchase of Bitcoins is lawful, the testimony at trial established that many financial institutions did not wish to process Bitcoin transactions by credit or debit card due to perceived risks of customer chargebacks, as well as "regulatory risks."[2]

The Coin.mx co-conspirators employed several different techniques to hide the fact that Coin.mx engaged in Bitcoin transactions. The only method which Yuri Lebedev was alleged to have knowingly participated in was to cause credit card transactions to be processed in the name of "front" companies, like the "Collectables Club," which purported to be a members-only association that traded coins and other collectable items. Through this

---

associated regulations. (A051, ¶5). Lebedev, however, was <u>not</u> charged in the Indictment with counts relating to the operation of an unlicensed money transmitting business. (A051, ¶5, A057-A060, ¶¶16-20). He also was not alleged to have processed and profited from Bitcoin purchases by victims of ransomware schemes, or by customers to use in illegal transactions on the Darknet. *Id*. Accordingly, the Redacted Indictment reflects that Lebedev was not charged with such conduct. (A082-A089).

[2] This summary of the alleged wrongdoing is based on the charges in the Indictment and on the district court's opinion denying Defendant Gross's post-trial motions (DE 619).

ruse, the banks processed the transactions when they would otherwise would have chosen not to.

At least in part to help facilitate the processing of Bitcoin transactions, Anthony Murgio, with the assistance of his father, co-defendant Michael Murgio, decided to obtain control of the Board of a credit union by paying bribes to Trevon Gross, the principal officer of the Helping Other People Excel Federal Credit Union ("HOPE FCU"), and the Pastor of a closely-affiliated church, the Hope Cathedral.

After effectively gaining control of HOPE FCU's operations, Murgio began to have HOPE FCU process ACH transactions for a Montreal-based payment processing company called Kapcharge, which was run by friends of Murgio's. HOPE FCU processed high-volume ACH transactions to the point where the historically low-income credit union began to attract scrutiny from the Federal Credit Union Administration, raising concerns that HOPE FCU did not have adequate capitalization to cover such transactions in the event of complications.

The regulatory scrutiny from the processing of ACH transactions caused a rift between Murgio and his Collectables Club Board members on the one hand, and Gross and the legacy Board members on the other. The parties sought to address their differences at a meeting in HOPE FCU's

6

offices in Lakewood, New Jersey on November 22, 2015. The crux of the dispute was that Gross demanded that Murgio provide $300,000-$500,000 in reserves to assuage the regulators' concerns about the volume of ACH transactions. Gross also demanded a $50,000 donation to Hope Cathedral in order to turn full control of the Board over to the Collectables Club.

The parties could not reach agreement due to mutual lack of trust, and Gross removed the Murgio-controlled members from HOPE FCU's Board. After this fallout, Murgio and his father orchestrated an effort to persuade the NCUA to reinstate the Collectables Club members on the HOPE FCU Board. Murgio told the Collectables Club members that the effort was being led with the guidance of legal counsel. In connection with the challenge to Gross's termination of the Collectables Club members from HOPE FCU's Board, Lebedev and others signed a letter that falsely asserted that the Collectables Club's headquarters were in Lakewood, New Jersey, and thus within HOPE FCU's "field of membership," thereby entitling the Collectables Club members to be reinstated to the Hope FCU Board.

Because the multi-object conspiracy count for which Lebedev was convicted included bank bribery as its object along with making false statements to the NCUA and obstructing its investigation, it is uncertain whether the jury, which deliberated for five days before reaching guilty

7

verdicts on all counts against Lebedev, unanimously found that Lebedev conspired to make false statements to the NCUA or obstruct its investigation, or instead believed, as the defense had argued, that Lebedev did not intentionally lie to the NCUA, or obstruct its investigation.

## ARGUMENT

**I. The Court's limitations on the scope of the examination of Special Agent Beyer impeded counsel from presenting Lebedev's defense.**

**A. Applicable Facts**

**1. Jose Freundt's credibility was absolutely critical to proving the government's case on the bribery and multi-object conspiracy counts.**

Freundt's testimony was absolutely critical to the government's case against Lebedev on the two bribery-related counts for which Lebedev was convicted: the substantive bribery count and the multi-object conspiracy count (which included as an object the conspiracy to bribe Gross). Of the three cooperating witnesses at trial, Freundt was the only one who: (i) had no prior criminal record, (ii) had meaningful interactions with Lebedev, and (iii) asserted that Lebedev knew in advance of the November 22, 2014 meeting that the payments made to Trevon Gross were bribes. (A105, A158).

Freundt's testimony about Lebedev's knowledge of the bribe payments was essential to convicting Lebedev because there was scant

evidence that Lebedev was even aware before the November 22, 2014 meeting at HOPE FCU that the purpose of any of the "donations" made to Hope Cathedral were for the Collectables Club members to take control of the HOPE FCU Board. And although the November 22 meeting was recorded, each of the testifying witnesses who had attended that meeting, including Freundt, testified that Lebedev's statements demonstrated that he plainly did not grasp what was happening, that his comments were ignored by the principal negotiators, and that Lebedev was not kept in the loop as to the developments after the meeting, including whether Gross received the bribe payment or not. (A101-A102, A151-A157, A258-A262).

### 2. Freundt's shocking testimony that a federal agent "suggested" that he withdraw his salary and take "a nice little bonus" from an illegal Bitcoin operation.

On cross-examination, Lebedev's counsel questioned Freundt about a statement that he made to prosecutors in a proffer session which was memorialized in a FBI-302 report in a single paragraph buried among the vast 3500 material produced in connection with his testimony. (A117-A121). During that proffer session, Freundt told the prosecution that he was visited by Secret Service agents at the offices of Coin.mx in Tallahassee, Florida on the day alleged co-conspirators Lebedev and Anthony Murgio were arrested in this case. *Id.* Freundt told the government that he had a

conversation with one of the agents, Special Agent Emily Beyer, who told him that Coin.mx was likely to be shut down. Freundt expressed concern that he was worried that he would not receive his last paycheck because of the arrests, and that Agent Beyer responded that he could withdraw the money for his paycheck and that he also should "give yourself a nice little bonus." *Id.* Freundt therefore withdrew $5,000 which represented "the salary that was owed to him and also a week or two extra." *Id.*

Rather than admit he had lied to prosecutors, as defense counsel had expected Freundt to testify, Freundt confirmed the very same account of his encounter with Beyer that he gave in his proffer session, eliciting audible gasps from the jury. *Id.* After Judge Nathan excused the jury for its lunch break, she asked the attorneys to return before the end of the break because she "was quite taken aback" by the testimony, and that "I just want to hear more. I'm not making evaluative judgments, but it's not something I've come across before." (A125).

In discussing Freundt's testimony with Judge Nathan, the government admitted that Freundt's proffer statements "raised concerns on our part about what happened there," and that the prosecution team attempted to contact Agent Beyer, but she was on extended leave, and never spoke to her. (A126-A127). The government expressed, in sum and substance, that it did

10

not believe that Agent Beyer had actually told Freundt that he could withdraw the funds, but speculated that Freundt had misunderstood what Agent Beyer had said, and that Agent Beyer was not familiar with the investigation. (A127-A150). Defense counsel, however, identified communications and other documents from the 3500 material that reflected Agent Beyer was well aware of the details of the investigation, that Coin.mx was viewed as an illegal enterprise, and that another Secret Service agent from the New York office, who was undoubtedly even more familiar with the facts of the investigation attended the meeting with Agent Beyer. (A147).

### 3. The Government's interviews of establish that Freundt perjured himself at trial and lied to the government in a proffer session.

At the court's request, the government interviewed Agent Beyer, the New York agent that accompanied her to the meeting with Freundt, and the lead case agent, to inquire about Beyer's recollection of the meeting. Although Beyer did not have a specific recollection of the conversation she had with Freundt, she told the government "unequivocally" that she most certainly did not suggest he withdraw funds from the bank account and to "help yourself to a nice little bonus." (A210).

11

### 4. Defense counsel establishes the necessity of calling Agent Beyer as a witness to present their defenses to the jury.

Gross's counsel articulated clearly why calling Beyer as a witness was required for essential, non-collateral impeachment of Freundt's testimony:

> [I]f Mr. Freundt is indeed lying about this episode—and one must choose to believe him or whether to believe the agents, there's no gray area there—but if one concludes that he is lying, he's violated his cooperation agreement. The jury does not know that. The jury has heard nothing but the implicit endorsement of Mr. Freundt as a truthful witness because the government called him on direct and did not impeach him on this basis and has, by its silence, stood by him, and presumably will continue to stand by him unless and until the Court permits us to elicit this evidence. . . . The government should be obligated to make a decision now as to Mr. Freundt's credibility to the Court, and then take whatever actions should be taken with respect to this case.
>
> In addition, this calls into question whether the government's truly attempting to enforce this cooperation agreement. . . . The government should be obligated to make a decision now as to Mr. Freundt's credibility. . . . If, . . . as one would expect in these circumstances the government says, "We believe the two sworn agents of the United States Secret Service, and now we no longer believe our witness, as we did last week," than that information has to be brought out, has to be presented to the jury. Otherwise, the jurors will not have an appropriate basis to evaluate Mr. Freundt's credibility, and as Your Honor has pointed out, that credibility goes to the heart of whether they vote to convict or acquit Mr. Gross, and Mr. Lebedev, for that matter.

(A210-A211). After substantial argument, the district court ruled that Agent Beyer could be called as a witness by the defense, but restricted the scope of the examination "in a very tailored and narrow way to get at what I think is

12

relevant and appropriate for the jury to consider here, which is whether a key

cooperating witness testified falsely. . . .” (A231).

### 5. Agent Beyer's testimony unwarrantedly rehabilitates Freundt's credibility.

On direct examination by Gross's counsel, Beyer testified that she

recalled that during the July meeting, Freundt expressed concern that

Coin.mx would be shut down and that he would be out of a job. (A238).

Although Beyer did not recall whether Freundt said that he was owed salary,

she testified that she “would never have authorized him to take specific

salary” or a bonus. (A239). However, Beyer added that “[w]e would have

discussed operations and the fact that we weren't effectively shutting the

business down, the business was still free to operate if they were able to.”

*Id*. Beyer again reiterated her testimony with the qualification that “we

weren't shutting the business down; that is, the business operations could

continue in whatever manner they were continuing, that they could

continue.” (A239-A240).

### 6. The District Court unduly restricts counsel's ability to establish Freundt's clear perjury.

The Court sustained objections to Gross's counsel's attempt to refresh

Beyer's recollection with her earlier statements and other evidence that

before her July meeting with Freundt, Beyer was well aware that Coin.mx would be shut down and could no longer operate. (A234-A251).

Following the direct examination of Agent Beyer, counsel for Lebedev made a proffer to the Court that he planned to establish on cross-examination, by refreshing Beyer's recollection that she was well aware at the time she visited Freundt that Coin.mx was an illegal money transmitting business and that it would be shut down. (A248). Defense counsel explained that such testimony would establish that there was no room for the jury to believe that Freundt somehow misunderstood what Beyer said. (A254-A256).

Accordingly, that testimony would demonstrate that Freundt had perjured himself at trial, lied to the government, and was not motivated to testify truthfully as required by his cooperation agreement, but instead, was motivated to implicate Lebedev in order to obtain leniency at sentencing. *Id.*

The Court agreed that the testimony provided the impression that there was a mutual mistake, but denied defense counsel the opportunity to cross-examine the witness as he described because it would turn the examination into a "sideshow." (A255-A256).

14

**B. Lebedev is entitled to a new trial because the district court's restriction on the scope of cross-examination inhibited counsel's ability to present critical arguments to the jury in his defense.**

It is well established in this Circuit that "a witness's credibility could very well [be] a factor of central importance to the jury, indeed every bit as important as the factual elements of the crime itself." *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir. 1975). Here, Freundt's testimony was essential to the government's case against Lebedev on the bribery-related counts. Furthermore, the prosecution implicitly endorsed Freundt's credibility by pointing to his principal obligation to tell the truth under his cooperation agreement, or face the consequences that, facing a possible maximum sentence of 85 years, the government would "nullify the agreement" if it discovered he testified falsely, and would decline to submit a §5K1.1 letter to the sentencing judge. (A110-A113). Thus, the jury was left to believe that the government would have torn up Freundt's cooperation agreement if the prosecution had concluded that Freundt lied in his proffer session, or perjured himself at trial.

And even after Freundt told his seemingly incredibly story that a federal law enforcement agent had sanctioned his withdrawal of $5,000 from an illegal Bitcoin operation, the government did not elicit testimony on redirect that Freundt had lied about it. The jury thus was left with an

15

implicit understanding that at least the government believed Freundt's story about his encounter with Agent Beyer was truthful, no matter how astonishing it was.

But if defense counsel were able to demonstrate to the jury that Freundt had beyond question perjured himself, and had previously lied to the government during a proffer session, then the jury would have powerful evidence to wholly reject Freundt's testimony about Lebedev's knowledge of the illegal nature of the payments to Gross. The jury also would be armed with facts establishing that despite the express language of the cooperation agreement, Freundt viewed his path to leniency at sentencing would be achieved not by telling the truth, but by implicating Lebedev.

By calling Agent Beyer as a witness, defense counsel could indeed effectively present these important arguments to the jury, leaving the government with almost no basis to save Freundt's credibility as a witness. Indeed, armed with the government's memoranda of its interviews of Beyer, along with irrefutable evidence already provided to the defense prior to trial that Beyer was familiar with the details of the investigation when she interviewed Freundt in July 2015, defense counsel could have elicited testimony from Beyer that: (i) she knew that the government had arrested Murgio and Lebedev, and that Coin.mx would be shut down; (ii) she

16

understood that the government viewed all of Coin.mx's assets obtained through Bitcoin sales were ill-gotten gains, and (iii) she "unequivocally" would never have told Freundt to withdraw his salary, let alone take a "nice little bonus" from Coin.mx. By establishing those points, the defense could have established beyond any reasonable doubt that Freundt had perjured himself because there was no possible way to square Freundt's testimony with the agent's.[3]

Nevertheless, even though Judge Nathan permitted Beyer to be called as a witness for the purpose of eliciting testimony that was "relevant and appropriate for the jury to consider here, which is whether a key cooperating witness testified falsely. . . .," (A231), the court precluded defense counsel from establishing that Freundt did just that. Indeed, all counsel requested was to refresh Agent Beyer's recollection—with materials that the defense had in its possession—that before she interviewed Freundt, she knew that

---

[3] Of course, the government could have continued to stand by Freundt's testimony, but it would have been hard pressed in those circumstances to establish a plausible explanation for what one of its own agents swore never would have happened. Indeed, the government would have been forced to concede Freundt's perjury. *See Jenkins v. Artuz*, 294 F.3d 284, 293 (2d Cir. 2002) ("We have further noted the heightened opportunity for prejudice where the prosecutor, by action or inaction, is complicit in the untruthful testimony.").

the government viewed Coin.mx as a wholly illegal business that held ill-gotten gains.  Coupled with her "unequivocal" testimony that she never would have told Freundt to withdraw his salary or a bonus from Coin.mx, Freundt's perjury and true motivations to testify would have been exposed. Instead, by permitting Agent Beyer's testimony to stand, the jury was left with an understanding as to how Freundt could have misinterpreted Beyer. The defense thus had lost ground and could not effectively present its defense to the jury.  Indeed, defense counsel now appeared to the jury to have made much of Freundt's testimony when it was really not so critical. The defense lost credibility, and unwarrantedly so.

Defense counsel would have established that Agent Beyer's testimony could not be reconciled with Freundt's testimony through several documents produced as 3500 material.[4]  *First*, defense counsel would have established that Agent Beyer did not remember Freundt asking about his salary, contrary to Freundt's representation that he had expressed concern to Agent Beyer

---

[4] Because the 3500 materials produced in this case are subject to a confidentiality stipulation that precludes defense counsel from publicly filing those documents, defense counsel will move to file the relevant 3500 materials under seal.

18

about not being paid his salary.[5]  *Second*, defense counsel also would have

shown Agent Beyer an FBI-302 of Freundt's proffer session that he recalled

Agent Beyer telling him that "Coin.mx was likely going to be shut down."

(GX 3504-011 at 10).  This may have refreshed Agent Beyer's recollection

that she had indeed told him that.

*Third*, defense counsel would have used law enforcement records to

refresh Agent Beyer's recollection, including:

> • Numerous operational summaries sent to all federal agents
> involved in the Coin.mx investigation, including Agent Beyer.
> Those reports describe the upcoming "near-simultaneous
> arrests, searches, and interviews of individuals associated with
> the operation of an unlicensed money transmitting business."
> (GX 3501-0380 at 1-2).
>
> • The operational summaries also made clear that the operation
> would involve the seizure of the "Coin.mx and collectpma.com
> domains." (GX 3501-0380 at 2).  In other words, the
> government would obtain warrants to shut down the Coin.mx-
> associated websites, effectively putting it out of business.  The
> actual seizure warrant affidavit (GX 3501-0003) and Agent
> Jarrow's trial testimony (A099:16-A100:3), would have

---

[5] According to a Secret Service Memorandum of Interview dated March 4, 2017, Agent Beyer said that "she does not remember Freundt discussing salary and stated unequivocally that she did not instruct Jose Freundt to remove, transfer or take any money or bitcoin from any Coin.mx related accounts.  To her knowledge, such instruction was never provided by any other agent to include SA Wozniak [who attended the interview with her]." (GX 3560-001).

19

reinforced the recollection that the government intended to, and did, shut down Coin.mx's business.[6]

• A July 8, 2015 email from Agent Jarrow to Agent Beyer advising her of his desire to "brief you on our investigation and how coin.mx fits into it, and the operation we have planned for 7/22." (GX 3501-0315).

• A July 15, 2015 email from Agent Beyer to Agent Jarrow discussing an interview of Coin.mx's employees a week before the arrests of Murgio and Lebedev, in which she stated that "I think both of them [Freundt and another Coin.mx employee] are going to 'freak out' when they find out about the arrests and they will do anything they can to help themselves. They both have kids that are important to them and *neither have a clue that anything is wrong with what coin.mx is doing.*" (GX 3501-0339) (emphasis added).

• An updated "Operational Summary" sent to law enforcement agents, including Agent Beyer, in advance of the July 22, 2015 arrests in which law enforcement planned to execute a "seizure warrant" of Coin.mx's internet domain (thus, effectively shutting down the website). In addition, the operational summary.

The above documentation would have swiftly refreshed Agent

Beyer's recollection that she knew at the time of her interview of Freundt

that the government considered Coin.mx to be an illegal money transmitting

business and that the site, and therefore the business, was going to be shut

---

[6] The operational summaries also described Freundt as a "subject" of the investigation, and instructed the Tallahassee agents (including Beyer) to interview Freundt and obtain a consent search of the Coin.mx offices and his work laptop, which would be transferred to New York City. (GX 3501-0360 at 5).

20

down.  Accordingly, the jury would have had the benefit of conclusive proof

that Freundt's testimony directly contradicted the testimony of a federal

agent who had no incentive to lie.  The government, at that point, would

have been forced to concede that Freundt perjured himself and tell the jury

that it was going to rescind Freundt's cooperation agreement (or, instead

argue that Agent Beyer was a rogue agent).  *See, e.g., Drake v. Portundo*,

530 F.3d 230 (2d Cir. 2009).

By preventing counsel from conducting the cross-examination he

requested—which hardly would have resulted in a "side show" or a lengthy

examination—Judge Nathan frustrated defense counsel's ability to

accomplish what the court had stated was the sole purpose of permitting the

examination of Agent Beyer:  to establish whether or not Freundt had

perjured himself.

Restricting defense counsel in this way was not immaterial.  The

weight of authority requires a reversal and a new trial.  This Court has

recognized that although "the existence of a cooperation agreement is a

'double-edged sword' . . . which can be wielded by the defense and the

Government," the "*entire* cooperation agreement bolsters more than it

impeaches."  *United States v. Certified Environmental Services*, 735 F.3d 72

(2014).  By permitting defense counsel to examine Agent Beyer as he

21

requested, the jury would have been left either believing that Freundt was fulfilling his obligation to "tell the truth" under the cooperation agreement (and Agent Beyer was lying) or that he was motivated solely to say what he thought the government wanted to hear. *See, e.g., United States v. Brechner*, 99 F.3d 96, 99-100 (2d Cir. 1996) ("As we have previously explained, a cooperating defendant's truthfulness about his own past conduct is highly relevant to the quality of his cooperation. . . . By lying to the prosecutor *during the period of his cooperation* about his own criminal involvement, Brechner made it impossible for the government to argue at any future trial that, despite his past sins, Brechner had acknowledged his guilt, turned over a new leaf and cooperated in a truthful and trustworthy manner. The disclosure of Brechner's lies to the bank officer's defense counsel . . . would have brought on harsh cross-examination and a powerful argument that Brechner was no more trustworthy a cooperating witness than he had been as a crook."). *See also United States v. Salerno*, 937 F.2d 797, 810 (2d Cir. 1991) (court inhibited defense counsel's ability to elicit witness's true motive for testifying against defendant, thereby "depriv[ing] Ianniello of his right to present a defense").

22

**II. Lebedev's convictions for Wire Fraud and Bank Fraud, and Conspiracy to commit both offenses should be reversed.**

Lebedev moved at the close of the government's case for a judgment of acquittal on all counts under Fed. R. Crim. P. 29. (A232-A233). With respect to the bank and wire fraud counts, Lebedev argued that the government failed to establish any contemplated harm to the financial institutions at issue or that such conduct presented a risk of economic harm to the financial institutions. *Id*. Lebedev renewed his Rule 29 motion at the close of the government's rebuttal case. (A263).

**A. Applicable Facts**

**1. The purpose of the fraudulent scheme.**

The government's own witnesses unanimously testified the sole purpose of the false and misleading statements were to facilitate the Bitcoin transactions—they never intended to steal money from any bank. (A267, A277-A278, A279-A280, A281-A282). Moreover, the Bitcoin transactions between Coin.mx and its customers were entered into voluntarily, and with the customers' consent. There was no effort to cheat the customers. Indeed, the company took great precautions to ensure that its customers were on record as approving the transactions. (A264-A266, A276). And while Coin.mx took pains to hide the nature of its business from the financial institutions, the company freely marketed its services in social media,

advertised on Bitcoin websites, and was profiled in Bitcoin industry publications. (A268-A275).

### 2. The scheme did not present any risk of economic loss to the banks.

No evidence was presented at trial that any victim financial institution suffered an actual monetary loss. Rather, representatives of JPMorgan Chase Bank, Erika Heinrich and Kimberly Hett, discussed the risks posed to the banks by the miscoding transactions and the concealing that Collectables Club was a business engaged in the trade of virtual currency. According to Heinrich, in determining whether to approve or decline a credit card transaction, Chase makes a "risk assessment." (A319-A320). The types of risks from Chase's perspective include "an economic risk if it's fraudulent transaction; a reputational risk, depending on what type of merchant we may be doing business with; or even a regulatory risk, depending on the type of transaction it is." (A320). When pressed as to "the specific financial implications that Chase might face" in the event of regulatory risk, Heinrich replied, "[w]e could be fined." *Id.*

In terms of opening bank accounts, Hett testified that it is important for Chase to know the account holder and understand the nature of its business in order to "manag[e] our legal risk, . . . [and] manag[e] our reputational risk, [and] any monetary risk that might come from banking the

24

wrong type of business." (A335). In specifying the nature of the monetary risk, Hett said, "[t]here are numerous cases of banks and firms that are fined because they're not meeting their regulatory obligations in their KYC programs or in their AML programs." (A337).

Although not a "victim" of the fraudulent scheme charged in the Indictment, First Data, a payment processor for credit cards and debit cards, also did not suffer any actual monetary loss. Furthermore, although Christian Wilson of First Data testified that it might face a theoretical risk of monetary loss where there is a high level of chargebacks and the merchant is unable to financially cover the costs of the chargebacks. (A297). Here, because of strict identity verification procedures employed by Coin.mx, and because First Data takes reserves from customers' accounts to protect against financial loss due to chargebacks, there was "minimal processing on the [Collectables Club] account and low transaction amounts," posing "minimal risk" of economic loss. (A285-A287). The account was closed not due to chargeback risk, but because the business involved transactions in virtual currency. (A287).

## B. Argument

### 1. The government failed to prove that Lebedev committed wire fraud or conspiracy to commit wire fraud.

The Superseding Indictment charged Lebedev with committing wire fraud and conspiracy to commit wire fraud by participating in a scheme to make material misrepresentations to "financial institutions and others in order to deceive those financial institutions into allowing Coin.mx to operate and process financial transactions through the institutions." (A067-A069, ¶¶ 34, 36. To convict a defendant of wire fraud, the government must prove that the defendants possessed an intent to cause some kind of actual harm to the victim. *See United States v Starr*, 816 F.2 94, 98 (2d Cir. 1987). Although the scheme need not have been successful—the victims need not have been actually harmed—the government must show that "some actual harm or injury was *contemplated* by the schemer." *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994). Mere intent to deceive is insufficient, as the Second Circuit has held:

> Because the defendant must intend to harm the fraud's victims, "[m]isrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution." *Starr*, 816 F.2d at 98. "Instead, the deceit must be coupled with a contemplated harm to the victim." *Id. . . .* Where the scheme does not cause injury to the alleged victim as its necessary result, the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent.

*D'Amato*, 39 F.3d at 1257.

26

Here, the testimonial and documentary evidence indisputably established that the co-conspirators in the alleged wire fraud scheme did not intend to deprive the banks of money or property. They did not intend to steal money from the banks. Rather, they concealed from the banks the nature of the transaction (*i.e.,* purchases and sales of Bitcoin) in order to deceive the banks into processing the transactions, which irrefutably between willing sellers and willing buyers. Schemes "that do no more than cause their victims to enter into transactions that they would otherwise avoid . . . do not necessarily violate the mail or wire fraud statutes. *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007). Indeed, "[a]n intent to harm a party to a transaction cannot be found where the evidence merely indicates that the services contracted for were dishonestly completed." *United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006).

The government's theory of wire fraud here was based on the "right to control" theory, which provides that a person can be deprived of money or property within the meaning of the wire fraud statute where that person is provided false information that, if believed, would prevent the person from being able to make informed economic decisions about what to do with his or her money or property. *See United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996) (when the government pursues the "right to control" theory

27

by seeking to show that a person or entity lost its chance to bargain intelligently because of some deceit or nondisclosure, it must prove that the person or entity 'has been deprived of potentially valuable economic information.'").

The "right to control" theory, however, fails to provide a basis for convicting Lebedev of wire fraud or conspiracy to commit wire fraud.  It is well-established that "misrepresentations or non-disclosure of information cannot support a conviction under the 'right to control' theory unless those misrepresentations or non-disclosures can or do result in tangible economic harm." *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017).

Here, there was absolutely no evidence adduced at trial that any financial institution suffered, or even was exposed to the risk of tangible economic harm by the defendants' concealment of the nature of the Bitcoin transactions.  To the contrary, witnesses at trial were only able to testify speculatively about some vague legal, reputational, and regulatory risks arising out of the transactions.  Those risks were neither quantified nor quantifiable.  For example, as for regulatory risk, there was no testimony that the banks actually faced any such risk because the bank witnesses identified nothing the banks did improperly in terms of their compliance duties that would have subjected them to regulatory fines or penalties.  As

28

for chargeback risk, the bank witnesses' testimony was also speculative and unfounded, since the representative of credit card processor First Data acknowledged that there "was minimal processing on the [Collectables Club] account and low transaction amounts," posing "minimal risk." (A285-A286).

In these circumstances, the wire fraud count and the conspiracy count, which includes as its object a conspiracy to commit wire fraud, should be reversed.

### 2. The government failed to prove that Lebedev committed bank fraud or conspiracy to commit bank fraud.

In *Shaw v. United States*, 137 S. Ct. 462 (2016), the Supreme Court held that the federal bank fraud statute, 18 U.S.C. §1344, "while insisting 'upon a scheme to defraud,' demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss to the bank. *Id.* at 467. In *Shaw*, the defendant used the identifying numbers of a Bank of America customer's account to transfer funds from that account to accounts in other banks to which the defendant had access. *Id.* at 466. The defendant argued that he was not guilty of bank fraud because he did not intend to cheat the bank, but only to defraud the customer. *Id.* The Court disagreed, holding that both the bank and the customer had property rights in the customer's account, and because the defendant intended to deprive the bank of the right

29

to use the money entrusted to it by its customer, the fact that the defendant may not have intended the bank to suffer financial harm was irrelevant. *Id.* at 467.

The circumstances here are different than those presented in *Shaw*. First, the defendants here did not intend to defraud *either* the bank *or* the customer. Second, because Coin.mx customers were willing participant in the transactions at issue, the banks were not deprived of its property interest in funds in the customer's account "entrusted to it." Indeed, the customers had a greater property right than the banks over their own accounts. There was no attempt by the defendants to steal from the customers' accounts. Moreover, there was no evidence that the bank suffered any loss of funds under its control. The bank was merely deceived into approving transactions that the customer wished it to approve.

The Supreme Court's decision in *Loughrin v. United States*, 134 S.Ct. 2384, 2387 (2014) also does not preclude Lebedev's argument that no bank property was taken by misrepresentation. In *Loughrin*, the defendant obtained bank property by the use of altered or forged checks, thus taking funds from the accounts held by the bank. In contrast, here, Coin.mx did not obtain *bank* property by misrepresentation. The purchasers of the Bitcoin were willing buyers of Bitcoin, and the funds came from their accounts

30

because they spent the money in the fashion they wished. There was no attempt to defraud the bank in order to obtain the property of the banks or its customers by deception.

Accordingly, the bank fraud and conspiracy to commit bank fraud convictions should be reversed.

31

## **CONCLUSION**

For all the reasons set forth above, the Court should vacate Lebedev's Judgment and remand for a new trial. In addition, the Court should reverse Lebedev's convictions under the wire fraud, bank fraud, and conspiracy to commit wire fraud and bank fraud counts, and direct the district court to enter a judgment of acquittal on those counts.

Dated:      New York, New York
             March 6, 2018

> Respectfully submitted,
> /s/ Eric M. Creizman
> Eric M. Creizman
> Melissa Madrigal
> CREIZMAN PLLC
> 747 Third Avenue, Suite 2000
> New York, NY 10017
> Tel. (212) 972-0200
> Fax (646) 200-5022
> ecreiz@creizmanllc.com
> mmadrigal@creizmanllc.com
>
> *Attorneys for Defendant-Appellant*
> *Yuri Lebedev*

32

## CERTIFICATE OF COMPLIANCE

1.  The undersigned counsel of record for Defendant-Appellant Yuri Lebedev certifies pursuant to Fed. R. App. P. 32(a)(7)(C) that the foregoing brief contains 6,721 words, excluding the parts of the brief exempted by Fed. R App. P. 32(a)(7)(B)(iii), according to the Word Count feature of Microsoft Word for Mac 2011.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac 2011 in 14-point font of Times New Roman.

Dated: March 6, 2018

/s/ Eric M. Creizman