# 17-3691-cr(L),
# 17-3758-cr(CON), 17-3808-cr(CON)

# United States Court of Appeals

*for the*

# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

MICHAEL J. MURGIO, JOSE M. FREUNDT, RICARDO HILL, AKA Rico,

*Defendants*,

ANTHONY R. MURGIO, AKA Sealed Defendant 1, YURI LEBEDEV, TREVON GROSS,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT TREVON GROSS

KRISTEN SANTILLO
GELBER & SANTILLO PLLC
*Attorneys for Defendant-Appellant Trevon Gross*
347 West 36th Street, Suite 805
New York, New York 10018
(212) 227-4743

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

JURISDICTIONAL STATEMENT ....................................................... 5

ISSUES PRESENTED.................................................................... 5

STATEMENT OF THE CASE............................................................ 7

I. PROCEDURAL HISTORY ........................................................... 7

II. STATEMENT OF FACTS........................................................... 9

    A. The Relationship Between Hope Cathedral and
    HFCU ................................................................................. 9

    B. AM, MM, Coin.mx and the "Collectables Club" ............................ 11

    C. The HFCU and CC Partnership............................................. 12

    D. Kapcharge and ACH Processing at the Credit Union ...................... 17

    E. Disintegration of the Relationship Between CC,
    Gross and HFCU, And Gross' Unequivocal Severance of
    All Ties With the CC............................................................. 18

    F. The Continued Relationship with Kapcharge .................................. 20

    G. Liquidation .................................................................... 21

ARGUMENT ............................................................................ 21

I. The District Court Erred In Allowing Rollins' Unnoticed
Expert Testimony ...................................................................... 21

    A. Legal Standards ............................................................... 21

    B. The District Court's Manifestly Erroneous
    Application of the Rule 16 Notice Provisions.................................... 23

    C. The District Court's Remedial Efforts Did Not Cure
    the Error......................................................................... 29

i. The Offer of a Continuance Was Ineffectual ................................. 29

ii. The Limiting Instruction Was Ineffectual .................................... 30

D. The Error Prejudiced Gross ................................................................ 31

II. The District Court's Erroneous Application of the
Coconspirator Exception to the Hearsay Rule Warrants
Reversal ........................................................................................................ 33

A. Legal Standards ..................................................................................... 33

B. Gross Unequivocally Communicated Withdrawal ........................... 34

C. Subsequent Acts of Concealment Did Not Extend the
Conspiracy ................................................................................................. 36

D. Jury Instructions Did Not Cure The Error ...................................... 38

E. The District Court's Error Prejudiced Gross .................................... 39

III. The Indictment Was Constructively Amended, Or at
Minimum There Was a Prejudicial Variance ........................................... 40

A. The Indictment Was Constructively Amended ................................ 41

i. Legal Standards ........................................................................... 41

ii. The Indictment ........................................................................... 43

iii. The ACH Processing Evidence, Arguments and
Instructions .................................................................................... 46

iv. Argument .................................................................................... 51

a. The Quid Pro Quo Bribery Scheme Was
Broadened ................................................................................... 51

b. The Nature of the Alleged Improper Business
Transactions at the Credit Union Was Broadened ...................... 54

c. The Nature of Misrepresentations Was
Broadened ................................................................................... 55

d. The Impermissible Broadening of the
Allegations Constituted Constructive Amendment........................ 57

e. The District Court's Definition of the Conspiracy
Did Not Prevent Constructive Amendment ................................. 58

B. Alternatively, There Was a Prejudicial Variance ............................. 60

IV. The District Court's Limitation on Beyer's Examination
Warrants Reversal ....................................................................................... 61

A. Legal Standards ................................................................................ 62

B. Beyer's Testimony Bore on A Critical Issue in the
Case - The Credibility of Freundt, A Key Cooperator........................... 64

C. The District Court's Limitation on the Examination of
Beyer........................................................................................................ 66

D. The District Court's Error Prejudiced Gross ..................................... 67

V. Government Intimidation of Witnesses from HFCU and
Hope Cathedral Deprived Gross of a Fair Trial.................................... 68

A. Legal Standard................................................................................. 68

B. Factual and Procedural History ........................................................ 70

C. The Government's Efforts to Gain an Unfair Strategic
Advantage at Trial .................................................................................. 72

D. Argument........................................................................................... 76

i. Gross Was Deprived of Material and Exculpatory
Evidence That Could Not Be Obtained Elsewhere .......................... 76

ii. The Government's Tactics Before and During Trial
Evidence Bad Faith............................................................................ 79

iii. The Government's Tactics Prevented a Fair Trial ....................... 80

VI. The District Court Erred In Admitting Unnoticed 404(B)
Evidence Related to Insider Loans ................................................................. 82

VII. The Cumulative Trial Errors Deprived Gross of a Fair Trial .................... 86

VIII. The District Court Erred At Sentencing.................................................... 88

    A. The District Court Erred In Imposing a 4-Level
    Leadership Enhancement .......................................................... 88

    B. The District Court Erred In Finding That The Offense
    Conduct Jeopardized the Safety and Soundness of a
    Financial Institution................................................................ 89

    C. The District Court Erred In Finding That Gross
    Abused a Position of Trust ...................................................... 91

IX. The District Court Erred In Imposing Restitution For
Losses Related to the Liquidation of HFCU...................................... 92

CONCLUSION ........................................................................... 94

# TABLE OF AUTHORITIES

## A. Cases

*Bourjaily v. United States*,
   483 U.S. 171, 175 (1987) ............................................................................. 6

*Daubert v. Merrel Dow Pharm.*,
   509 U.S. 579, 597 (1993) ........................................................................... 12

*Davis v. Alaska*,
   415 U.S. 308, 318 (1974) ........................................................................... 12

*Delaware v. Van Arsdall*,
   475 U.S. 673, 680 (1986) ........................................................................... 12

*Gordon v. Arcanum Investigations, Inc.*,
   646 Fed. Appx. 18, 20 (2d Cir. 2016) ...................................................... 9,10

*Grunewald v. United States*,
   353 U.S. 391, 402 (1957) ........................................................................... 12

*Howard v. Walker,*
   406 F.3d 114,129 (2d Cir. 2005) .................................................................. 5

*Hughey v. United States*,
   495 U.S. 411, 413 (1990) ................................................................ 4,5,6,7,12

*Krulewitch v. United States*,
   336 U.S. 440, 442-43 (1949) ..................................................................... 6,7

*Peters,*
   642 F.3d 381, 389 (2d Cir. 2011) ............................................................... 12

*Pinkerton,*
   11 N.Y.3d 588, 901 N.E.2d 1268, 1271 [2008] ........................................... 5

*Stirone v. United States,*
   361 U.S. 212, 217-8 (1960) ........................................................................ 6,7

*Taylor v. Illinois,*
   484 U.S. 400, 409 (1988) ........................................................................... 12

*United States v. Al-Moayad,*
   545 F.3d 139, 178 (2d Cir. 2008) ................................................................. 5

*United States v. Barnwell,*
2017WL 1063457, S.D.N.Y 2017 ...................................................................... 5

*United States v. Cruz,*
363 F.3d 187, 192 (2d Cir. 2004) ...................................................................... 5

*United States v. Curley*,
639 F.3d 50, 57 (2d Cir. 2011) ...................................................... 4,5,6,7,12

*United States v. Cuti,*
708 F. App'x 21, 23 (2d Cir. 2017) .................................................................. 5

*United States v. D'Amelio,*
683 F.3d 412, 416 (2d Cir. 2012) ...................................................................... 5

*United States v. Dallas,*
229 F.3d 105, 110 (2d Cir. 2000) ...................................................................... 5

*United States v. Dorvee*,
616 F.3d 174, 179 (2d Cir. 2010) ................................................. 4,5,6,7,12

*United States v. Eisen,*
947 F.2d 246, 269 n.8 (2d Cir. 1992) .............................................................. 5

*United States v. Floyd,*
555 F.2d 45, 48 92d Cir. 1977 ........................................................................ 5

*United States v. Ghavami,*
23 F.Supp.3d 148, 165-66 (S.D.N.Y. 2014) .................................................... 5

*United States v. Gigante*,
166 F.3d 700, 705 (4th Cir. 1967) ................................................. 4,5,6,7,12

*United States v. Golding,*
168 F.3d 700, 705 (4th Cir. 1999) .................................................................... 5

*United States v. Greenfield,*
44 F.3d 1141, 1149-50 (2d Cir. 1995) ............................................................. 5

*United States v. Guglielmini,*
384 F.2d 602, 607 (2d Cir. 1967) ...................................................................... 5

*United States v. Gushlak*,
728 F.3d 184, 195 (2d Cir. 2013) ................................................. 4,5,6,7,12

*United States v. Maynard,*
   743 F.3d 374, 379 (2d Cir. 2014) ................................................................. 5

*United States v. McDermott,*
   245 F.3d 133, 139-40 (2d Cir. 2001) .......................................................... 5

*United States v. McKee,*
   506 F.3d 225, 229 (3d Cir. 2007) ............................................................... 5

*United States v. Milstein,*
   401 F.3d 53, 65 (2d Cir. 2005) ................................................................... 5

*United States v. Mize,*
   No. 13-6558, 2016 WL 640636 (6th Cir. Feb. 18, 2016) ............................. 5

*United States v. Mollica,*
   849 F.2d 723, 729 (2d Cir. 1988) ............................................................... 5

*United States v. Murgio,*
   209 F. Supp. 3d 698, 720 (S.D.N.Y. 2016) ................................................. 5

*United States v. Nerlinger,*
   862 F.2d 967, 974 (2d Cir. 1988) ............................................................... 5

*United States v. Pinto,*
   850 F.2d 927, 932 (2d Cir. 1988) ............................................................... 5

*United States v. Rankin,*
   2017 WL 3009203 at *4 (S.D. Ohio, 2017) ................................................. 5

*United States v. Roshko,*
   969 F.2d 1, 5 (2d Cir. 1992) ....................................................................... 5

*United States v. Salmonese,*
   352 F.3d 608, 620, 621 (2d Cir. 2003) ....................................................... 5

*United States v. Scott,*
   677 F.3d 72, 79 (2d Cir. 2012) ................................................................... 5

*United States v. Silkowski,*
   32 F.3d 682,689 (2d Cir. 1994) ................................................................... 5

*United States v. Stratton,*
   779 F.2d 820, 829 (2d Cir. 1985) ............................................................... 5

*United States v. Vilar,*
   729 F.3d 62, 97 (2d Cir. 2013) ................................................................ 5

*United States v. Williams,*
   205 F.3d 23, 29-30 (2d Cir. 2000) ........................................................... 5

*United States v. Wozniak,*
   126 F.3d 105, 109 (2d Cir. 1997) ............................................................. 5

*United States v. Zingaro,*
   858 F.2d 94, 98-9 (2d Cir. 1988) .............................................................. 5

*Webb v. Texas,*
   409 U.S. 95, 98 (1972) ............................................................................. 5

## B.  <u>Statutes</u>

18 U.S.C. § 1001 ............................................................................................ 5

18 U.S.C. § 1517 ............................................................................................ 5

18 U.S.C. § 215 .............................................................................................. 5

18 U.S.C. § 3663 ............................................................................................ 5

18 U.S.C. § 3663(b) ....................................................................................... 5

18 U.S.C. § 3663A .......................................................................................... 5

18 U.S.C. § 3663A(a)(2) ................................................................................ 5

18 U.S.C. § 3663A(b) ..................................................................................... 5

18 U.S.C. § 3231 ............................................................................................ 5

18 U.S.C. § 215(a)(1) ..................................................................................... 5

18 U.S.C. § 215(a)(2) ..................................................................................... 5

18 U.S.C. § 1291 ............................................................................................ 5

FED. R. CRIM. P 16(a)(1)(G) ...................................................................... 5

FED. R. CRIM. P 16(a)(1)(G)(d)(2)(B)-(D) ........................................... 5

FED. R. CRIM. P 16(a)(1)(G) ...................................................................... 5

FED. R. CRIM. P 404(b) ............................................................................... 5

FED. R. EVID. 104(a) ................................................................................... 5

FED. R. EVID. 404(b) ................................................................................... 5

FED. R. EVID. 404(b)(2)(B) ....................................................................... 5

FED. R. EVID. 801(d)(2)(E) ....................................................................... 5

## INTRODUCTION AND SUMMARY OF ARGUMENT

Trevon Gross was a fulltime Pastor at Hope Cathedral in Jackson, New Jersey and the part-time, volunteer Chairman and Chief Executive Officer of the Helping Other People Excel Federal Credit Union (the "HFCU") when the events underlying this case transpired. HFCU was a 107-member, struggling, low-income credit union run by volunteer board members when Michael Murgio ("MM") and his son Anthony ("AM") approached the credit union, purporting to act on behalf of the Collectables Club ("CC"), a memorabilia association with over 14,000 members.

CC was a sham front-company for Coin.mx, an unlawful Bitcoin exchange, but there was no evidence at trial that Gross ever knew the CC was a fiction, or that AM and his associates were engaged in illegal activity at Coin.mx.

The Murgios expressed an interest in CC bringing its resources, members and technology to the credit union, and in exchange sought majority representation on the board of HFCU. In addition, CC offered to make a donation to Hope Cathedral, which had financed HFCU for years.

Gross and other volunteer board members of HFCU (the Legacy Board Members or "LBMs") agreed to this partnership, and CC members ultimately joined the board of HFCU (the Collectables Club Board Members, or "CCBM")

1

and made donations to Hope Cathedral. The CCBMs served for less than five months before Gross severed all ties with them, removing them from HFCU.

The government charged Gross with soliciting and accepting corrupt payments in violation of 18 U.S.C. § 215, contending that the donations to Hope Cathedral were bribes. Six weeks before trial, the government added a conspiracy charge, alleging that Gross conspired with CC members to make and accept bribes and to make false statements and obstruct an examination of HFCU by the National Credit Union Administration ("NCUA") to cover up the bribery scheme.

Gross presented a multi-faceted good faith defense at trial, including arguments that: he believed in good faith that the partnership with CC was a legitimate business transaction and it was in the best interest of the credit union; there was nothing improper or unlawful about accepting a donation to Hope Cathedral as Hope Cathedral had financially supported HFCU for years; and he had not intentionally made false statements or obstructed an examination.

During Gross' four-week trial, multiple trial errors compromised Gross' right to a fair trial and prejudiced his good faith defense, warranting reversal of his convictions.

*First*, the District Court erred in admitting the unreliable, unnoticed expert testimony of John Rollins, an accountant, on a critical issue – whether Gross used the donations to Hope Cathedral on personal expenses. Over Gross' objection and

2

in direct contravention of the notice provisions of Federal Rule of Criminal Procedure 16 and the District Court's gatekeeping function under *Daubert*, the District Court permitted the government to present Rollins' testimony to establish a one-to-one correlation between the donations and particular personal expenses for Gross, even though Rollins himself acknowledged that such a correlation was "impossible." The District Court's error permitted the government to argue, with the unwarranted weight of expert corroboration, that Gross spent the donations on trivial luxury items, such as massages, dinners, pool supplies and Broadway tickets, when there was no evidentiary basis for these arguments. In a case that turned on whether Gross was acting in good faith, this was reversible error.

*Second*, the District Court erred in admitting as co-conspirator statements numerous prejudicial comments made by CCBMs denigrating Gross' integrity and implicating him in criminal conduct, when these comments were made after Gross unequivocally communicated to AM and the CCBMs that he wanted no further contact with them, effectively withdrawing from any alleged conspiracy with them. As against Gross, these were hearsay statements that never should have been admitted, and they severely undermined his good faith defense.

*Third*, while the government charged Gross with accepting bribes to facilitate the takeover of HFCU by CC and making false statements and obstructing an examination of HFCU to cover up the bribery scheme, the vast

3

majority of the evidence against Gross at trial related to processing Automated Clearinghouse ("ACH") transactions on behalf of Kapcharge, a third-party payment processor, without sufficient regulatory controls. The voluminous evidence and arguments relating to ACH processing for Kapcharge clients with no connection to Coin.mx or CC amounted to a constructive amendment of the Indictment, or, at minimum, a prejudicial variance, warranting reversal.

*Fourth*, the District Court erred in prematurely truncating defense counsel's examination of Special Agent Emily Beyer about prior inconsistent statements made days prior to her testimony. Beyer's testimony bore directly on the credibility of a key cooperator, CCBM Jose Freundt, and whether Freundt committed perjury. Freundt's credibility was critical to the government's case, and the District Court's refusal to allow Gross to confront Beyer and expose Freundt's perjury prejudiced Gross' defense.

*Fifth*, Gross' due process right to a fair trial was compromised when the government, for strategic advantage, took the position that all of the witnesses who could corroborate Gross' good faith defense had criminal exposure, intimidating them from testifying.

*Sixth*, the District Court erred in allowing the government to introduce evidence that Gross, Hope Cathedral and another LBM took out insider loans from HFCU with insufficient underwriting to cover negative balances, when the

4

government had provided no prior notice under Federal Rule Evidence 404(b), and the evidence did not relate to any disputed issues. This was improper propensity evidence, and it created the false impression that Gross stole from the credit union, undermining Gross' good faith defense.

*Seventh*, these errors cumulatively resulted in an unfair trial, warranting reversal.

*Eight*, the District Court abused its discretion in imposing enhancements at sentencing for leadership role, jeopardizing the safety and soundness of a financial institution and abuse of position of trust.

*Ninth*, the District Court erred in imposing restitution for indirect costs incurred by HFCU that were attenuated from the offense of conviction and unauthorized by statute.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231. Judgment was entered on November 16, 2017. (SPA-1). Gross timely appealed. (A-4643). This Court has jurisdiction under 28 U.S.C. §1291.

## ISSUES PRESENTED

I.     Did the District Court err in permitting the government to present unreliable, unnoticed expert testimony on a critical issue – whether Gross personally profited from donations to Hope Cathedral?

5

II.     Did the District Court err in permitting prejudicial statements of CCBMs to be used against Gross as co-conspirator statements when he had unequivocally severed the business relationship with CC, explicitly communicating withdrawal?

III.    Where the Indictment charged a conspiracy to facilitate a scheme to take over HFCU in furtherance of the business of Coin.mx, an unlawful Bitcoin exchange, was it a constructive amendment, or alternatively a prejudicial variance, when the vast majority of the trial evidence related to ACH processing for Kapcharge clients with no affiliation to Coin.mx?

IV.     Did the District Court err in prematurely truncating the examination of a government witness about her prior inconsistent statements, resulting in the unwarranted bolstering of a critical cooperator?

V.      Did the government improperly intimidate Gross' witnesses in violation of his due process right to present witnesses?

VI.     Did the District Court err in allowing the government to introduce unnoticed 404(b) evidence relating to insider loans, when the insider loans were not relevant to any disputed issues and were used for improper propensity purposes?

VII.    Did the cumulative trial errors amount to an unfair trial in violation of Gross' due process rights?

6

VIII.  At sentencing, did the District Court err in:

    a.  Imposing a 4-level leadership enhancement;

    b.  Finding that the bribery scheme jeopardized the safety and soundness of a financial institution; and

    c.  Imposing a 2-level enhancement for abuse of position of trust?

IX.  Did the District Court err in imposing restitution for costs relating to the liquidation of HFCU that were attenuated from the offense of conviction, and unauthorized by statute?

## STATEMENT OF THE CASE

**I.  Procedural History**

Gross appeals a judgment of conviction, sentence and restitution entered by the United States District Court for the Southern District of New York (Nathan, J.) following a jury trial.  SPA-1-8.[1]

The S6 Indictment charged Gross with accepting a bribe as an officer of a financial institution under 18 U.S.C. § 215 (Count Five), and conspiracy to make and accept bribes under 18 U.S.C. § 215, to obstruct an examination under 18 U.S.C. § 1517 and to make false statements under 18 U.S.C. § 1001 (Count Three) (A-62-89).

---

[1] "A" refers to the Appendix. "SPA" refers to the Special Appendix.  "CA" refers to the Confidential Appendix.

7

Trial began on February 15, 2017 and lasted approximately four weeks.  On March 17, 2017, the jury returned a verdict of guilty on both counts.

At the close of the government's case, Gross moved for a judgment of acquittal.  A-3175; 3297-98.  After trial, Gross filed motions for a judgment of acquittal and a new trial.  The District Court denied the motions on October 18, 2017.  A-4537.

The Government and Gross disputed whether enhancements should be added for leadership role, jeopardizing the safety and soundness of a financial institution, abuse of position of trust and obstruction of justice.  After applying all of the enhancements, the District Court calculated Gross' sentencing range as between 121-151 months.  A-4073.  The District Court denied Gross' motion for a downward departure based upon Gross' lifetime of good works, which was supported by 134 letters from his friends, family and congregants.  *See* Dkt. No. 581, Volumes I and II. [2]  Although Probation recommended a below-Guidelines sentence of 48 months incarceration due to Gross' "lack of criminal history, strong ties to the community, and participation in charitable efforts," PSR 26, the Court imposed a sentence of 60 months on October 30, 2017.  SPA 3.

---

[2] Dkt." refers to the district court docket, S.D.N.Y. No. 15-cr-769.

8

The Court also imposed a term of three years of supervised release, a $12,000 fine and restitution of $194,293.72. SPA 4-7. The District Court amended the restitution order to change the amount to $126,771.82 on January 5, 2018. Dkt. No. 697.

## I.     STATEMENT OF FACTS

### A.     The Relationship Between Hope Cathedral and HFCU

Gross is the founder and lead pastor of Hope Cathedral in Jackson, New Jersey. A-3207. HFCU was a low-income credit union serving members who had difficulty accessing traditional banking services. A-3231. Gross volunteered at HFCU for 10 years without incident before he was approached by CC, and volunteered to become Chairman in addition to his duties as a fulltime pastor. A-3209-14.

HFCU was originally located in Lakewood, New Jersey, but when Superstorm Sandy devastated New Jersey communities in 2012, HFCU was displaced, and Gross permitted HFCU to be relocated to the Hope Cathedral Administrative building. A-3215-16; A-4127 and A-4218.

Beyond housing HFCU, Hope Cathedral financially supported HFCU in numerous ways. Hope Cathedral paid for moving and renovation costs and security updates relating to HFCU's move from Lakewood. A-3216. The church

9

also "paid for teller services,…computer equipment, all the supplies…, telephone, website design.  The church fully funded the credit union."  A-3216.[3]

It was part of Gross' defense that he believed in good faith that the donations to Hope Cathedral were legitimate because they in effect reimbursed Hope Cathedral for the expenses it had poured into the credit union over the years.  A-3273 (Gross explaining that the donation was a "win win" that could benefit the credit union and "make the church whole for its financial investment that it had put into the credit union for 10 years.")[4]

When HFCU moved to Hope Cathedral, the previous volunteer board members, except for George and Delores Wyatt, retired.  Gross recruited members of his community and his church to serve as voluntary board members.  A-3214-15.  The volunteer board members included Joseph Lane, Bernard Larkins, Marvin and Cynthia Purry, Fred DeSilva and George and Delores Wyatt.  These LBMs attended regular board meetings and volunteered at HFCU.

---

[3] An NCUA examiner testified that it is common and proper for outside organizations to financially support a credit union.  A-951-52.

[4] Gross sought and obtained a good faith instruction and a bona fide payments instruction, providing that the corrupt payments statute "does not apply to bona fide salary, wages, fees, or other compensation paid, <u>or expenses paid or reimbursed</u>, in the usual course of business."  A-3946 (emphasis added).

Loretta Larkins was the volunteer bookkeeper at the church, and kept track of all of Hope Cathedral's expenses, including any payments to Gross and expenses for HFCU. A-3303, A-3314.

Because HFCU was serving a low-income community and could not generate fee income, HFCU struggled for years to grow its membership. HFCU could not afford to implement basic services or technology, such as debit cards to attract members. *See* A-4459 (February 2014 board minutes: "[o]ur goal this year is to introduce and provide to our members a 'Debit Card' for a full functioning credit union.") HFCU made labored, incremental progress under the stewardship of Gross and the LBMs and would have continued to do so if MM and AM had not targeted the struggling credit union in April 2014.

## B. AM, MM, Coin.mx and the "Collectables Club"

In a scheme that began in late 2013, predating any connection between HFCU and CC, AM began operating an unlicensed Bitcoin exchange called Coin.mx with the assistance of Lebedev and other co-conspirators. A-231-32. AM used CC as a front company to trick banks into believing that Coin.mx was simply a members-only association for individuals "who discussed, bought, and sold collectable items, such as stamps and sports memorabilia." A-64; *See also* A-4140 (Citibank account application noting the Collectables Clubs was created to discuss

11

collectable items). AM also urged customers to lie to the banks about their Bitcoin transactions. A-64-5.

CC had a website containing misrepresentations about collectible items that could be exchanged, including stamps, records and baseball cards. A-255-58. The website was minimally functional, but to the public it appeared to be a real website, and customers would sometimes be deceived and call seeking to sell memorabilia. A-367-68.

AM enlisted his father, MM, to assist him in misleading financial institutions, and used his father's name and address to lend an air of legitimacy to his businesses. A-282-83, A-253; A-359; A-4139 (Citibank account application for CC listing MM's address.)

### C. The HFCU and CC Partnership

AM and MM began plotting to take over a credit union as early as July 2013. *See* A-4396, A-4264. AM arranged it so that MM would be the front person sending emails. A-4266; A-4270. The Murgios specifically targeted "distressed" and "failing" credit unions. A-4268.

MM approached HFCU at AM's direction.[5] An initial email was sent on April 2, 2014 from AM's email address, but signed by MM, with the subject

---

[5] *See also* A-4278; A-4279 (April 5, 2014 email from AM prodding MM to email Gross; MM responding); A-4287 (MM setting up business account for CC).

12

"Partnership with [HFCU]." A-4271. The email described "a memorabilia and financial education association with over 14,000 members" "interested in joining a credit union that we can add value to," with many "tech savvy" members. A-4271. *See also* A-4272 (email signed by MM from AM's account on behalf of a "memorabilia and financial guidance association," proposing options for a partnership.) Additional emails laid out the contours of the early discussions, including the potential to have CC members join the board, adding debit cards, peer-to-peer lending, and technology upgrades. A-4274. AM misled Gross about his interest in Bitcoins during these discussions. A-4402 (April 17, 2014 chat from MM to AM asking if AM spoke with Gross about Bitcoins, with AM responding "Peer to peer loans, and micro payments.")

Gross raised the potential CC partnership with the LBMs, in discussions that were memorialized in HFCU's board minutes, and the LBMs voted to pursue the partnership. *See* A-4461 (April 2014 minutes with Gross presenting new company "interest in working with [HFCU]" that would "afford [HFCU] to pursue some new opportunities (i.e. debit card)," with the LBMs approving further discussions.)

Gross, on behalf of HFCU, and MM, as "Treasurer" of CC, entered into a Memorandum of Understanding ("MOU") in April 2014. "[N]o contractual relationship [was] created," but the MOU provided "a framework for any future binding contract." *See* A-4392

13

A donation to the Church was also discussed, and it was agreed that CC would pay for updated technology, including debit cards. *See* A-4281 (Gross asking how the donation and covering the operational costs for upgrades like debit cards would work.)

There were several emails back and forth between AM and Gross regarding the details of the partnership, including discussion of the size and timing of the donations, the election of the board members, the expenses and obligations the CC would incur, and Gross' continued role in training the CC board members and ensuring a smooth transition. *See* A-4284 (AM proposing $160,000 in total donations, and a timeline for implementation of services, with Gross proposing $10,000 less of a donation and a different timeframe); A-4289 (Gross discussing timing of board elections and noting that he "met with our Board last night and though they are intrigued by your offer, they will not proceed until we have satisfied the initial terms of our MOU, which called for your organization to make a donation in the amount of $15k and cover the expenses for Debit Cards."); A-4296 (offering to train CCBM to ensure "smooth transition").

Gross' emails reflected his understanding that if CC brought all of its members to the credit union, the existing HFCU membership would be outnumbered by the much larger CC membership and the CC could vote for its members and effectively control the board in any event. A-4292 (Gross noting

14

that, after the election, "[w]e would be the clear minority."); A-3226 (Gross: "we recognized that if we have a hundred members and they even bring in 200 members, at the next member meeting, they have the votes to do whatever they want to do.")

As part of the deal, it was understood that if there was a successful transition, CC would set aside $50,000 in an escrow account so that existing HFCU members could charter their own credit union. *See* A-4327; *see also* A-4339 (discussing final donation to be paid by January 1).

Gross updated the LBMs on the CC partnership, and May 2014 board minutes show Gross reported "[t]hey will take on the responsibly of running the entire credit union. We would continue to conduct and do our credit union business for our customers and clients. The board will nominate six new Board Members to work with [HFCU]." A-4467. The names and resumes of the CCBMs were attached to the minutes. These CCBMs were longtime friends of AM, but their resumes, by AM's design, contained credentials that would make them attractive to a credit union seeking to grow and modernize its technology. *See*, *e.g*., A-4472-73 (Freundt's resume showing degrees in Finance and Business Administration, securities licenses, employment as a Budget Specialist for the Florida court system, and prior experience as a branch manager at a credit union.) *See also* A-2539-40 (Freundt testifying that AM exaggerated his credit union experience without his

15

knowledge.); A-4476-78 (Lebedev resume showing extensive experience in computer programming and web design, work as a software architect at BB&T bank, and numerous degrees, including a Ph.D. in Mathematics.); A-4479 (Ellrich resume showing experience as financial center manager at Fifth Third Bank.); A-1438-40 (Hill exaggerated credentials and omitted affiliation with Coin.mx from resume.); A-4296 (Gross noting "[t]his is an impressive board.")

Although the government alleged that Gross made misrepresentations to the NCUA about whether CCBMs were from New Jersey, all but one of the CCBM resumes showed home addresses outside of New Jersey, and those resumes were available for inspection by the NCUA. *See* A-4467; A-4290 (Gross noting that examiners like to see resumes in file). The evidence was clear that the NCUA was well aware that CCBMs had addresses outside of New Jersey, and the only question was whether, if their organization was based in New Jersey, the individuals could be members. A-4502 (Document of Resolution noting that CCBMs lived out of state and "board assumed that since these individuals were members of a business in Lakewood (Collectibles Club) they were eligible for membership in the credit union.")[6] The CCBMs were elected by the LBMs in June 2017. A-4502.

---

[6] NCUA examiner McDonough testified that he was not even aware of some of the "complex" rules relating to field of membership requirements, including what he characterized as an "obscure section…that relates specifically to low-income

### D. Kapcharge and ACH Processing at the Credit Union

Kapcharge was a Canadian –based third-party payment processor that was introduced to HFCU through AM as a business looking to process ACH transactions. As an NCUA witness testified, ACH is "a fairly normal service that credit unions provide." A-2663. *See also* A-1431 (Hill testifying he believed ACH processing was "perfectly legal.")

The only issue with ACH processing at HFCU was the volume of the transactions, and questions were raised by the NCUA and other credit unions about the adequacy of HFCU's compliance program given the volume. But the evidence was clear that Gross never had a plan to process such a substantial volume of ACH transactions in June 2014, the time by which he had agreed to accept the $150,000 donation to Hope Cathedral. A-4314 (Gross asking on May 27, 2014 for "more clarity as to what they actually want to do via ach," with AM responding that they "are going to utilize for their internal payments to employees and merchants."); A-4324 (On June 13, 2014, Gross regarding Kapcharge processing structure: "for the rest of the year it should be limited.)"; A-4335 (Gross on June 17, 2014: "We have to grow incrementally."); A-4136 (September 18, 2014 call, with Gross noting he

---

designated credit unions, in that an association located within a low-income designated credit union's field of membership, members of that association, regardless of where they live, can become members of that credit union." A-2643-44.

did not yet know the expected ACH transaction volume). Indeed, Kapcharge did not begin processing ACH transactions until August 2014, and the vast majority of the processing activity took place between September and November 2014. A-4129 (summary chart of Kapcharge processing activity.)

Kapcharge funded some of the donation payments to Hope Cathedral, but as Gross testified, he was not made aware of this until November 2014, towards the end of the relationship with CC. A-3330-01.

The government placed processing "millions of dollars" of ACH transactions for Kapcharge at the heart of its corruption case against Gross, but the evidence was clear that these "millions of dollars" of ACH transactions were for Transferwise, a Kapcharge client like Paypal with no connection to CC or Coin.mx. *See, e.g.*, A-107-08 (in opening statements, describing "the plan to have the credit union process tens of millions of dollars in risky transactions for Kapcharge."); A-921; A-4129; A-4410 (AM telling MM in September 2014 that ACH processing was "[n]ot for cmx, For other clients, Guys in Montreal.")

### E.    Disintegration of the Relationship Between CC, Gross and HFCU, And Gross' Unequivocal Severance of All Ties With CC

The relationship between AM and Gross became increasingly more hostile as Gross disagreed with the direction AM wanted to take HFCU, the volume of ACH processing and the risks it placed on the credit union. *See*, *e.g.*, A-4512 (Email from Gross to AM and Hill: "Please can we not be this aggressive !!!!.");

18

A-1432  (Hill testifying that Gross was the only one trying to ensure the credit union remained compliant.)

On November 22, 2014, the CC members and Gross had a meeting, which culminated in a falling-out between CC and Gross.  The meeting was recorded, and there is a discussion of CC members paying Gross' church $50,000 that was owed, in exchange for certain LBMs resigning.  A-4379.

As part of his defense, Gross explained that emails from June 2014 show that this $50,000 was a part of an exit provision in the original deal, and had been intended to be used for the purposes of establishing a new low-income credit union if the CC board members had successfully joined the HFCU board and a partnership no longer made sense.  A-3322-23.  *See also* A-1288 (Hill describing the $50,000 as the "final installment" of the agreement).

Although there was discussion of a $50,000 payment in the November 22, 2014 meeting, Gross never accepted the $50,000 payment.  Shortly after the November 22, 2014 meeting, Gross unequivocally communicated to AM and other members of CC that he wanted to have no further business dealings with them.  A-4423-49.

Despite Gross' unequivocal statements, AM and other CC members continued to try to send Gross $50,000, and they continued to discuss Gross amongst themselves over emails and chats.  *See* A-4423-49.  Gross twice rejected

19

these payments and revoked the access of the CC members to HFCU. A-4219-25; A-1293-94.

After they were ejected from HFCU, the CC came up with elaborate schemes to take back control of HFCU, including hiring a lawyer to challenge the removal of CCBMs and drafting a January 7, 2015 letter to the NCUA making misrepresentations, including a misrepresentation that CC had its headquarters at AM's aunt's house. *See* A-4423; A-4499; A-4419 (stipulation establishing that Oswald address on letter to NCUA was a misrepresentation.)

AM and the CCBMs thereafter also independently pursued their own endeavors, including immediately targeting additional credit unions to take over through the same false pretenses they used to take over HFCU, A-4350, A-4351, attempting to create their own credit union, A-1302-03, and continuing to defraud banks and operate an elaborate unlawful Bitcoin exchange through a sham front company.

## F. The Continued Relationship with Kapcharge

After Gross ceased all communications with CC, HFCU, under the leadership of the LBMs and a new CEO, Charles Blue, continued to try to process smaller volumes of ACH transactions for Kapcharge clients other than Transferwise with no affiliation to CC. No members of Kapcharge assumed any positions on the board of HFCU. While Kapcharge did provide $50,000 in funding

20

to HFCU for overhead expenses, this money went directly to HFCU, and not to Hope Cathedral or Gross. A-4228-29. After extensive efforts, HFCU implemented a compliance program the NCUA deemed sufficient to conduct ACH processing at HFCU, curing the problems the NCUA had identified. A-4515-22. After diligence and a site investigation by the NCUA, Kapcharge was ultimately determined to be in the field of membership. A-2726-27.

### G.    Liquidation

HFCU was placed into conservatorship in October 2015 and ultimately liquidated in November 2015 following the arrests of AM and Lebedev and the government's criminal investigation. A-4529.

## ARGUMENT

### I.    The District Court Erred In Allowing Rollins' Unnoticed Expert Testimony

The district court committed reversible error in permitting the unreliable, unnoticed expert testimony of John Rollins, an accountant, on a critical issue -- whether Gross personally profited from the donations.

### A.    Legal Standards

When parties seek to introduce expert testimony in accordance with Federal Rule of Evidence 702, "a district court must serve as a gatekeeper." *United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004). The Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a

21

reliable foundation and is relevant to the task at hand." *Daubert v. Merrel Dow Pharm.*, 509 U.S. 579, 597 (1993).

Pursuant to Rule 16 (a)(1)(G) of the Federal Rules of Criminal Procedure, "the government must give to the defendant a written summary of any [expert] testimony that the government intends to use . . . during its case-in-chief at trial." FED. R. CRIM. P. 16(a)(1)(G). The requisite notice "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Id.*

The rule "is intended to minimize [the] surprise that often results from unexpected testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." *Cruz*, 363 F.3d at 192. Moreover, "[t]he disclosure requirement creates an incentive for the government to limit its use of experts to proper subject matters of expert testimony, lest broader expert testimony require broader pre-trial disclosure." *Id.* (citations omitted).

Where a party "fails to comply with [Rule 16's mandatory disclosure provisions], the [district] court may," among other things, "(B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances." FED. R. CRIM. P. 16(a)(1)(G)(d)(2)(B)-(D).

A "trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Gordon v. Arcanum Investigations, Inc.*, 646 Fed.Appx. 18, 20 (2d Cir. 2016).

## B. The District Court's Manifestly Erroneous Application of the Rule 16 Notice Provisions

Gross asked for, and never received, notice that the government intended to present expert testimony at trial. To the contrary, both before and during trial, the government offered repeated assurances that it intended to offer bank records through a summary witness, and <u>not</u> through expert testimony.

At the Final Pretrial Conference less than two weeks before trial, the government represented it would be presenting a "summary witness" and had "not given expert notice because we don't think he's going to opine about anything in his expertise." A-93. *See* also A-2117 (calling Rollins a "summary witness" on February 28, 2018, the third week of trial); A-2569 (calling Rollins a "summary witness" on March 3, 2017); A-2901 (on March 6, 2017, the day before his testimony, representing that the "RSM summary witness" is "just summarizing the bank records.")

By March 3, 2017, days before resting, the government had not even provided Gross with critical information about Rollins' background or the basis for his opinion, as would have been necessary to comply with Rule 16(a)(1)(G). A-2470

23

("we will produce all of the 3500 to you today.  He has a resume that will be in there…And the backup charts, we can give you the tracing as well.")  Further, the government's presentation was not final, and they were still "cutting the deck" "to make it as tight as possible."  A-2572.

Immediately after receiving these additional disclosures, Gross notified the government of his objection to Rollins' testimony as unnoticed expert testimony. A-2987 (government noting defense counsel notified the government on March 4 of their objections to Rollins' methodology as unnoticed expert testimony).

The government did not provide defense counsel with final slides until early morning on the day of Rollins' testimony.  A-2993 (defense counsel:  "we still, until literally 5:00 o'clock this morning, did not have a final version of this chart.")

Upon receipt of the final slides, defense counsel objected on multiple grounds.  First, the defense argued that the government was seeking to present unnoticed expert testimony through a summary witness.  A-2992; A-2994 ("the witness should not be permitted to…testify…as a summary witness or a lay witness…when he's, in fact, an expert witness and giving expert testimony.")

Defense counsel also objected on substantive grounds, explaining that there was no valid scientific basis for Rollins' application of the "first in first out" accounting method ("FIFO"), which was arbitrarily chosen by the government to plug a substantial hole in the government's case – the lack of any evidence that

24

Gross used the payments to benefit himself, as the government charged in the Indictment and promised the jury it would prove. A-2291-92; 2995 ("we object to…the jury being fed an accounting theory that leads to the inevitable and inculpatory conclusion that that specific dollar-for-dollar tracing resulted in [Gross] spending…the alleged bribe funds, on himself."); A-3053 ("they can't substitute an expert opinion for that lack of connection").

Over Gross' objection, and based on the government's contentions that the defense was on notice of Rollins's methodology due to earlier disclosure of his slides and he would actually give lay testimony, the District Court allowed Rollins to testify and apply the FIFO accounting method. A-3001-2. During his testimony, Rollins himself acknowledged that specifically correlating the payments from CC to Gross personally was "impossible." A-3038-39.

After hearing the initial part of Rollins' testimony, Gross further objected substantively and on expert notice grounds. A-3055 ("What we have a problem with is using an expert accounting analysis to specifically link the sources of funds to the expenditures, when he has…testified, that to do that without the benefit of that accounting methodology would be, quote, impossible, unquote.")

The District Court expressly recognized that Rollins was giving expert testimony, not summary testimony as the government had promised. A-3047 ("in the course of testimony with this person's credentials and the process that they

25

used, it's an expert providing summary testimony…it's not simply summary."); A-3044 ("it's not lay. It's not."). Additionally, the District Court recognized that the testimony amounted to vouching for the government's arbitrarily selected accounting method. Rollins testified that, with specific identification being impossible, he chose FIFO: "both in discussions with counsel, but…in thinking about how most people handle their finances, and look at your bank statements, and how you make payments out of your bank accounts intuitively, first-in, first-out makes sense." A-3036. The district court observed: "[Rollins] added that it's what sort of makes sense, which, given his expert background, suggests a vouching for a particular methodology, and then when he specifically discussed counsel giving it to him, he described it as in the course of a colloquy and a conversation. So it's not just a plug-and-play. He testified to his qualifications. It adds a level of vouching to the methodology selected." A-3041.

Despite this recognition, the district court permitted further testimony based on her conclusion that "the defense was on notice of this issue," and "failed to timely raise the matter." A-3057. *See also* A-3060 (citing her "conclusion based on effectively a late objection based on expert testimony.") This was manifest error and a clear shifting of the burden under the notice provisions of Rule 16.

The government repeatedly represented it would not offer expert testimony through the summary witness. An earlier objection to Rollins as an expert would

26

have been pointless. For instance, in *United States v. Barnwell*, 2017 WL 1063457, at *2 (S.D.N.Y., 2017), the defendant raised a concern that an agent was "an expert witness disguised as a summary witness." The court noted that the "Government has clearly stated that it 'does not intend to qualify Agent Jones as an expert witness'" and the point was "therefore moot." Similarly, in *United States v. Rankin*, 2017 WL 3009203, at *4 (S.D.Ohio, 2017), the District Court noted that the Government asserted it did not intend to offer an IRS agent as an expert and "[t]his explicit representation disposes of the matter. He will not be offered as an expert and cannot give opinion testimony, thereby rendering a *Daubert* hearing unnecessary." These cases demonstrate that defense counsel was never in a position to raise a *Daubert* challenge to Rollins' expert testimony before it became clear that the government intended to use him as an expert.

Additionally, the Court's position--that it is incumbent upon defense counsel to guess whether the government intends to introduce expert testimony, even in the face of express government representations to the contrary, or risk waiving any right to object, would eviscerate the Rule 16 notice provisions, which squarely place the burden of giving notice on the offering party. A-2992-93 (defense counsel noting: "This is not Cape Fear where I have to keep worrying about whether the government is going to insert expert issues into the case after we've asked for the notice, and it hasn't been given.") The District Court's decision to

27

penalize the defense for failing to timely object was inconsistent with the express notice provisions of Rule 16, and it was an abuse of discretion.

Instead, the District Court should have held the government to its representations. In *Cruz*, the government informed defense counsel that it would notify him "in a timely fashion of any expert the government intends to call at trial." 363 F.3d at 196 n.2. Thereafter, the government notified defense counsel of the identity of one expert but not a second expert. *Id*. This Court held that it was error for the district court to allow the second expert to testify, noting that "where…the government represents to the defendant that it will comply with Rule 16's requirements pertaining to expert testimony, the government bears the burden of following through on that representation." *Id*. at 196, n.2.

Similarly, here, the government unequivocally represented to defense counsel before and during trial, including the day of his testimony, that it had no intention of using Rollins as an expert. Having repeatedly assured defense counsel of its intention to call only a summary witness, the government should have been directed to "follow through on th[ose] representations." *Id*. Indeed, defense counsel proposed ways in which Rollins could modify his presentation to testify only as a summary witness with minimal interruption in the presentation, but the District Court rejected that suggestion. A-3051-55. The District Court's decision

28

to permit Rollins to testify in the face of these objections was error. *See Cruz*, 363 F.3d at 196.

The District Court, based on the erroneous premise that Gross had waived the objection, also abdicated its role as a gatekeeper in failing to adequately address Gross' substantive objections, allowing Rollins to testify as to a specific one-to-one correlation between the donations and Gross' personal expenses when even Rollins acknowledged this exercise was "impossible." *See* A-3042; A-3060.

## C.     The District Court's Remedial Efforts Did Not Cure the Error

The District Court imposed two measures to attempt to cure the government's failure to provide a timely expert disclosure, both of which were ineffectual. The District Court: 1) allowed time for defense counsel to find an expert to counter Rollins after he testified; and 2) gave a limiting instruction. Neither of these steps cured the error.

### i.     The Offer of a Continuance Was Ineffectual

Allowing time to find an expert to counter Rollins <u>after</u> he testified did not cure the error. No expert should have been permitted to testify as to a one-to-one correlation between the donations and personal expenses for Gross when such specific identification was admittedly "impossible." Once the district court permitted Rollins to add artificial weight to the government's argument that there

29

was a one-to-one correlation between the CC payments and specific personal expenses, the bell could not be unrung with another expert.

Defense counsel did have every intention of calling a fact witness, Loretta Larkins, to testify on Gross' behalf in response to Rollins. Larkins was the volunteer bookkeeper for the church, and would have been in a position to testify that the donations were actually spent on the church, and not for Gross personally. *See* A-3319-3766. Nonetheless, as discussed below, due to the government's strategic efforts to intimidate Gross' witnesses from testifying, Larkins declined to testify due to fears of criminal exposure.

The district court's offer of a continuance to rebut Rollins' expert testimony was therefore too late – any continuance should have been given before Rollins began testifying to permit a proper *Daubert* challenge, or his testimony as anything other than a summary witness should have been excluded altogether. *See Cruz*, 363 F.3d at 196 ("the district court improperly allowed [the government's undisclosed second expert] to begin testifying as an expert witness in the face of defense counsel's objections.").

### ii.     The Limiting Instruction Was Ineffectual

The district court also provided a limiting instruction, instructing the jury that:

> The witness testified that he was instructed by the government to apply this [accounting] method. This is an opinion witness, not an expert witness. You

30

should not in any way rely on the witness' testimony to establish that the accounting method was itself a proper one. The witness was offered solely to help the jury apply the method and not in any way to determine whether this method, rather than others, is the most helpful in understanding the evidence.

A-3143. This instruction was counter-factual and ineffectual. As the District Court previously recognized, Rollins in fact was testifying as an expert, he vouched for the government's methodology, and the expert nature of his testimony was unmistakable.

## D. The Error Prejudiced Gross

The District Court's error was enormously prejudicial. Rollins presented slides and testified as to his opinion of what uses were "traceable" to the payments from CC, even though the direct tracing method was "impossible." A-3073-93; A-3098; A-4141 at 39-51. These uses included inherently prejudicial purchases, including a massage, pool supplies, Broadway tickets, movies and Apple products.

The government emphasized these purchases as evidence of Gross' corruption in opening statements, and again in summation and rebuttal. In opening, the government argued that Gross used the donations to "line his pockets and pay for personal expenses, like a swimming pool at his home, hotels, and Broadway shows on trips into Manhattan, massages, and to pay off his personal credit cards." A-101. In summation, the government emphasized Rollins' "analysis" to establish a definitive correlation to Gross' personal expenses.

31

> See you know that [Gross] acted corruptly because, ultimately, it was he who benefited from those payments… You saw the <u>analysis yourself from Mr. Rollins</u>, who <u>analyzed</u> the flow of transactions and the influx of funds…And you saw that they went to pay for personal expenses on some of Trevon Gross' personal credit cards…These weren't just uses simply for church funds. They were uses for himself as well…<u>the numbers don't lie</u>….Gross benefited from this bribe money.  A-3715.[7]  (emphasis added).

*See also* A-3727 ("They wanted to keep the bribery scheme hidden so that they could put the money in all of their pockets.")

In rebuttal summations, the government used Rollins' expertise to attack defense counsel's credibility. A-3911:  ("Rollins explained to you that when you <u>properly applied the FIFO methodology</u> to credit cards, it's the payments that are attributed to the oldest expenses first, not the most recent payments. So, Mr. Rollins isn't mistaken, Mr. Klingeman is.")  The government also again reiterated the false one-to-one correlation.  *See* A-3910 ("thousands and thousands of dollars from the bribe payments did flow directly to Trevon Gross' pockets in the form of payroll checks, cash withdrawals, car loan payments, movie tickets, various meals, and those massages.").

Rollins' testimony was therefore used with enormous prejudicial effect to establish specific, frivolous personal uses for the payments, even though there was

---

[7] While the government argued, in the alternative, that Gross could be convicted for bribery even if he accepted the payments to benefit the church, and not himself, the implication, emphasized in opening and closings, that Gross personally pocketed the donations was critical to the government's case and deeply prejudicial to Gross.

no scientific or evidentiary basis to support the correlation. This was the only testimony in the trial to establish such a correlation. In a case that turned on whether Gross was acting in good faith, its admission was reversible error.

## II. The District Court's Erroneous Application of the Coconspirator Exception to the Hearsay Rule Warrants Reversal

The District Court's erroneous application of Federal Rule of Evidence 801(d)(2)(E) to statements made by CCBMs after the falling-out constitutes reversible error.

### A. Legal Standards

Under Rule 801(d)(2)(E), "a [hearsay] statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is admissible as nonhearsay. Before admitting a coconspirator's statement over an objection that it does not qualify under Rule 801(d)(2)(E), a court must make a preliminary determination that the statement actually falls within the Rule. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); Fed.R.Evid. 104(a).

"As the language of the rule indicates, once a party withdraws from a conspiracy subsequent statements by a coconspirator do not fall within this exemption." *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988).

In order to demonstrate withdrawal, a defendant must show affirmative acts inconsistent with the object of the conspiracy that are communicated in a manner reasonably calculated to reach coconspirators. *See United States v. Greenfield*, 44

F.3d 1141, 1149–50 (2d Cir. 1995) ("either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators is sufficient to establish withdrawal."); *United States v. Dallas*, 229 F.3d 105, 110 (2d Cir.2000) (same).

A district court's decision regarding the admission of coconspirator statements is reviewed for clear error, and is subject to harmless error analysis. *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). Admission of statements under Rule 801(d)(2)(E) when there has been an explicit withdrawal is error. *Nerlinger*, 862 F.2d at 973.

## B. Gross Unequivocally Communicated Withdrawal

At trial, ample contemporaneous documents and the government's own cooperators established that Gross unequivocally severed all ties with members of the CC, informing them that he wanted nothing to do with them on November 24, 2014. In a chat between AM and the CCBM on November 24, 2014, there is abundant, unambiguous evidence of withdrawal. *See*, *e.g*., A-4423 (Hill: "[Gross] is not interested in renegotiating."); A-4224 (Freundt: "He informed me he is done playing games and renegotiating."); A-4228 (Freundt: "I don't see a way forward."); A-4330 (Freundt: "I asked him if the relationship between our group and his is salvageable to which he responded "no" in not sooo little words.")

34

Reviewing this chat, Freundt testified: "at that point, I understood [Gross] to be done with us." A-1825.

Further documents and testimony demonstrated that the rift between Gross and the CC was permanent. A-1293 (Hill testifying that he tried to reach out to Gross after the fallout, and "[h]e let me know that he wouldn't be negotiating with us anymore, that we should not try to wire funds into the credit union anymore, basically that we were done."); A-1293-94 (Hill noting that Gross cut off all access to the credit union by November 25, 2014.); A-1295 (Gross rejecting calls for a special board meeting, and telling CCBMs on November 25: "as non-members of the Credit union, you have no standing on the board to request a board meeting."); A-4472 (Gross to AM: as you are aware we are not moving forward.").

Due to this unequivocal evidence of withdrawal, Gross sought to exclude all post-falling out statements made by members of the CC on hearsay grounds. *See* Dkt. No. 425. The District Court denied this request, and issued the following limiting instructions, allowing the statements to be used against Gross:

> Acts and statements by the defendants and members of the [CC] regarding the November 22nd meeting or the relationship between [Gross] and the [CC] that occurred after the date of the falling-out between [Gross] and the [CC] may be considered against both [Lebedev] and [Gross].

> Acts and statements by [Lebedev] and other members of the [CC] regarding the NCUA about [HFCU] that occurred after the date of the falling-out between [Gross] and the [CC] may be considered against both [Lebedev] and [Gross].

A-3965.  Given the unequivocal evidence of withdrawal, these acts and statements should have been excluded as against Gross before they ever reached the jury. *Nerlinger*, 862 F.2d at 974.

## C.    Subsequent Acts of Concealment Did Not Extend the Conspiracy

The government has argued that Gross continued to be a part of the conspiracy despite this clear evidence of withdrawal, and therefore the statements by CC members continued to be coconspirator statements because:  1) Gross engaged in post-fallout acts of concealment; and 2) Gross continued to work with Kapcharge.  Dkt. No. 654 at 16-18.  Neither is a proper basis for concluding that Gross remained in a conspiracy with CC members.

First, any alleged post-conspiracy acts of concealment occurred after any alleged conspiracy with the CC had failed.  A-4571 (email from October 17, 2015, nearly a year after the falling-out and months after AM and Lebedev were arrested); A-4523 (email dated December 2, 2014, after cooperators testified Gross had severed all ties with CC).

In *United States v. Eisen*, 974 F.2d 246, 269 n.8 (2d Cir. 1992), the Second Circuit expressly distinguished acts of concealment of an ongoing conspiracy from acts of concealment of a concluded conspiracy, and noted that "[p]ost-conspiracy acts of concealment do not, without more, extend the life of the conspiracy after its main objective has been attained."  *See also Grunewald v. United States*, 353 U.S.

36

391, 402 (1957) (permitting acts of covering up to extend a conspiracy would "extend indefinitely the time within which hearsay declarations will bind co-conspirators."); *Krulewitch v. United States*, 336 U.S. 440, 442–43 (1949); *United States v. Stratton*, 779 F.2d 820, 829 (2d Cir. 1985) ("statements made during the 'concealment phase' of a conspiracy are not 'in furtherance of' the conspiracy within the meaning of Fed.R.Evid. 801(d)(2)(E)."); *United States v. Floyd*, 555 F.2d 45, 48 (2d Cir. 1977) ("*Krulewitch*, *Grunewald* and related cases create a barrier at the end of a conspiracy that we do not think should be breached to permit the inclusion of an event on the other side, no matter how proximate it may be to the conspiracy in time and place.")  Here, any acts of concealment post-dating the falling-out did not extend Gross' involvement in a conspiracy with the CC such that their post fallout-out statements should have been admissible against him.

Second, Gross' continued relationship with Kapcharge also did not extend his participation in a conspiracy <u>with the CC</u>.   To qualify as a coconspirator statement, "[t]here must be evidence that there was a conspiracy <u>involving the declarant</u> and the nonoffering party, and that the statement was made 'during the course and in furtherance of the conspiracy.'"  *Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (emphasis added).  Here, unless Gross had continued to engage in a relationship with the declarants, members of the CC, their statements

37

should not have been offered against him. The record unequivocally showed no continued relationship.

### D. Jury Instructions Did Not Cure The Error

In denying Gross' motion for bail pending appeal, the District Court contended that its jury instructions, including its withdrawal instruction, cured any errors with respect to the coconspirator statements. A-4638. But the District Court's instruction on the affirmative defense of withdrawal misstates the standard for withdrawal in the coconspirator statement context. The District Court instructed the jury that "it is a defense to the charge of conspiracy that the defendant withdrew from the conspiracy before the commission of the first overt act in furtherance of the conspiracy," and it is the defense's burden to prove the defense by a preponderance of the evidence. A-3961. This is a higher burden than the standard for establishing withdrawal in the context of coconspirator statements. *See Nerlinger*, 862 F.2d at 974 ("once a party withdraws from a conspiracy subsequent statements by a coconspirator do not fall within" the co-conspirator exception to the hearsay rule.) The District Court's withdrawal instructions were thus erroneous on the question of withdrawal for purposes of Rule 801(d)(2)(E), and could not have properly guided the jury on how to evaluate the question of withdrawal.

## E. The District Court's Error Prejudiced Gross

The District Court's error was not harmless. The central disputed issue in this case was whether Gross was acting corruptly or in good faith when he accepted the donations, and the post-withdrawal statements were enormously prejudicial on this issue. For instance, the following post-withdrawal statements were introduced:

- Lebedev: "That guy was clearly money hungry… If he is walking away from this [t]he only logical explanation is that he is getting much more from somewhere else…Otherwise it's back to his low volumes and no money." A-4432.
- Freundt: "We shouldn't mention $$ (bribery) in the resignation email…That's why I worded agreement," with Murgio responding "Donation." A-4438.
- Elrich: "I think he saw Anthony as a cash cow...then once he had problems with Anthony and the way things were shaking out, he prob complained to mark...and mark offers him a way to cut ant out…Trevon is shiesty enough to do this." A-4445
- Freundt: "if shit doesn't work I will call ncua my self and let them know how the credit union took 'donations' from kap in order to do business with them at a lower rate" A-4446.
- Freundt: "I…have emails from trevon telling us ways to get around the must live in nj aspect of things." A-4447.
- Lebedev: "Money do unbelievable things to people. Even pastors." A-4487.

These statements were directly aimed at Gross' character and intentions, and they were made by AM allies who barely knew Gross or his intentions. They equated the term "donation" to "bribery," when whether the donations were bribes was the primary contested issue in the case. *See* A-3723 (government in

39

summation:  "Freundt calls it what it is, bribery, with that little dollar sign.")  No

other documentary evidence made such a link.

These statements were also made during a key turning point, after the

falling-out, when Freundt testified that "the dynamics of everything that was going

on changed." A-2004.  The CC members were angry with and working at cross-

purposes to Gross and they went to great lengths to try to regain control of HFCU.

It was not until this turning point, after Gross had walked away, that Freundt

himself understood the payments the CC members were continuing to try to make

after the falling-out to be bribes.  A-2004 (Freundt testifying that he changed his

mind overnight, from November 24 to 25, as to whether the payments were

bribes.)  The government relied upon the chats in summation, including Lebedev's

statement that "Money do unbelievable things to people, even pastors," to establish

corrupt intent.  A-3725.

Considering how prejudicial the statements were and how impactful they

were on the central disputed issue in the case – whether the payments were corrupt

–the District Court's error requires reversal.

## III.   The Indictment Was Constructively Amended, Or At Minimum There Was a Prejudicial Variance

The evidence and arguments at trial, as well as the district court's jury

instructions, constructively amended the Indictment, which mandates reversal of

40

Gross' convictions.  At minimum, there was a prejudicial variance, which also warrants reversal.

While the District Court issued a lengthy opinion denying Gross' Rule 29 and 33 motions on constructive amendment and prejudicial variance grounds, A-4537, this Court reviews constructive amendment and variance claims *de novo*. *United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012).  In any event, as discussed more fully below, the District Court's opinion denying the motions contained numerous factual and procedural errors, and under a *de novo* review, a finding of constructive amendment, or at minimum, a prejudicial variance is warranted.

### A. The Indictment Was Constructively Amended

#### i.  Legal Standards

Under the Fifth Amendment to the United States Constitution, "a defendant has the right to be tried only on charges contained in an indictment returned by the grand jury." *United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997).  This right "limit[s] [a defendant's] jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." *Stirone v. United States*, 361 U.S. 212, 218 (1960).

A constructive amendment "is a per se violation of the Grand Jury Clause of the Fifth Amendment that requires reversal even without a showing of prejudice to

41

the defendant." *Milstein*, 401 F.3d at 65 (2d Cir. 2005). *See also United States v.*

*McKee*, 506 F.3d 225, 229 (3d Cir. 2007) ("a constructive amendment is an

exceptional category of error because it violates a basic right of criminal

defendants, the grand jury guarantee of the Fifth Amendment."). "To prevail on a

constructive amendment claim, a defendant must demonstrate that either the proof

at trial or the district court's jury instructions so altered an essential element of the

charge that, upon review, it is uncertain whether the defendant was convicted of

conduct that was the subject of the grand jury's indictment." *Milstein*, 401 F.3d at

65 (*quoting United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir.2003).[8] *See*

*also United States v. Roshko*, 969 F.2d 1, 5 (2d Cir. 1992) (constructive amended

occurs where proof at trial "broadens the basis of conviction beyond that charged

in the indictment.")

---

[8] Relying on *United States v. Mize*, No. 13-6558, 2016 WL 640636 (6th Cir. Feb. 18, 2016), the District Court suggested that, for constructive amendment to occur, there must be an alteration in *both* the evidence and the jury instructions. A-4597-98. The Second Circuit has never so held, and *Milstein* and other cases regularly state that constructive amendment occurs when "either the proof at trial or the district court's jury instructions" alter the indictment. *Milstein*, 401 F.3d at 65. *See also United States v. Zingaro*, 858 F.2d 94, 99 (2d Cir.1988) (constructive amendment when indictment altered "by prosecutor or court"). Indeed, this Court has expressly held in the variance context that there are circumstances when limiting instructions cannot cure the prejudice variance. See *United States v. McDermott*, 245 F.3d 133, 139–40 (2d Cir. 2001) (finding prejudicial variance even when limiting instructions were given.) In any event, as discussed below, the District Court's jury instructions did not appropriately define the core of criminality or cure the prejudice from the variance.

Whereas "an indictment drawn in more general terms may support a conviction on alternate bases," "an indictment with specific charging terms will not." *Zingaro*, 858 F.2d at 99. Particularly when conspiracies are charged, courts must be "vigilant to ensure that the government does not attempt to broaden the already pervasive and widesweeping nets of conspiracy prosecutions." *Roshko*, 969 F.2d at 4–5 (citation omitted); *see also United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988) ("[i]n order to avoid amending an indictment in violation of the Fifth Amendment, the government in fraud cases should think through the nature of the crime it wishes to allege and then spell out the offense in a carefully drafted indictment.")

### ii. The Indictment

On March 3, 2016, Gross was charged in an Indictment with co-defendants AM and Lebedev with one substantive count of accepting a bribe as an officer of a financial institution. *See* Dkt. No. 57 (the "S2 Indictment"). AM and Lebedev were charged with a conspiracy to bribe Gross, but Gross himself was not charged in a conspiracy.

Gross moved to dismiss the Indictment, or, alternatively, for a Bill of Particulars, because the Indictment did not charge him with conspiracy or any knowledge that CC was an unlawful Bitcoin exchange, and it was otherwise unclear how his conduct was corrupt. *See* Dkt. No. 140. The District Court

43

ordered the Government to provide Gross with a Bill of Particulars and specify which rules and regulations it alleged he violated because "specifying any such laws or duties is necessary to enable Gross "to prepare for trial [and] to prevent surprise." SPA-34. While the Government identified some NCUA regulations it alleged Gross violated, *see* Dkt. No. 565-1 at 2, the Bill of Particulars made no mention of NACHA, the Bank Secrecy Act, the Patriot Act or OFAC.

Gross was not charged with conspiracy until the S6 Indictment was filed on December 22, 2016, six week before trial. A-62-89. Despite adding Gross as a coconspirator, the "Bribery Scheme" in the S6 Indictment largely mirrored the conspiracy count against AM and Lebedev in the S2 Indictment, but added additional false statement and obstruction objects.

The S6 Indictment alleged that AM, Lebedev, and their co-conspirators acquired control of HFCU "in an effort to evade scrutiny from financial institutions…about the nature of Coin.mx and to facilitate the operation of an unlawful Bitcoin exchange," and Gross assisted them in exchange for bribes. A-67. Paragraph 14 alleged that, with the assistance of Gross, AM "installed his co-conspirators, including [Lebedev], on the Board of [HFCU] and transferred Coin.mx's banking operations to [HFCU]." A-68. And further that AM, Lebedev their coconspirators "operated [HFCU] as a captive bank for their unlawful Bitcoin exchange until at least late 2014." A-68.

44

Paragraph 15 alleged that Murgio, Lebedev, Gross and their coconspirators obstructed an examination of HFCU by the NCUA "in furtherance of the scheme to facilitate the takeover of HFCU," and gave the following examples:

  a.    MURGIO, LEBEDEV, and GROSS made material misrepresentations to, and withheld material information from, the NCUA concerning the installation of LEBEDEV and other Board members selected by MURGIO on the Board of [HFCU].

  b.    MURGIO and GROSS attempted to mislead the NCUA concerning the financial health of [HFCU] and the eligibility of LEBEDEV and the other Board members selected by MURGIO to serve as Board members of [HFCU].

  c.    In or about January 2015, MURGIO and LEBEDEV caused a letter to be drafted and sent to the NCUA, which was signed by LEBEDEV and two other co-conspirators not named as defendants herein, which falsely stated that the "Collectables Club" was "headquartered" in Lakewood, New Jersey.

A-68.

In Count Three, the statutory conspiracy allegations incorporated by reference paragraphs 12-15 describing the Bribery Scheme, and alleged that AM, Lebedev, Gross and others known and unknown conspired to commit offenses in violation of 18 U.S.C. 215(a)(1), 215(a)(2), 1001, and 1517, and cited the language of these statutes as objects. A-72-73. In paragraph 27, as overt acts, the government alleged that: AM and MM (referred to as CC-2), communicated with Gross "in an effort to take over control of the Board of HFCU in furtherance of Coin.mx's operations;" MM executed an agreement with Gross stating that CC

45

members would be nominated to the HFCU board; various payments were made and discussed; emails were sent by Murgio "in furtherance of the efforts of Murgio, Lebedev and other individuals to acquire and maintain control" of HFCU; and Lebedev signed a letter to the NCUA falsely stating that the CC was headquartered in Lakewood, New Jersey. A-75-77.

The S6 Indictment did not mention Kapcharge. There was only one mention of ACH that had nothing to do with the "Bribery Scheme." A-65. The "Bribery Scheme" did not make any reference to processing millions of dollars of ACH transactions for a Kapcharge client named Transferwise, a company with no affiliation to Coin.mx or CC, or any other businesses, including payday lenders.

### iii.     The ACH Processing Evidence, Arguments and Instructions

Despite the absence of any allegations about Kapcharge or ACH processing in the Indictment, the vast majority of the evidence against Gross at trial was about ACH processing for Kapcharge client Transferwise in 2014, and efforts made in 2015, after the falling out with CC, to continue processing ACH transactions for other Kapcharge clients with no affiliation to CC or Coin.mx.

Ten out of twenty trial witnesses testified about ACH processing. Hill testified extensively about posting ACH transactions for Kapcharge, the volume of transactions, and the relationship between HFCU and corporate partners Alloya and Magic Wrighter. Freundt testified about his concerns about whether ACH

46

transactions were properly being scrubbed against Office of Foreign Asset Control ("OFAC") lists.  A-1761-62.

Two witnesses from HFCU's corporate credit union, Alloya, and one witness from United Advantage Northwest Federal Credit Union testified exclusively about ACH processing for Kapcharge, particularly on behalf of Transferwise. *See also* A-4131 (call with Alloya representatives regarding Transferwise.)  A-2317-31. Steven Valentine testified about communications between Gross, the office of his Congressman and the NCUA related to ACH processing for Kapcharge in 2015, after Gross severed all ties with CC. A-2130-81. Four NCUA examiners also testified extensively about ACH processing for Kapcharge, *see e.g*., A-837-39; A-919-22; A-2093-210; A-2358-64 ; A-2659-63; A-2683-91, including Terence Adam, who testified about examinations related to ACH processing for Kapcharge in 2015 after the falling out.

The evidence failed to show that Gross had any knowledge that CC was a sham front-company for an unlawful Bitcoin exchange, A-1361-62, and not a single witness testified that any Bitcoin transactions passed through HFCU.[9]  Small

---

[9] The District Court erroneously concluded that it was "evident" that Coin.mx processed Bitcoin transactions through the credit union, A-4557, when not a single witness, included Wotherspoon and Hill, employees of Coin.mx, testified that this was true.  The District Court's conclusion that Bitcoin transactions were processed through the credit union was based upon pure speculation.  A-4557-58 (speculating that an individual named Phong Le processed Bitcoin transactions through the credit union.)

ACH transactions for CC accounted for approximately 1.5% of the total volume of ACH transactions processed by Kapcharge through HFCU, and the evidence only showed that these were payroll and invoice payments. A-4129; A-920-21; A-1141 (Hill testifying that the only types of ACH transactions he was aware of were direct deposits from an employer to an employee.); A-4523 (Kapcharge employee noting that CC "mainly ran payroll and invoice payment transactions through the CU.")

While there was evidence that Gross had heard of Coin.mx and generally knew that AM had an interest in virtual currency, *see* A-4347 and A-4349, even Freundt, a friend of AM who would later work for Coin.mx, testified that, when Freundt was involved with the credit union in 2014, he did not know that Coin.mx and CC were the same thing, and never told Gross that CC was a phony front company for an unlawful Bitcoin exchange. *See* A-2035; A-2011. Hill also never told Gross CC was a sham, or that Coin.mx was involved in illegal activity. A-1361-62.

In opening, closing and rebuttal, the government argued that the "*quid pro quo*" of the bribery scheme was not only accepting payments from CC in exchange for board control of HFCU to further Coin.mx's operations, but also accepting donations in exchange for allowing Kapcharge to process "tens of millions of

---

dollars in ACH transactions." *See, e.g.*, A-102-03 ("in return for paying for all that corruption, Kapcharge was going to run tens of millions of dollars in transactions through the credit union."); A-107-08 (Gross "worked to implement the plan to have the credit union process tens of millions of dollars in risky transactions for Kapcharge."); A-108; A-3665 ("one of the main thin[g]s that Gross…did while operating the credit union was to process lots of ACH transactions for Kapcharge."); A-3718; A-3907 ("What makes the defendants' conduct illegal is that the decisions were being made concerning the ACH processing and the board nominations as a result of the bribes.").

The government also argued that Gross "permitted Murgio and Lebedev to use the credit union for a huge volume of risky ACH transactions," not only "for Coin.mx's anonymous Bitcoins," but also "for TransferWise's international money-transmitting businesses, and for Wakpamni payday lending, all three things which pose a risk to [HFCU]."

The Government further argued that the alleged misrepresentations extended to Kapcharge, including "lies" "about what Kapcharge was, whether it was based in New Jersey, and what all those millions of dollars in transactions were for." A-104.

The government also heavily emphasized regulatory issues associated with ACH processing, including Bank Secrecy Act and OFAC violations, arguing that:

49

[T]here was absolutely no Bank Secrecy Act policies or procedures in place at the credit union…And HOPE FCU was doing this without even checking against that OFAC list. That's the Office of Foreign Asset Control, the list of individuals and entities that U.S. financial institutions are barred from transacting with due to terrorism concerns, sanctions, or narcotics trafficking. A-3708-09.

Gross raised issues with the difference between the charges in the Indictment and the case the government was seeking to prove multiple times pre-trial and throughout the trial, and sought to limit the testimony about ACH processing for Kapcharge on 403 grounds. *See, e.g.*, Dkt. No. 390 at 3 ("The conspiracy the government describes…is in essence a conspiracy to process ACH transactions for Kapcharge. This is not the charged conspiracy); A-1245-46 ("this kind of piling on about this issue about ACH processing raises serious 403 issues….Gross is not charged with negligently processing ACH transactions."); A-2575.[10]

---

[10] Though not finding waiver, the District Court faulted defense counsel for not raising constructive amendment in pre-trial motions *in limine*. A-4541-44. But Gross moved to dismiss the S3 Indictment, and expressly argued that the theory the government was seeking to prove was "not alluded to anywhere in the Indictment" and was a violation of Gross' grand jury rights. *See* Dkt. No. 174 at 5-6. Additionally, in the motions in limine, which were filed before decision on the motion to dismiss and before the conspiracy was charged, Gross raised the issue in the 403 context that ACH processing for Kapcharge in 2015 was "not probative of Gross' corrupt intent in 2014." Dkt. No. 203 at 12. The District Court's suggestion that defense counsel did not timely raise the issue, or conceded that the Indictment reflects the government's theories, thus has no support in the record. Additionally, a constructive amendment claim does not ripen until trial, as it turns on whether the evidence and arguments or the jury instructions <u>at trial</u> altered the Indictment.

Counsel also sought to have the conspiracy defined in the jury instructions to make clear that the conspiracy did not extend to ACH processing for Kapcharge, requesting that the conspiracy be defined as: "to facilitate the takeover of [HFCU] by CC in order to facilitate the operation of an unlawful Bitcoin exchange." A-2940. Alternatively, counsel requested that the Court simply direct the jury to the Indictment when defining the conspiracy. A-3264.

The government advocated for a much broader reading of the charged conspiracy, characterizing it as an "agreement among Lebedev, Gross, and their co-conspirators to make corrupt payments to Gross (and for Gross to receive such corrupt payments) in exchange for influencing the decision making of Gross in connection with the business of [HFCU]…." *See* Dkt. 430 at 7.

Resolving the dispute by broadening defense counsel's definition and narrowing the government's definition, the Court defined the conspiracy as: "conspiring with others, from in or about April 2014 to in or about 2015, to achieve four unlawful objectives in an effort to further the operations of Coin.mx or the Collectables Club." A-3947.

### iv. **Argument**

The evidence, arguments and jury instructions broadened the charges against Gross in numerous respects.

51

### a. The Quid Pro Quo Bribery Scheme Was Broadened

First, even though the evidence showed that Gross had no knowledge that Kapcharge would be processing such a large volume of transactions until months after he agreed to accept a $150,000 donation to his church, the government consistently referred to the donations in exchange for processing millions of dollars of ACH transactions as at the core of the *quid pro quo* of the bribery scheme. *See* A-102-103 ("Kapcharge was in on the bribery scheme, too. It actually funded most of the bribe payments and consulting fees to Gross. Now, in return for paying for all that corruption, Kapcharge was going to run tens of millions of dollars in transactions through the credit union.") (emphasis added); A-108 ("Kapcharge funded most of the corrupt payments that went to Gross and his church and…in return, the credit union had to process large volumes of Kapcharge's high-risk transactions.")(emphasis added). *See also* A-3640 (describing a scheme "so that Coin.mx could use [HFCU] as a captive credit union to process its financial transactions without having to use any banks, and a scheme that allowed for Kapcharge, a Canadian-based processing company, to run tens of millions of dollars in ACH transactions, including for Coin.mx, through that small credit union."). This distinct *quid pro quo bribery* scheme appeared nowhere in the Indictment.

52

The distinction between these two *quid pro quo* bribery schemes is not "trivial, useless, nor innocuous." *Stirone*, 361 U.S. 212, 217. There is a substantial difference between alleging that Gross accepted a donation from CC in exchange for board control of HFCU and alleging that he accepted a donation from Kapcharge, a payment processing business, in exchange for ACH processing. While the government devoted days to establishing that the CC was a phony front company for Coin.mx, and Coin.mx's sole business was to operate as an unlawful Bitcoin exchange, multiple witnesses testified that ACH processing is perfectly legal. Indeed, while Hill testified that he committed crimes at Coin.mx, he testified that he believed that ACH processing at HFCU was "perfectly legal." A-1441.

Witnesses testified that the only issue with ACH processing at HFCU was the volume of ACH transactions and the inadequacy of the compliance procedures at HFCU given the volume. But the evidence was also clear that there was never a plan by Trevon Gross to process such a substantial volume of ACH transactions in June 2014, the time by which Gross had agreed to accept the $150,000 in donations to his church. A-4136.

There is thus is a legal flaw and a logical disconnect in the government's allegation that Gross agreed to accept the June 2014 donations in exchange for allowing Kapcharge to process "tens of millions of dollars" in transactions for Kapcharge, when he had no knowledge that such a volume of transactions would

53

be processed through the credit union at the time the payment was accepted. The grand jury should have been permitted to pass on whether the government properly alleged an unlawful *quid pro quo* in the acceptance of a donation to a church in June 2014 when Kapcharge's intention of processing such a large volume of transactions in September-November 2014, if it actually existed in June 2014, was unknown to Gross.

Kapcharge also conducted business with the credit union, but no representatives of Kapcharge ever assumed a board position at HFCU. Thus in processing transactions for Kapcharge, both before and after the fallout between members of the CC and HFCU, Kapcharge never sought to "take over" the credit union. The government's evidence and arguments thus substantially broadened the *quid pro quo* bribery scheme charged in the Indictment.

### b. The Nature of the Alleged Improper Business Transactions at the Credit Union Was Broadened

In the Indictment, the government alleged a conspiracy to take over HFCU "to facilitate the operation of Coin.mx, an unlawful Bitcoin exchange," and further alleged that "Murgio, Lebedev and their co-conspirators operated [HFCU] as a captive bank for their unlawful Bitcoin exchange." But at trial, the government argued that there were improprieties with respect to three distinct lines of business for which Kapcharge processed ACH transactions, "Coin.mx's anonymous bitcoins,…Tranferserwise's international money-transmitting businesses,…and

Wakpamni payday lending, all three things which pose a risk to [HFCU]." A-3708

(emphasis added). None of these businesses, or any allegations about any

regulatory violations with respect to these businesses, appeared anywhere in the S6

Indictment. The processing activity for Transferwise is what drove the volume and

dollar amounts of the ACH transactions at HFCU, creating the risks that were the

subject of voluminous evidence at trial, and they were mentioned nowhere in the

Indictment. The ACH processing for Transferwise was also what raised concerns

from the NCUA about the Bank Secrecy Act, the Patriot Act, and the need to check

transactions against the OFAC list.

The government also made arguments and presented evidence that

Kapcharge was processing ACH transactions for payday lenders, another business

that was entirely distinct from the Bitcoin transactions at Coin.mx and governed by

different regulatory and reputational risks than Bitcoins. Again, there was no

mention of payday lending in the Indictment.

### c. The Nature of the Misrepresentations Was Broadened

In the Indictment, the government alleged that, "in furtherance of the scheme

to facilitate the takeover of [HFCU]," Murgio, Lebedev and Gross made material

misrepresentations to the NCUA about "the installation of Lebedev and other

Board members selected by Murgio on the board of [HFCU]," "and the "eligibility

of Lebedev and other Board members to serve as Board members of [HFCU]." S6

55

Indictment at 15(a)-(b).  But at trial, the government also argued that Gross lied "about what Kapcharge was, whether it was based in New Jersey, and what all those millions of dollars in transactions were for."  *See also* A-104.

Indeed, in closing arguments, the government discussed in detail Gross' "lie[] to the NCUA about [Kapcharge's] presence in Lakewood" over 10 transcript pages.  A-3734-44.  In rebuttal, the government also alleged misrepresentations about a payday lender not referenced in the Indictment:  "Was Gross acting in good faith when he violated the credit union's field of membership requirements by opening accounts for Collectables Club, and Kapcharge, and Wakpamni, that payday lender that was based in South Dakota, even though he knew they had no connection whatsoever to Lakewood, New Jersey?" (emphasis added).  A-3912.  These arguments and the evidence from which they were drawn impermissibly broadened the misrepresentations alleged in the Indictment.

The Indictment makes an allegation about misrepresenting the "financial health" of HFCU, but the allegation is made as an "example" of a misrepresentation made by AM and Trevon Gross "in furtherance of the scheme to facilitate the takeover of [HFCU]."   S6 Indictment ¶ 15(b).  The allegation does not mention Kapcharge or ACH processing for Transferwise.  Yet the evidence and arguments solely relate to Kapcharge's ACH processing activity for Transferwise.  Transferwise's business drove the volume of ACH transactions at HFCU, and it

was the volume of these transactions that raised concerns about the net worth ratio. Simply put, these allegations have nothing to do with the operations of Coin.mx or CC. *See* A-3758 ("they know if they actually reflect the true nature of Kapcharge's business, the capitalization ratio will be totally out of whack."); *id*. at A-3760 ("he's concerned about what the balances are going to look like in that Kapcharge account."); *id*. at A-3763 (all of this careful planning that he had done with Kapcharge, to make sure that they had that voided phone check of $619,000, the careful planning with Rico Hill to post that wire after the September 30th date, that was all for naught because Meg Flok saw the real financials at Kapcharge as of October."); *id*. at A-3764 ("This is a deliberate lie on the part of Trevon Gross, that required deliberate action on the part of him and others at Kapcharge, to manipulate the books, to keep from the NCUA the truth of what was going on at HOPE Federal Credit Union.")

### d. The Impermissible Broadening of the Allegations Constituted Constructive Amendment

Given the number of ways in which the evidence and arguments at trial broadened the allegations in the Indictment, Gross' case falls squarely in line with those Supreme Court and Second Circuit cases where a *per se* violation of the Fifth Amendment grand jury clause mandates reversal. *See e.g.*, *Stirone v. United States*, 361 U.S. 212, 217-18 (finding "fatal error" because it could not "be said with certainty that with a new basis for conviction added, *Stirone* was convicted

57

solely on the charge made in the indictment the grand jury returned."); *United States v. Zingaro*, 858 F.2d 94, 98 (2d Cir. 1988) (finding constructive amendment when "admission of evidence concerning a loan not specified in the indictment allowed the jury to find predicate acts of loansharking and unlawful debt collection that were not embraced by the specific charges of the indictment."); *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005) (indictment "charging Milstein with misbranding due to his repackaging of the drugs, was constructively amended when the Government alleged that the drugs were misbranded because they were not sterile.")

### e. The District Court's Definition of the Conspiracy Did Not Prevent Constructive Amendment

In its opinion denying Gross' constructive amendment claim, the District Court contended that its instruction defining the conspiracy as "conspiring with others, from in or about April 2014 to in or about 2015, to achieve four unlawful objectives in an effort to further the operations of Coin.mx or the Collectables Club," prevented any possibility of constructive amendment. A-3947. But the District Court's accompanying limiting instructions exacerbated the variance in proof instead of preventing constructive amendment. In addition to the limiting instruction discussed above, *see* Point II and A-3965, the District Court issued the following instruction related to Kapcharge evidence:

58

Acts and statements by Trevon Gross, Charles Blue, and other individuals affiliated with [HFCU], and Mark Francis, Shoula Cohen, and other individuals affiliated with Kapcharge that occurred after the date of the falling-out between Trevon Gross and the Collectables Club: (a) may be considered against Trevon Gross; and (b) may be considered against Yuri Lebedev only for whether the conspiracy charged in Count One existed and who its members were, but not for whether Yuri Lebedev knowingly participated in that conspiracy. A-3965-66.

While this instruction recognized that there were limits to the conspiracy that Lebedev was in with Kapcharge, it allowed for consideration of all evidence of ACH processing activity for Kapchage in 2015 as direct evidence of the conspiracy against Gross without limits. The District Court's limiting instructions, combined with the District Court's definition of the conspiracy as extending into 2015, after the falling out, obliterated any limitations on the conspiracy as defined by the District Court. The difference in the limiting instructions as against Gross and Lebedev show that, whereas Lebedev only had to defend against an alleged conspiracy to take over HFCU in furtherance of Coin.mx as charged in the Indictment, Gross had to defend against both an alleged conspiracy to take over HFCU in furtherance of Coin.mx/Collectables Club and a conspiracy to process ACH transactions for Kapcharge. The District Court's "prophylactic" jury instruction was therefore nothing of the sort, and did not adequately protect Gross' grand jury rights. A-4572.

59

## B. Alternatively, There Was a Prejudicial Variance

At minimum, Gross established a prejudicial variance. "A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003).

In order to reverse a conviction because of the existence of a variance, the variance must have caused the defendant "substantial prejudice" at trial. *United States v. McDermott*, 245 F.3d 133, 139 (2d Cir. 2001). In evaluating whether a defendant has been prejudiced by a variance, this Court consider several factors, including: (1) whether the court gave a *Pinkerton* charge; (2) whether statements of persons not in the conspiracy were used against the defendant; (3) whether there was prejudicial spillover due to a large number of joined defendants; and (4) whether any inflammatory or shocking evidence came in against the defendant. *McDermott*, 245 F.3d at 139.

While the government presented evidence at trial to establish what was in essence a conspiracy to process ACH transactions for Kapcharge, Gross suffered enormous spillover prejudice from allegations that he was in a conspiracy to facilitate an unlawful Bitcoin exchange scheme at HFCU. There were days of prejudicial evidence related to illegal activities at Coin.mx that had nothing to do with Gross' own conduct, but undoubtedly prejudiced the jury against Gross for

60

engaging in business with CC members, including allegations that Coin.mx defrauded banks, sold Bitcoins to customers to make illegal purchases on the dark net, and profited off of victims of ransomware. A-168-69; A-372. Gross, who knew nothing of this illegal activity, suffered from spillover prejudice.

Additionally, as set forth above, the variance also opened the door to the admission of numerous prejudicial "co-conspirator" acts and statements against Gross that were not made in furtherance of any conspiracy Gross was in with CC members.  *See* Point II.

Additionally, Gross suffered from unfair surprise at trial, as the trial was dominated by allegations related to regulatory violations, including the failure to conduct sufficient due diligence on ACH transactions, to scrub transactions against an OFAC list and comply with the Bank Secrecy Act, when the government did not identify these laws and regulations in its bill of particulars.

Thus, even under a variance standard, Gross' convictions must be reversed.

## IV.   The District Court's **Limitation** on Beyer's Examination Warrants Reversal

The District Court also committed reversible error in preventing defense counsel from questioning Special Agent Beyer about her prior inconsistent statements and potential bias on a critical issue in the case implicating the credibility of Freundt, one of the government's key cooperating witnesses.

61

### A. Legal Standards

The Supreme Court and the Second Circuit have repeatedly noted the importance of permitting defense counsel to question witnesses about their biases and truthfulness. *See Howard v. Walker*, 406 F.3d 114, 129 (2d Cir. 2005) ("while the right to cross-examination is not absolute, it is effectively denied when a defendant is prohibited from 'expos[ing] to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.'") (*citing Davis v. Alaska,* 415 U.S. 308, 318 (1974)); *United States v. Ghavami*, 23 F.Supp.3d 148, 165–66 (S.D.N.Y. 2014) ("The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" (*citing* 3A J. Wigmore, Evidence s 940, p. 775 (Chadbourn rev. 1970)); *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) ("a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness.[11] This Court reviews a District Court's limitation on the examination of witnesses for abuse of discretion. *In re Peters*, 642 F.3d

---

[11] While Beyer testified on direct after being subpoenaed by defense counsel, as opposed to cross-examination, she is nonetheless a government agent who gave testimony that rehabilitated a government cooperator, and the cases addressing the right of defendants to explore truthfulness and bias on cross-examination apply with equal force here.

381, 389 (2d Cir. 2011). The constitutionally improper denial of a defendant's opportunity to impeach a witness for bias is subject to harmless-error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* In evaluating harmless error, this Court considers a host of factors such as "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.*

This Court reviews a District Court's limitation on the examination of witnesses for abuse of discretion. *In re Peters*, 642 F.3d 381, 389 (2d Cir. 2011). The constitutionally improper denial of a defendant's opportunity to impeach a witness for bias is subject to harmless-error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* In evaluating harmless error, this Court considers a host of factors such as "the importance of the witness' testimony in the prosecution's case, whether the

63

testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id*.

### B. Beyer's Testimony Bore on A Critical Issue in the Case – The Credibility of Freundt, A Key Cooperator

The District Court denied Gross' right to examine witnesses by prematurely halting the questioning of Beyer, and preventing defense counsel from confronting her with her prior inconsistent statements.

Freundt was a crucial witness for the government as a CCBM, a participant in the recorded meeting, and, later, an employee of Coin.mx. He was the only witness who testified that he had a belief that the $50,000 payment from CC to Gross was a bribe around the time it was made, and he characterized Gross as "deceitful." A-2062-63. Freundt's credibility was critical to the case, and the government bolstered his credibility on direct by eliciting the fact that Freundt would be prosecuted if he committed perjury. A-1727.

During cross-examination, Freundt repeatedly testified that a government agent, Beyer, suggested to him that he should withdraw money from the Coin.mx bank account and "give yourself a nice little bonus." A-1913-15; A-1920.

Due to the highly unusual circumstance of a federal agent telling a government cooperator to take money from the bank account of an illegal business

64

it was in the process of shutting down, questions were raised by the District Court

and defense counsel about whether Freundt had committed perjury. At the District

Court's urging, the government investigated the matter, and in an agent report

produced by the government on March 4, 2017, the last week of trial, the

interviewing agent noted that "Beyer stated that she would not have instructed

Freundt to take any money from Coin.mx." A-3536.

In light of the agent report demonstrating that Freundt gave sworn testimony

that was directly inconsistent with the recollection of a federal agents, defense

counsel sought the testimony of Beyer to impeach Freundt. In ruling to permit the

defense to call Beyer, the Court recognized the significance of Freundt's

testimony. Specifically, the Court stated:

> Freundt's testimony is highly significant to the government's case and touches
> on the guilt of both defendants. Evidence showing not only that Freundt, a
> key cooperating witness for the government, did not tell the truth on the
> witness stand, but specifically that he said something not true about
> government agents telling him it was appropriate to raid the bank account of
> a company about to be shut down for illegal activity is highly probative.

A-3122. *See also* A-2762 (District Court: "the truthfulness of the cooperator

clearly matters to this trial, I have no doubt about that."); *id*. at A-3004 ("it is

relevant and appropriate[] for the jury to consider… whether a key cooperating

witness testified falsely.")

65

### C.     The District Court's Limitation on the Examination of Beyer

In the District Court's order permitting the defense to call Beyer, the District Court limited the questioning to "extracting what [Beyer] recalls and what she would say about whether she encouraged and suggested to [Freundt] that he help himself to a nice little bonus from the bank account of Coin.mx before it was shut down." *Id*. at A-3123.

Beyer was called by the defense and briefly testified on March 8, 2017. Beyer made several statements that were inconsistent with the agent's reports of her interview the previous weekend. Specifically, she was asked whether she instructed Freundt to remove, transfer or take any money from any Coin.mx related accounts for any reason. A-3545. Whereas to federal agents she unequivocally stated "no" to this exact question, *see* Ex. J, at trial she stated:

> It's not an easy yes-or-no answer…I would not have told him to take money if that was not part of his job responsibilities. But…we were not shutting down the business. I would have told him to continue whatever his duties were. If his duties were to move money, I wouldn't have said anything about it but I would have told him to continue with his duties. I would not have directed him to do something that he normally not [sic] would have done.

A-3545-46.

Despite arguments and objections by defense counsel, the Court would not permit any further questioning based on the facial inconsistency between the agent's report and Beyer's testimony, or any inquiry into whether Beyer had been

informed about Freundt's prior testimony or could have been biased. A-3549. The

jury was thus left with the impression that Freundt's testimony was based on a

mutual mistake or misunderstanding, as opposed to a lie. A-3548.

The District Court's reasoning in limiting further questioning of Beyer

makes clear that the District Court resolved a credibility question about Beyer's

testimony in the government's favor based on material that was not available to the

jury, and in doing so usurped the role of the jury. A-3549 (District Court

concluding it was a misunderstanding based on "the host of information and

material" she considered.)

The District Court's limitation on defense counsel's questioning of Beyer

was error, and the jury should have been permitted to evaluate the credibility of

both Freundt and Beyer after more complete questioning from defense counsel and

an opportunity to confront Beyer with her prior inconsistent statements and explore

her potential biases.

### D.    The District Court's Error Prejudiced Gross

While limitations on the questioning of witnesses are subject to a harmless

error analysis, in this case, as the District Court recognized in permitting Beyer's

testimony in the first place, Freundt was a key cooperating witness and was

"highly significant to the government's case and touche[d] on the guilt of both

67

defendants," and a perjured statement, if proven, would have been "highly probative." A-3122.

The district court's erred permitted the government to rehabilitate and bolster Freundt's testimony. In rebuttal summations, the government argued:

> [Beyer] told you that although she doesn't have a specific recollection, she would have told Freundt that he could carry out transactions that he would have done in the normal course of business. Mr. Freundt interpreted that, apparently, as authorization to pay himself the salary that he was owed.

Since further testimony from Beyer consistent with her prior statements to agents would have exposed Freundt's perjury, and instead Beyer's testimony rehabilitated Freundt, Gross was prejudiced by the error.

## V. Government Intimidation of Witnesses from HFCU and Hope Cathedral Deprived Gross of a Fair Trial

The government engaged in tactics before and during trial to systematically prevent the LBMs, HFCU CEO Charles Blue and Loretta Larkins from testifying and corroborating Gross' good faith defense in violation of Gross' due process rights. The absence of corroborating defense witnesses due to these tactics fundamentally compromised the fairness of Gross' trial, warranting reversal.

### A. Legal Standard

"It is elementary that criminal defendants have a right to establish a defense by presenting witnesses." *United States v. Williams*, 205 F.3d 23, 29–30 (2d Cir. 2000) (*citing Webb v. Texas*, 409 U.S. 95, 98 (1972)). This includes "the right to

present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Id.* *(citing Taylor v. Illinois*, 484 U.S. 400, 409 (1988)).

This Court has explained that: "prosecutorial intimidation that dissuades a potential defense witness from testifying for the defense can, under certain circumstances, violate the defendant's right to present a defense." *Id.* *See also United States v. Pinto*, 850 F.2d 927, 932 (2d Cir. 1988).

In order to establish a violation of the right to present a defense, a criminal defendant must generally show:  1) that he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means; 2) bad faith on the part of the government; and 3) that the acts complained of were "of such quality as necessarily prevent[ed] a fair trial." *Williams*, 205 F.3d at 29–30. All of these elements are met here.

"Because the existence of substantial interference is a factual question," a District Court's decision will only be reversed if it is "clearly erroneous." *Pinto*, 850 F.2d at 932.  Because witness intimidation raises "an allegation of constitutional error," this Court "may affirm only if [the] error is harmless beyond a reasonable doubt." *Id.* at 933.

69

B.     **Factual and Procedural History**

The government evidenced an intent to distort the truth-seeking function of

Gross' trial even before trial began by selectively choosing which LBMs it

intended to call, offering them the potential for a non-prosecution agreement, and

claiming that similarly-situated witnesses who were more helpful to Gross had

criminal exposure.

Before trial, the government wrote an email to Cedric Ashley, the attorney

representing Hope Cathedral and the LBMs.  *See* Ex. D to Dkt. No. 388.  The

email served trial subpoenas on four of the LBMs, the Wyatts and the Purrys.  The

government also asked to speak to Ashley about the status of the Purrys "in light of

admissions they made to us during interviews and in the grand jury concerning

their knowledge of the illegal payments to HOPE Cathedral in connection with the

takeover of [HFCU] by the Collectables Club."  *See* Ex. D to Dkt. No. 388.

(emphasis added).  Ashley interpreted this as a threat of criminal exposure for the

Purrys, despite the fact that they received no personal benefits from the donation,

and he accordingly requested immunity for the witnesses.  *Id.*

In subsequent conversations with Ashley, the government discussed the

possibility of non-prosecution agreements with the Purrys to obtain their

testimony, but did not make a comparable offer to other similarly-situated

70

witnesses, who were also aware of the donation but were more helpful to Gross, including Bernard Larkins and Joseph Lane. *See* Dkt. No. 383 at 8.

As the government was well aware, a key element of Gross' good faith defense was that he disclosed the donations to the LBMs, in a sign that he was not acting with a corrupt intent or hiding anything, and he believed the donations were proper. The Purrys were aware of the donation, but had critical limitations as witnesses, including lapses in memory as to the amount and purpose of the donations, and they were also missing from key meetings. CA-3-5; CA-8. Joseph Lane and Bernard Larkins, on the other hand, were aware of the donations, but had much more mitigating information that corroborated Gross' good faith defense. CA-11-13; CA-15-21.

On January 31, 2017, defense counsel filed a motion alerting the Court that the government had intended to offer non-prosecution agreements to some witnesses and not others, and requested that other LBMs and Blue be given use immunity to testify at trial instead of permitting the government to gain a tactical advantage by selectively immunizing the witnesses it had chosen and presenting a distorted narrative. *See* Dkt. No. 375 at 2.

In response, the government acknowledged that it had discussed the possibility of non-prosecution agreements for the Purrys with Ashley, but argued that it had not yet given non-prosecution agreements to them, so it had not yet

71

formally immunized anyone, much less selectively immunized them. *See* Dkt. No. 383 at 8. Additionally, the government argued that the testimony of Lane and Larkins would be cumulative to that of the Purrys, and Larkins and Blue faced potential exposure relating to alleged misstatements to the NCUA. Dkt. No. 383 at 10. Accordingly, the government opposed the motion.

Notably, in its letter brief, the government expressly stated that it intended to call the Wyatts, the Purrys and DeSilva as witnesses at trial. *See* Dkt. No. 383 at 8. The government noted that, since the Wyatts and DeSilva were "unaware of the payments from [CC] to HOPE Cathedral" they "could testify without invoking their Fifth Amendment privilege against self-incrimination." *See* Dkt. No. 383 at 9 n.11. After further briefing, the District Court denied the defense request for use immunity for Gross' defense witnesses. A-93.2-93.4.

## C. The Government's Efforts to Gain an Unfair Strategic Advantage at Trial

Although the Wyatts, the Purrys and DeSilva had been on the government's witness list, the government made a strategic decision on February 28, 2017, in the third week of trial, that it did not intend to call any LBMs in its case-in-chief. A-2117.

While the Government had raised the possibility that Ashley might have a conflict requiring a *Curcio* hearing in its February 6, 2017 letter opposing defense counsel's request for use immunity for its witnesses, the government never asked

72

for a *Curcio* hearing when the LBMs were on the government's own witness list.

Instead, the government waited until March 1, 2017, after the defense indicated

that it would call these board members as witnesses on behalf of Gross to request a

*Curcio* hearing, and to inform the Court and the defense that they had changed

their position, and now the government believed that the Wyatts, too, also had

criminal exposure.

Defense asked for a representation as to which LBMs the government

believed had exposure, and the government acknowledged that "we had

represented that the Wyatts would potentially not be exposed," but had changed its

position in prepping for trial based on alleged misrepresentations in minutes

certified by Delores Wyatt. A-2388. The government stated that the "only one

that we don't think at this point has any exposure is DeSilva" because he did not

know about the donation and was not involved in misrepresentations to NCUA. A-

2388. The government specifically carved out Loretta Larkins as being a witness

who was not on the board of HFCU, so was not among the people who had

potential criminal exposure. A-2390.

After court on March 1, 2017, the District Court issued an order outlining

the procedural history in the case and ordering a *Curcio* hearing for any LBMs

who wished to testify to resolve the perceived conflict of Ashley representing the

church and the LBMs. *See* Dkt. No. 422. The order generally required the

73

potential witnesses to come to Court on March 3, 2016 to consult with conflict-free

counsel if they wished to testify, but also repeatedly noted in stark terms the

Government's belief that these potential witnesses faced criminal exposure.

The order noted that the Government had taken the position on February 6,

2017 that "the former board members, and [HFCU]'s former CEO, might face

criminal exposure of relevance to any prospective testimony they might offer."

(emphasis added). *See* Dkt. No. 422. n

> The Court further noted that the:
>
> Government indicated that it no longer intended to call any members of the [HFCU] Board, or [HFCU]'s former CEO, in its case-in-chief, or offer them non-prosecution agreements or use immunity. On March 1, 2017, counsel for Gross indicated that he may call all of the [HFCU] Board members, and [HFCU]'s former CEO, Charles Blue. In response, the Government again noted its belief that many of the prospective witnesses could face potential criminal exposure….Dkt. No. 422 at 2.

The Court then ordered that defense counsel serve all witnesses with trial

subpoenas by March 2, 2017 ordering that they appear in court by March 3, 2017 if

they wished to testify, and serve the Order itself, including the warning that the

witnesses faced potential criminal exposure, on all potential witnesses who faced

the potential conflict. Dkt. No. 422 at 2.

On March 3, 2017, the morning after the trial subpoenas and the District

Court's order were served on the potential witnesses, defense counsel was

informed that none of the witnesses would be appearing in court or testifying. A-

2401. The Government and the Court's order had intimidated all of the LBMs and Blue from testifying.

With all of the LBMs and Blue opting not to testify for fear of criminal exposure, the only remaining substantive witness the defense intended to call was Loretta Larkins. Despite having taken the position on March 1, 2017 that Loretta Larkins had no criminal exposure because she was not involved with the credit union, the government changed its position, and on March 3, 2017 suddenly took the position that Loretta Larkins too had criminal exposure.

The government argued that Loretta Larkins faced potential criminal exposure, not with respect to the underlying charges, but with respect to tangential issues, such as preparing Gross' W-2s and signing loan documents on behalf of the church. A-2450-51. In light of the government's sudden change in position about Loretta Larkins's alleged potential criminal exposure, defense counsel renewed Gross' request that these witnesses be given use immunity, a non-prosecution agreement or otherwise be permitted to testify. *See* A-2453-54.

Defense counsel also pointed out that the government had offered non-prosecution agreements to witnesses on the Coin.mx side of the business, including Wotherspoon, who had committed serious crimes, and yet suddenly took the position that every LBM, Blue and Loretta Larkins all had criminal exposure and jeopardized themselves by testifying. A-2453-54 ("Ms. Wotherspoon stood up,

75

and testified and said, I am Coin.mx, and she got a nonprosecution agreement. And Loretta Larkins did his W-2s, and she has criminal exposure? It is gamesmanship.")

Defense counsel renewed the motion for immunity for Gross' defense witnesses and the District Court denied the motion finding that "there's just simply no basis to conclude that the government is engaging in any kind of outrageous conduct here." A-2461-63.

Loretta Larkins, who had every intention of testifying on behalf of Gross from the outset of trial and through the last week of trial, was intimidated from testifying after hearing of the exposure she faced. A-3246, A-3282.

## D. Argument

The government's witness intimidation in this case violated Gross' right to present a defense.

### i. Gross Was Deprived of Material and Exculpatory Evidence That Could Not Be Obtained Elsewhere

There were several key components to Gross' good faith defense that only Loretta Larkins, the LBMs and Blue could corroborate.

While the government introduced the unnoticed expert testimony of Rollins to establish that Gross personally benefited from the CC payments, Loretta Larkins could have testified that all of the funds were used to benefit Hope Cathedral. *See*

76

Dkt. No. 611 (*citing* 3554-01 at 5 "The $150,000 that was deposited into HOPE CATHEDRAL'S operating account did not pay Gross' salary, pay Gross' unpaid salary, or benefit Gross personally. The money was used solely to benefit HOPE CATHEDRAL.")[12]

Other LBMs were also critical to corroborate Gross' good faith defense, including Gross' belief that CC was a legitimate memorabilia association that would benefit the credit union by bringing its members, resources and technology.

Lane was aware of the donation to the church and participated in meetings and votes. He could have testified that the donation was discussed at a HFCU board meeting and: "the HFCU BOD felt [the donation] was appropriate because anyone could make a donation to the church. The donation would be made to the church because the church occasionally provided financial assistance to HFCU when HFCU needed funds to maintain certain ratings." CA-12.

Lane was also on the loan committee, so he knew of the church's ongoing payment of defaulted loans at the credit union. He also would have testified that CC would "help the credit union expand their membership and product lines," and he "believed that it was natural for members of [CC] to join [HFCU] because [CC] was more capable with technology, and its members had the largest interest in the HFCU." CA-12.

---

[12] 3554-01 was given to the District Court for review. Dkt. No. 583.

Bernard Larkins was also familiar with the credit union's strategic plan, including the goal of increasing membership, and could have testified that CC "could bring back-office technology to [HFCU] (specifically, debit cards)," and AM "did not mention anything about Bitcoins." CA-16. Bernard Larkins was also aware that CC contributed money to set up ATM cards. He also explained the donation as AM "wanting to give a gift to Hope Cathedral…because of what the church had done to support the credit union in the past" and he could have articulated specific financial contributions the church made to the credit union including guaranteeing credit union loans. CA-17.

Blue could have testified that, prior to working a HFCU, he had no knowledge that CC or Kapcharge had given a donation to Hope Cathedral, so he could not have been influenced by it, and everything done with Kapcharge was at arm's length. CA-23; 27. He also could have testified to the extensive diligence he did to bring HFCU into compliance, and to the fact that Gross stepped back from the credit union in 2015 when Blue became CEO. CA-28.

George and Delores Wyatt were present at the November 15, 2014 board meeting and could have testified that CC board members were in fact moved to an advisory board, an issue that was disputed at trial, with the suggestion raised that the minutes had been doctored. A-1269.

78

**ii.    The Government's Tactics Before and During Trial Evidence Bad Faith**

The government's evolving positions on the potential criminal exposure of witnesses with favorable information to Gross, and the government's strategic timing in raising the issues, evidence the government's bad faith. Even before trial, it was evident from the government's attempt to offer non-prosecution agreements to the Purrys rather than to more favorable witnesses to Gross, that the government was trying to hamper Gross' witnesses from testifying and distorting the truth.

As of February 27, three weeks into trial, the Purrys and the Wyatts were on the government's witness list. As of March 1, 2018, the Government took the position that every LBM– except one with limited knowledge of the issues at trial – had criminal exposure and should consult with independent lawyers if they wanted to testify. *See* A-2388.

The government's shifting positions on Loretta Larkins's criminal exposure also evidences bad faith. On March 1, 2017, the government specifically carved out Loretta Larkins as being a witness who was not on the board of HFCU, so she did not have criminal exposure. A-2390. On the next trial date, days before the government rested and the defense case began, the government suddenly took the position that Loretta Larkins too had criminal exposure. A-2403. This is the case even though the government was aware from Gross' opening statement that Loretta

79

Larkins would testify and had previously interviewed her and were well aware of what testimony she would provide. *See* A-3319; A-3766.

The government also took the position before trial that Blue was a co-conspirator and therefore had criminal exposure so he could not testify, but bolstered Blue in summations, and claimed that he too was a victim of Gross' lies, and was kept in the dark about misrepresentations made to the NCUA on behalf of Kapcharge until at least April 2015. A-3765-68. The government's argument that Blue was kept in the dark demonstrates that it never had a good faith belief that Blue was criminally exposed.

The government's bad faith is also evidenced by the fact that, to date, after securing Gross' conviction in a lopsided trial devoid of any corroborating witness, the government has not brought a single criminal charge against Blue, Loretta Larkins or any other LBMs, nor would there be any basis to do so.

iii.    **The Government's Tactics Prevented a Fair Trial**

The government's tactics were "of such quality as necessarily prevent[ed] a fair trial." *Williams*, 205 F.3d at 29–30.

First, the government exploited the absence of corroborating evidence as to Gross' good faith in its summation. The government was well aware that Loretta Larkins, as the church's bookkeeper, would have been in a position to testify that Gross did not use the donations from the Collectables Club to benefit himself, and

80

she and other witnesses including Lane would have been able to testify that the

church in fact paid expenses for the credit union over the years.

Nonetheless, after having procured the absence of corroborating witnesses,

the government argued in rebuttal summations:

> Trevon Gross told you that the church had paid credit union expenses. There's no evidence of that. There is no documentary evidence, not a shred, to support Gross' testimony that the church had paid $150,000 in expenses for the credit union. <u>All you have is the word of Trevon Gross</u>. And, as you saw in his answers that he gave on cross-examination, you can't trust a single word that man says.  A-3909.

Not only was this impermissible burden shifting, but it was misconduct to

comment on the absence of corroborating evidence when the government went to

such great lengths to prevent all LBMs and Larkins from testifying and

corroborating Gross' defense.  In *United States v. Golding*, 168 F.3d 700, 705 (4th

Cir.1999), the Court reversed a conviction where the government intimidated a

witness from testifying and the "prosecutor further abused her power by

commenting on the witness's failure to testify."  The Court noted that "[t]he

authorities are uniform that threatening a witness with prosecution and comment

about the absence of a witness who has a privilege not to testify are a violation of

the Sixth Amendment right of a defendant to obtain witnesses in his favor."

*Golding*, 168 F.3d at 703.

Without any LBMs or Blue available to corroborate Gross' testimony that he

thought the business transaction with CC and ACH processing would have benefits

81

to the credit union, the government also argued that: "[t]his deal did not benefit the credit union or its members at all. This was Gross selling out the credit union and its members to Lebedev, and Murgio, and the others, so that they could use it to process transactions for Coin.mx." A-3907. And further, "for Gross, it was also about the money, to secretly make money for himself and his church by selling out the credit union." A-3907.

In a case that turned on whether Gross was acting with a corrupt intent, the jury's inability to hear testimony from key witnesses who could have corroborated Gross' good faith defense and countered the government's devastating narrative undermined the fairness of the trial, warranting reversal.

## VI. The District Court Erred In Admitting Unnoticed 404(B) Evidence Related to Insider Loans

Pursuant to Federal Rule of Evidence 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, the evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed.R.Evid. 404(b). *See also United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011). ("'Other act' evidence serves a proper purpose so long as it is not offered to show the defendant's propensity to commit the offense.") If used for such a purpose, the government must provide notice to the defense "before trial

-- or during trial if the court, for good cause, excuses lack of pretrial notice." Fed.R.Evid. 404(b)(2)(B).

In determining whether a district court committed error in introducing 404(b) evidence, this Court considers "whether: (1) it was offered for a proper purpose; (2) it was relevant to a material issue in dispute; (3) its probative value is substantially outweighed by its prejudicial effect; and (4) the district court gave an appropriate limiting instruction to the jury if so requested by the defendant." *United States v. Scott*, 677 F.3d 72, 79 (2d Cir. 2012). When no limiting instruction is requested, the Court limits its analysis to the first three factors. *Id.*

"The district court abuses its discretion when it admits 'other act' evidence with a high possibility of jury misuse but with only slightly more probative value than other evidence on the same issue." *United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011).

If the district court erred, this Court must determine whether the error was harmless, by evaluating factors including: "whether the testimony bore on an issue that is plainly critical to the jury's decision, whether that testimony was material to the establishment of the critical fact or whether it was instead corroborated and cumulative, and whether the wrongly admitted evidence was emphasized in arguments to the jury," and "the strength of the government's case." *Curley,* 639 F.3d 50, 58 (2d Cir. 2011). Unless there is "fair assurance" that "the judgment was

83

not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

Here, the government elicited testimony from NCUA examiner Meg Flok about negative share balances in the Hope Cathedral HFCU account, and an insider loan taken out by Hope Cathedral to cover these negative share balances. No 404(b) notice was given relating to this testimony. Gross repeatedly objected to this line of questioning, and the District Court permitted the inquiry, even though the government's proffered purpose for offering the testimony – to establish that Gross had control over the Hope Cathedral HFCU account – was not in dispute. See A-2236-42; A-2350-54.

After the government was permitted to inquire about this loan over Gross' repeated objections, defense counsel briefly cross-examined Flok for the limited purpose of establishing that the loan had been approved by the HFCU board, and Flok herself had not examined the loan files, so was not testifying based on personal knowledge. A-2289-93.

The government then sought to introduce additional loan files for Gross and Larkins through a second witness, NCUA examiner Adam, because "[t]hese documents will tend to show Trevon Gross' control over that account." A-2623. Defense counsel objected again to the introduction of the loan files because the

84

issue of whether Gross had control over Hope Cathedral's HFCU account were not in dispute, there was no 404(b) notice given, and it was unduly prejudicial. A-2624-29. The district court overruled the objection, and permitted Adam to testify about the insider loans, suggesting that it was defense counsel that opened the door by pursuing a limited cross-examination of Flok to address issues introduced over defense counsel's objection. A-2674-82.

While the government purported to rely upon these loans to show Gross' control over the HFCU accounts, the government's true intention of using this evidence was revealed in the government's sentencing submission, where the government described the insider loans as "additional deceitful conduct." *See* Dkt. No. 587 at 12 ("Gross engaged in additional deceitful conduct. Specifically, Gross arranged for himself and Bernard Larkins, the Chief Financial Officer of HFCU and a member of Hope Cathedral, to take out "insider" loans from the credit union without obtaining the necessary approvals from the loan officer or conducting any proper underwriting.") This evidence had the sole impact of tarnishing Gross' reputation, and was used for an improper propensity purpose.

In sum, the district court erred in permitting the government to introduce unnoticed 404(b) evidence. While the government and the District Court contended that Gross opened the door to this questioning, that was error, as Gross repeatedly objected to the introduction of the evidence in the first place and

85

narrowly crossed Flok about her own personal knowledge. The error had the intended effect of establishing that Gross was deceitful and took money from the credit union for his personal gain. This evidence bore directly on Gross' character, and should never have been introduced. In a case that bore on whether Gross was acting in good faith this was enormously prejudicial.

## VII. The Cumulative Trial Errors Deprived Gross of a Fair Trial

Even if this Court were to find that the above trial errors did not, standing alone, deprive Gross of a fair, the cumulative trial errors amounted to a violation of due process requiring reversal of Gross' conviction.

The "cumulative effect of a district court's errors, even if they are harmless when considered singly, may amount to a violation of due process requiring reversal of a conviction." *United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008). *See also United States v. Guglielmini*, 384 F.2d 602, 607 (2d Cir. 1967) (although no error singly would have required reversal, finding that "the total effect of the errors…was to cast such a serious doubt on the fairness of the trial that the convictions must be reversed").

The errors in this case all bore on the single contested issue in this case – whether Gross was acting in good faith.

86

- The Rollins testimony allowed the government to repeatedly argue that Gross pocketed the donation money and used it on frivolous purchases, a refrain that was echoed in openings and closings.

- The improper admission of co-conspirator statements established that Gross was "money hungry," and "shiesty," and the "donations" he professed to believe were legitimate constituted "bribery"

- The variance from the Indictment allowed for voluminous evidence related to uncharged conduct that overwhelmed the trial and confused the issues for the jury, and the admission of these hearsay statements.

- The undue limitations on the cross of Beyer bolstered the testimony of Freundt instead of exposing his perjury and theft from the Coin.mx bank account, when Freundt testified that it was Gross who was deceitful, and that the term donation should be equated to bribery.

- The intimidation of Gross' witnesses prevented any corroboration of his good faith defense, and any counter-weight to the depiction by CC members of Gross as "money hungry and shiesty."

- The unnoticed 404(b) evidence on an undisputed issue relating to insider loans suggested that Gross used deceitful conduct to steal from the credit union.

87

These errors combined to severely undermine Gross' good faith defense and deprive him of a fair trial.

## VIII.  The District Court Erred At Sentencing

This Court reviews all sentences using a "deferential abuse-of-discretion standard." *United States v. Dorvee*, 616 F.3d 174, 179 (2d Cir. 2010).

### A.  The District Court Erred In Imposing a 4-Level Leadership Enhancement

The parties disputed whether a 4-level leadership enhancement should be applied against Gross.  Probation found that a leadership enhancement role was not warranted because Gross "became involved in the instant offense through his co-defendants' efforts to acquire [HFCU] in an attempt to evade scrutiny from financial institutions...Gross did not organize the instant offense and did not control his co-defendants' actions."  Presentence Report ¶¶ 22-23.

The District Court imposed the 4-level leadership enhancement, reasoning that, even though Gross did not originate the scheme, he:  had a leadership and supervisory role at the credit union; he supervised Hill in ACH processing; he continued as Chairman of HFCU after CC members were elected; he raised issues with the appropriate capitalization ratio for ACH processing with co-conspirators and "suggested they take steps to hide the true net worth ratio;" he "repeatedly met with the NUCA;" and Hill testified that he needed Gross' approval to raise the limits for ACH processing.  A 4077-78.

88

Applying a 4-level leadership enhancement was an abuse of discretion. The evidence was clear that Gross and HFCU were targeted by AM and MM and key aspects of their motivations and plans were kept from Gross. See A-4271 (purporting to be representing a memorabilia association). With regard to ACH processing, even the District Court recognized in its order denying Gross' post-trial motions that "Murgio was the key driving force in pushing the credit union to process these ACH transactions." A-4557. Gross repeatedly urged CC members to be less aggressive with ACH processing, as confirmed by both Hill and Freundt, and his pleas were ignored. A-1432 (Hill testifying that Gross was the only one trying to ensure the credit union remained compliant.); Tr. 2260 ("from conversations with [G]ross, every time he expressed that we were going too fast."); A-4574 (Email from Gross to AM and Hill, "Please can we not be this aggressive !!!!.") When AM and Gross had a falling out, all CCBMs left with AM, demonstrating that they were operating under AM's leadership. The evidence failed to show that Gross was the leader of any conspiracy to further the operations of Coin.mx or Collectables. It was therefore an abuse of discretion to conclude that a 4-level leadership enhancement was warranted.

B. **The District Court Erred In Finding That The Offense Conduct Jeopardized the Safety and Soundness of a Financial Institution**

The District Court elevated Gross' base offense level to 24 pursuant to U.S.S.G § 2B4.1, reasoning that the:

89

ACH transactions which were indeed part of the conspiracy as narrowly defined by the Court insofar as they were in furtherance of and caused by the central *quid pro quo* arrangement created a substantial risk of insolvency in two senses. First, they created a substantial risk of insolvency because the credit union lacked capitalization to cover those transactions; and, second, they created such a risk because the credit union faced extensive fines for violations of relevant regulations. So, as a result, the offense level does indeed rise to 24.

The District Court's decision turns on a finding that processing large volumes of ACH transactions for Kapcharge from September to November 2014 was a part of the "central *quid pro quo* arrangement" of the bribery scheme. But any of the risks created by ACH processing were unknown to Gross when he accepted donations to HFCU in June 2014. The District Court also points to hypothetical fines for violations of "various regulations," but any hypothetical fines would arise out of the ACH processing activity, which, again, was unknown to Gross in June 2014. In any event, no fine was ever imposed on HFCU for any of the processing activity, and the government has never established that a fine was warranted.

By the time of the falling out in November 2014, when the other payments in the Indictment, one $6,000 payment and other $50,000 attempted payments, were made, the credit union was no longer processing ACH transactions. A-76. U.S.S.G §2B4.1 must be applied to the bribery objects of the conspiracy, and here, there was no evidence that the *quid pro quo* arrangement jeopardized the safety and soundness of a financial institution within the meaning of § 2B1.4.

90

## C.     The District Court Erred In Finding That Gross Abused a Position of Trust

The district court imposed a two-point enhancement pursuant to U.S.S. G. 3B1.3, reasoning that Gross abused his position of trust:  1) relative to members of the credit union "by allowing himself to be influenced by those payments to make decisions that jeopardized the safety of the credit union in violation of his fiduciary duties;" and 2) relative to the NCUA because "the NCUA, which is a public regulatory body, cannot do its job effectively and insure member deposits if examiners can't rely on the information that they're being provided [by] credit unions."

The District Court's decision was in error because the evidence was clear that, at the time Gross accepted the $150,000 donations, he did not even know that Kapcharge would be processing such a large volume of ACH transactions, so he did not have the intent to be influenced in an activity that jeopardized the safety of the credit union when he took the payments.  Additionally, Gross was in an arm's length relationship with the NCUA as HFCU's regulator, and this relationship could not have created a position of trust.  *United States v. Huggins*, 844 F.3d 118, 124–25 (2d Cir. 2016) ("[w]hether a position is one of 'trust' within the meaning of § 3B1.3 is to be viewed from the perspective of the offense victims....A purely arm's-length contractual relationship between the defendant and the victims does not create a position of trust.")

91

## IX.    The District Court Erred In Imposing Restitution For Losses Related to the Liquidation of HFCU

Restitution orders are reviewed for abuse of discretion.  *See United States v. Cuti*, 708 F. App'x 21, 23 (2d Cir. 2017).  A district court abuses its discretion when it exceeds its statutory authority to award restitution.  *Id*. at 24.

The government sought restitution against Gross for costs relating to the liquidation of HFCU in November 2015, nearly a year after the falling out.  In doing so, the government relied upon the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, and the Victims and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663.  These statutes delineate specific categories of loss for which restitution may be assessed, and no other harms are compensable as restitution.  *See United States v. Maynard*, 743 F.3d 374, 379 (2d Cir. 2014) ("Because courts have no inherent authority to order restitution, Congress must provide the authority.").

Under both the MVRA and the VWPA, the losses the government claims must be the "direct and proximate result" of the offenses of conviction.  *See* 18 U.S.C. § 3663A(a)(2) ("victim' means a person <u>directly and proximately</u> harmed as a result of the commission of an offense for which restitution may be ordered"); 18 U.S.C. § 3663(a)(2)(same)).  *See United States v. Vilar*, 729 F.3d 62, 97 (2d Cir. 2013) ("Congress has 'authorize[d] an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction.'")

92

(*citing Hughey v. United States*, 495 U.S. 411, 413 (1990)); *United States v. Silkowski*, 32 F.3d 682, 689 (2d Cir. 1994) ("if the district court based its determination of loss on conduct outside the offense of conviction, no matter how 'relevant' that conduct might have been in a Guidelines sentencing context, the restitution order would run afoul of *Hughey*."); *id.* at 690 ("absent an agreement to the contrary, *Hughey* and its progeny limit the amount of loss for restitution purposes under the VWPA to losses directly attributable to conduct underlying the offense of conviction.")

In imposing restitution, the District Court expressly relied upon post-fallout conduct of ACH processing for Kapcharge in 2015 that did not fall directly within the definition of the conspiracy as defined by the Court. The District Court reasoned that even if some of the costs incurred by the fallout relating to ACH processing in 2015 "were not directly in furtherance of the conspiracy for which any of the defendants were convicted," "but for the bribery" "the credit union would not ultimately have adopted a business model relying on fees from ACH transactions, would not have partnered with KapCharge and implemented unsafe ACH processes, would not have ended up in a state where all of its directors were ethically compromised, and would not have adopted a model incurring high and unsustainable operating costs." A-4059-60. *See also* 4061 (finding that Gross's actions in preventing the NCUA from timely discovering the bribery scheme

93

"facilitated his ultimate corrupt relationship with KapCharge after the fallout and the actions that he took in furtherance of <u>that relationship</u>.")  These are precisely the type of remote and attenuated losses related to uncharged conduct that are prohibited by statute.  Since the District Court expressly relied upon losses caused by conduct that fell outside the offense of conviction, the losses were not "direct and proximate" and thus are not compensable by statute.  The District Court's order thus "ran afoul of *Hughley*" and it must be reversed.

## **CONCLUSION**

For the reasons explained above, this Court should reverse the District Court's judgment of conviction, sentence and restitution order.

Dated:      New York, New York
            May 30, 2018                    /s/ Kristen Marie Santillo
                                            Kristen Marie Santillo
                                            GELBER & SANTILLO PLLC
                                            347 West 36th Street, Suite 805
                                            New York, New York 10018
                                            (212) 227-4743

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENT, AND <u>TYPE STYLE REQUIREMENT</u>

1. The undersigned counsel of record for Defendant-Appellant Trevon Gross certifies pursuant to Federal Rules of Appellate Procedure 32(g) and Local Rule 32.1 that the foregoing brief contains 21,513 words, excluding the parts of the brief exempted by Fed. R. App. P.32(f), according to the Word Count feature of Microsoft Word 2010.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point font of Times New Roman.

Dated:   May 30, 2018                                         /s/ Kristen Marie Santillo

                                                                                Kristen Marie Santillo

**SPECIAL APPENDIX**

i

## SPECIAL APPENDIX TABLE OF CONTENTS

**Page**

Judgement, filed on November 16, 2017 ................... SPA-1

SPA-1

AO 245B (Rev. 09/17)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) | |
| | ) | |
| TREVON GROSS | ) | Case Number:  1:S6 15CR00769-03 (AJN) |
| | ) | |
| | ) | USM Number:  77229-054 |
| | ) | |
| | ) | Kristen M. Santillo & Henry E. Klingerman |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)      3 and 5 _____
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. 371 | Conspiracy to Commit Financial Institution Bribery, to Make False Statements, and to Obstruct the Examination of a Financial Institution | 3/3/2016 | 3 |

   The defendant is sentenced as provided in pages 2 through ___8___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)   underlying indictment   ☐ is   ☑ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

10/30/2017
Date of Imposition of Judgment

_____
Signature of Judge

HON. ALISON J. NATHAN, U.S.D.J.
Name and Title of Judge

11/16/17
Date

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: NOV 16 2017

SPA-2

AO 245B (Rev. 09/17)   Judgment in a Criminal Case
Sheet 1A

|  | | Judgment—Page | 2 | of | 8 |

DEFENDANT:  TREVON GROSS
CASE NUMBER:  1:S6 15CR00769-03 (AJN)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
| --- | --- | --- | --- |
| 18 U.S.C. 215(a)(2) | Receiving Corrupt Payments as an Officer of a Financial Institution With the Intent to be Influenced | 3/3/2016 | 5 |

SPA-3

AO 245B (Rev. 09/17)   Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page   3   of   8

DEFENDANT: TREVON GROSS
CASE NUMBER: 1:S6 15CR00769-03 (AJN)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

60 months on count 3 and 5 to run concurrently.

☑ The court makes the following recommendations to the Bureau of Prisons:

That the defendant be consider for placement in the Fort Dix facility or FCI Fairton, New Jersey, If not close to the New Jersey area as possible to help facilitate maintenance of ties with his family.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

   ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☑ before 2 p.m. on   1/5/2018_____ .

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

SPA-4

AO 245B (Rev. 09/17)   Judgment in a Criminal Case
            Sheet 3 — Supervised Release

Judgment—Page __4__ of __8__

DEFENDANT:   TREVON GROSS
CASE NUMBER:   1:S6 15CR00769-03 (AJN)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

3 years on count 3 and 5 to run concurrently.

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.

2.   You must not unlawfully possess a controlled substance.

3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

4.   ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*

5.   ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*

6.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

7.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

SPA-5

AO 245B (Rev. 09/17)   Judgment in a Criminal Case
　　　　　　　　　　　Sheet 3A — Supervised Release

| | Judgment—Page | 5 | of | 8 |

DEFENDANT:  TREVON GROSS
CASE NUMBER:  1:S6 15CR00769-03 (AJN)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature  _____     Date  _____

SPA-6

AO 245B(Rev. 09/17)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page ___6___ of ___8___

DEFENDANT: TREVON GROSS
CASE NUMBER: 1:S6 15CR00769-03 (AJN)

## SPECIAL CONDITIONS OF SUPERVISION

The defendant must provide the probation officer with access to any requested financial information. Any requested financial information specifically includes "any financial information of HOPE Cathedral if Trevon Gross and/or his wife have access to any financial accounts of HOPE Cathedral while the defendant is on supervised release.

The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless the defendant is in compliance with the installment payment schedule.

It is recommend that the defendant be supervised in his district of residence.

SPA-7

AO 245B (Rev. 09/17)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___7___ of ___8___

DEFENDANT: TREVON GROSS
CASE NUMBER: 1:S6 15CR00769-03 (AJN)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| TOTALS | $ 200.00 | $ | $ 12,000.00 | $ 194,293.72 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| National Credit Union Administration | $194,293.72 | $194,293.72 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| TOTALS | $ 194,293.72 | $ 194,293.72 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

SPA-8

AO 245B  (Rev. 09/17)  Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page __8__ of __8__

DEFENDANT:  TREVON GROSS
CASE NUMBER:  1:S6 15CR00769-03 (AJN)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   ☑   Lump sum payment of $   200.00   due immediately, balance due

     ☐   not later than _____ , or
     ☐   in accordance with  ☐  C,    ☐  D,    ☐  E, or    ☐  F below; or

B   ☐   Payment to begin immediately (may be combined with    ☐ C,    ☐ D, or    ☐ F below); or

C   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E   ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ☐   Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☑   Joint and Several

     Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

     Anthony Murgio;15-cr-00769-01(AJN), 194,293.72. Yuri Lebedev; 15-cr-00769-02(AJN), 194.293.72. Trevon Gross; 15-cr-00769-03(AJN), 194.293.72.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

SPA-9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: SEP 1 9 2016

United States of America,

—v—

Anthony R. Murgio, et al.,

Defendants.

15-cr-769 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

Defendants Anthony Murgio ("Murgio"), Yuri Lebedev, Trevon Gross, and Michael Murgio—Anthony's father—are charged in a nine-count superseding indictment ("the Indictment"). *United States v. Murgio*, No. 15-CR-769 (AJN) (S.D.N.Y. Apr. 21, 2016) ("S3 Indictment"), Dkt. No. 87. The allegations in the Indictment stem from Murgio's alleged operation, with Lebedev's assistance, of Coin.mx, a website that the Government characterizes as an unlawful Bitcoin[1] exchange, and from an alleged scheme to bribe Gross, the chairman of the board of a federal credit union, in order to obscure the illegal nature of Coin.mx. *Id.* ¶¶ 3, 4, 10. Before the Court are various pre-trial motions brought by the Defendants. In broad terms, the motions challenge the sufficiency and wording of the Indictment, seek particulars from the Government, request disclosure of certain information in advance of trial, and, in one case, seek a severance. For the reasons that follow, the Court grants several of the requests for a bill of particulars, but otherwise denies the Defendants' motions.

---

[1] "Bitcoin," according to the complaint filed against Murgio, is "an anonymous, decentralized form of electronic currency that exist[s] entirely on the Internet and not in any physical form." *See* Complaint as to Anthony Murgio, *United States v. Murgio*, No. 15-CR-769 (AJN) (S.D.N.Y. July 17, 2015); *see also* Kevin V. Tu & Michael W. Meredith, *Rethinking Virtual Currency Regulation in the Bitcoin Age*, 90 Wash. L. Rev. 271, 277 (2015) (defining Bitcoin as "a type of virtual currency . . . that (1) is electronically created and stored, and (2) lacks the backing of a government authority, central bank, or a commodity like gold"). Bitcoin "can be used to purchase goods and services from any person that is willing to accept it as a form of payment," but it does not "have the status of legal tender." Tu & Meredith, *supra*, at 277-78. The Court uses "Bitcoin," with a capital "B," to refer to the concept of the virtual currency, and "bitcoins," with a lowercase "b," to refer to units of the virtual currency.

1

## I.   BACKGROUND

A grand jury returned the third superseding indictment in this case on April 14, 2016. *See* S3 Indictment at 22.  Murgio is charged in eight of the Indictment's nine counts.  The first two counts charge Murgio with operating, and conspiring to operate, Coin.mx as an unlicensed money transmitting business.  *Id.* ¶¶ 11-15.  The Government alleges that Murgio and his co-conspirators attempted to shield the true nature of his Bitcoin exchange business by operating through several front companies, including one known as "Collectables Club," to convince financial institutions that Coin.mx was just a members-only association of individuals interested in collectable items, like stamps and sports memorabilia.  *Id.* ¶ 5.  Counts Six and Seven of the Indictment charge Murgio with committing, and conspiring to commit, wire fraud by virtue of making material misrepresentations to the financial institutions he was allegedly attempting to deceive.  *Id.* ¶¶ 24-28.  In Counts Eight and Nine, he is charged with engaging in, and conspiring to engage in, money laundering.  *Id.* ¶¶ 29-33.

Counts Three through Five of the Indictment pertain to what the Government labels the "bribery scheme," an alleged effort to acquire control of HOPE FCU, a federal credit union in New Jersey with primarily low-income members.  *Id.* ¶ 10.  Counts three and four charge Murgio, Lebedev, and Michael Murgio with bribing, and conspiring to bribe, Gross, the Chairman of the Board of HOPE FCU.  *Id.* ¶¶ 16-21.  Count Five charges Gross with accepting those bribes.  *Id.* ¶¶ 22-23.  All told, Murgio and his co-conspirators allegedly paid more than $150,000 to bank accounts under Gross's control.  *Id.* ¶ 10.  In return, Gross allegedly assisted Murgio in installing co-conspirators, including Lebedev, on HOPE FCU's board and in transferring Coin.mx's banking operations to HOPE FCU.  *Id.*

Three of the Defendants filed pre-trial motions.  First, Murgio filed a motion to dismiss Counts One and Two of the Indictment, as well as a series of omnibus pre-trial motions.  Dkt. Nos. 130, 132.  Second, Gross filed a motion to dismiss Count Five of the Indictment and a motion for a bill of particulars.  Dkt. No. 138.  And third, Lebedev filed a series of omnibus pre-

2

trial motions.[2]  Dkt. No. 134.  Michael Murgio did not separately file any motions, but he seeks leave to join several of the motions of his co-defendants—a request made by Murgio and Gross as well.  Dkt. Nos. 141, 147, and 148.  Those requests are granted.

## II.   MURGIO'S MOTION TO DISMISS COUNTS ONE AND TWO

Murgio moves to dismiss Counts One and Two of the Indictment, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), on the grounds that those counts fail to state an offense. Because "federal crimes are solely creatures of statute, a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (internal quotation marks and citations omitted). An indictment can also be challenged on the grounds that it lacks required specificity.  Fed. R. Crim. P. 12(b)(3)(B)(iii).  An indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  But in order "to satisfy the pleading requirements of Rule 7(c)(1), an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (internal quotation marks and citation omitted).  Put differently, "the indictment need only allege the 'core of criminality' the Government intends to prove at trial, since the indictment is 'read . . . to include facts which are necessarily implied by the specific allegations made.'" *United States v. Budovsky*, No. 13-CR-368 (DLC), 2015 WL 5602853, at *3 (S.D.N.Y. Sept. 23, 2015) (alteration in original) (quoting *United States v. Rigas*, 490 F.3d 208, 229 (2d Cir. 2007)).  In

---

[2] The Court adopts the following labeling conventions for citations to the briefs on these various motions. "Murgio MTD Br." refers to the memorandum of law in support of Murgio's motion to dismiss Counts One and Two. *See* Dkt. No. 133. "Murgio Omni. Br." refers to the memorandum of law in support of Murgio's omnibus pre-trial motions. *See* Dkt. No. 131. "Gross Br." refers to the memorandum of law in support of Gross's motion to dismiss Count Three and motion for a bill of particulars. *See* Dkt. No. 140. And "Lebedev Br." refers to the memorandum of law in support of Lebedev's omnibus pre-trial motions. *See* Dkt. No. 135. The Government filed one opposition brief ("Opp. Br.") to all of the pending motions. *See* Dkt. No. 163. For reply briefs, the Court uses the same naming conventions as for the opening briefs, but with "Reply" added—i.e., "Murgio Omni. Reply Br."

3

evaluating a motion to dismiss, the Court "accept[s] as true all of the allegations of the indictment." *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

Count One of the Indictment charges Murgio with conspiring to commit an offense against the United States, in violation of 18 U.S.C. § 371. The object of that alleged conspiracy is the operation of an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960. This underlying substantive offense, which Murgio is charged with in Count Two, is the focus of Murgio's motion to dismiss.

Section 1960 makes it a crime to "knowingly conduct[], control[], manage[], supervise[], direct[], or own[] all or part of an unlicensed money transmitting business." 18 U.S.C. § 1960(a). The key phrase in § 1960, for purposes of this motion, is "unlicensed money transmitting business." Breaking that phrase down into its component parts, first, the statute defines "money transmitting" to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." *Id.* § 1960(b)(2). Whether Coin.mx handled "funds," and if so, whether it "transferr[ed]" them on behalf of the public, are key questions here.

Next, the statute does not provide a particularized definition of "business," other than to specify that a "money transmitting business" must "affect[] interstate or foreign commerce" in order to fall within § 1960. *Id.* § 1960(b)(1).

Finally, the statute lists three ways in which a "money transmitting business" can be deemed "unlicensed." First, a money transmitting business is unlicensed if it "is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony." *Id.* § 1960(b)(1)(A). Second, such a business is unlicensed if it fails to comply with federal "money transmitting business registration requirements." *Id.* § 1960(b)(1)(B). And third, a money transmitting business is unlicensed if it "involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity." *Id.* § 1960(b)(1)(C).

SPA-13

In sum, to qualify as an "unlicensed money transmitting business" under § 1960, a business must a) transfer, on behalf of the public, b) funds, and c) do so in violation of state or federal licensing and registration requirements, or with knowledge that the funds were derived from a criminal offense.

Murgio raises three principal arguments in support of dismissing Counts One and Two of the Indictment. First, he argues that bitcoins do not qualify as "funds" under § 1960. Second, he claims that the Indictment fails to allege that Coin.mx transferred funds so as to be a "money transmitting business" under § 1960. And third, he contends that the Indictment inadequately alleges that Coin.mx failed to comply with state and federal licensing and registration requirements. For the reasons that follow, the Court rejects each of these arguments.

### A.    Bitcoins Are "Funds" Under § 1960

Section 1960 does not specify what counts as "money" that is "transmitted," other than to note that it "includes . . . funds." 18 U.S.C. § 1960(b)(2). This raises the question of whether bitcoins are "funds" under the statute. The Court concludes that they are.

"When a term goes undefined in a statute," courts give the term "its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012). The ordinary meaning of "funds," according to Webster's Dictionary, is "available pecuniary resources." Webster's Third New International Dictionary 921 (2002). "Pecuniary" is defined as "taking the form of or consisting of money." *Id.* at 1663. And "money," in turn, is defined as "something generally accepted as a medium of exchange, a measure of value, or a means of payment." *Id.* at 1458. This definition of "funds," and the corresponding definition of "money," have consistently been adopted by courts in this circuit. In *United States v. Faiella*, Judge Rakoff defined "funds," in the context of interpreting § 1960, as "'available money' or 'an amount of something that is available for use.'" 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014) (citation omitted). And as the Court does here, he also defined "money" as "something generally accepted as a medium of exchange, a measure of value, or a means of payment." *Id.* (citation omitted). Similarly, Judge Forrest has explained that "'[f]unds' are defined as 'money, often money for a specific

5

purpose,'" and that "'[m]oney' is an object used to buy things." *United States v. Ulbricht*, 31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014) (citation omitted). Although Judge Forrest reached that conclusion in a case involving a different statute—18 U.S.C. § 1956, which prohibits money laundering—she did so by engaging in the same analysis the Court must perform here. *See id.* (noting that "'[f]unds' is not defined in the statute and is therefore given its ordinary meaning"). In light of this consensus as to the term's ordinary meaning, the Court concludes that "funds," for the purposes of § 1960, means pecuniary resources, which are generally accepted as a medium of exchange or a means of payment.

Applying that definition here, it is clear that bitcoins are funds within the plain meaning of that term. Bitcoins can be accepted "as a payment for goods and services" or bought "directly from an exchange with [a] bank account." *Getting started with Bitcoin*, bitcoin, https://bitcoin.org/en/getting-started (last visited Sept. 16, 2016). They therefore function as "pecuniary resources" and are "used as a medium of exchange" and "a means of payment." As Judge Rakoff explained, bitcoins "clearly qualif[y] as 'money' or 'funds'" under § 1960 because they "can be easily purchased in exchange for ordinary currency, act[] as a denominator of value, and [are] used to conduct financial transactions." 39 F. Supp. 3d at 545; *see also Ulbricht*, 31 F. Supp. 3d at 570 (holding that bitcoins are "funds" because they "can be either used directly to pay for certain things or can act as a medium of exchange and be converted into a currency which can pay for things"). Courts considering other virtual currencies have reached the same conclusion—those currencies also count as "funds" under § 1960. *See Budovsky*, 2015 WL 5602853, at *14 (relying on *Faiella* for the proposition that "LR," another virtual currency, "qualifies as 'funds' for purposes of § 1960"); *see also United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82, 88 (D.D.C. 2008) (noting that "[s]ection 1960 defines 'money transmitting' broadly to include transferring 'funds,' not just currency, by 'any and all means'").

The legislative history of § 1960 supports the conclusion that bitcoins fall within the statute's purview. Section 1960 was enacted to address the fact that "money launderers with illicit profits ha[d] found new avenues of entry into the financial system." S. Rep. No. 101-460

(1990). From its inception then, § 1960 sought to prevent innovative ways of transmitting money illicitly. It appears that Congress "designed the statute to keep pace with . . . evolving threats," and this Court must accordingly give effect to the broad language Congress employed—namely, that § 1960 "appl[ies] to *any* business involved in transferring 'funds . . . by *any and all means.*'" *Faiella*, 39 F. Supp. 3d at 546 (emphases added) (quoting 18 U.S.C. § 1960(b)(2)). Dictionaries, courts, and the statute's legislative history all point to the same conclusion: bitcoins are funds.

Murgio, however, urges the Court to reject this straightforward conclusion. He asks the Court to adopt a more narrow definition of "funds," contending that the term should mean only "currency." Murgio MTD Br. 7. The path that leads him to that conclusion is as follows: First, he claims that Black's Law Dictionary defines "funds" as "[a] sum of money or other liquid assets established for a specific purpose." *Id.* (alteration in original) (quoting Black's Law Dictionary 788 (10th ed. 2014)). Second, he cites Black's definition of "money." *Id.* Black's defines "money" as "[a]ssets that can be easily converted to cash," and, more narrowly, as "the medium of exchange authorized or adopted by a government as part of its currency." Black's Law Dictionary, *supra*, at 1158. As Murgio notes, the narrower of the two definitions of "money" is taken from the Uniform Commercial Code ("UCC"). Murgio MTD Br. 7; *see also* U.C.C. § 1-201(b)(24) (Unif. Law Comm'n). Third, and finally, Murgio argues that "funds" must mean only "currency" because the other definition of "money" from Black's—i.e., assets easily converted to cash—would render § 1960 "meaningless and overly broad." MTD Br. 7. Each step in this chain of reasoning is flawed.

First, Murgio's resort to Black's—a legal dictionary—as the starting point for defining "funds" ignores the rule that an undefined term in a statute is given its *"ordinary* meaning." *Taniguchi*, 132 S. Ct. at 2002 (emphasis added). The definitions of "money" and "funds" from Black's "would only be relevant if Congress intended that these terms be given special meaning as legal 'terms of art.'" *Faiella*, 39 F. Supp. 3d at 545 n.2. There is no evidence that Congress intended such a specialized meaning here.

7

Second, even if Black's were the right dictionary to consult, Murgio errs in three respects in consulting it. First, the definition of "funds" that he cites is actually the definition of "fund," singular. *See* Black's Law Dictionary, *supra*, at 788 ("A *sum* of money or other liquid assets established for a specific purpose." (emphasis added)). That definition is inapplicable here because "funds," as used in § 1960, clearly refers to the money or liquid assets themselves, rather than the kind of "fund" that is *comprised* of a sum of assets. *Compare* Black's Law Dictionary, *supra*, at 788 (providing example of "a fund reserved for unanticipated expenses"). And in fact, Black's provides a definition of the plural of "fund," defining "funds" as "[m]oney or other assets, such as stocks, bonds, or working capital, available to pay debts, expenses, and the like." *Id.* Murgio's second error is ignoring the second half of this definition—i.e., that "funds" includes "other assets." The examples of "other assets" that Black's provides—stocks, bonds, or working capital—are clearly broader than just "currency." Finally, even if the Court were to ignore half of the definition of "funds" and rely only on Black's definition of "money," it would reject the narrower of the two definitions of money that Black's provides. The narrower definition relies expressly on the UCC, which is evidence that "money" only has a restricted meaning in specialized contexts, like commercial law. *See* U.C.C. § 1-103 (Unif. Law Comm'n) (explaining that the UCC's purpose is to "modernize the law governing commercial transactions").

Third, Murgio's concern about overbreadth—i.e., that interpreting "funds" to mean more than just "currency" would render § 1960 overly broad—is meritless. Murgio argues that using the ordinary meaning of "funds," as outlined above, would require treating commodities like copper, hogs, or coffee as "funds," thereby bringing those commodities within the purview of the money transmitter statute. Murgio MTD Br. 8. But no one would consider coffee or hogs "pecuniary resources," and although such commodities are *traded* on exchanges, they do not themselves function as a "medium of exchange." *See* Webster's, *supra*, at 921, 1458. Murgio's concerns about absurd results are therefore unfounded.

8

SPA-17

Murgio attempts to buttress his argument in favor of a narrower definition of funds by relying on various government documents that discuss virtual currencies. None of those documents, however, address the meaning of "funds" in the context of § 1960. For instance Murgio cites the Department of Treasury's Financial Crimes Enforcement Network's ("FinCEN") guidance on virtual currencies. *See* Application of FinCEN'S Regulations to Persons Administering, Exchanging, or Using Virtual Currencies, FIN-2013-G001 (Mar. 18, 2013) ("FinCEN Guidance") (reproduced at Murgio MTD Br., Ex. B). That document defines "funds" for the limited purpose of explaining when a person has provided or sold "prepaid access," and concludes that prepaid access to "funds or the value of funds" is limited to "real currencies." *Id.* at 3 & n.18. But the FinCEN Guidance does not even mention § 1960, much less purport to interpret the statute's use of the word "funds." Similarly, the fact that the IRS treats virtual currency as "property," rather than "currency," for tax purposes is irrelevant to the inquiry here. *See* I.R.S. Notice 2014-21, *available at* http://www.irs.gov/pub/irs-drop/n-14-21.pdf. In fact, the IRS Notice that Murgio cites makes clear that it "addresses *only the U.S. federal tax consequences* of transactions in, or transactions that use, convertible virtual currency." *Id.* at 1 (emphasis added). The document does not speak to the definition of "funds" or have anything to do with § 1960. *See Budovsky*, 2015 WL 5602853, at *14 (rejecting both the FinCEN Guidance and the IRS Notice as "inapposite" because the documents "do not suggest that the term 'funds' should not be read to encompass virtual currencies"). Finally, Murgio's invocation of the fact that the Commodity Futures Trading Commission ("CFTC") has classified Bitcoin as a commodity is similarly unmoored from § 1960 and from the Court's responsibility to determine the plain meaning of "funds." *See* Murgio MTD Br. 11; *see also In re Coinflip, Inc.*, CFTC No. 15-29, 2015 WL 5535736 (Sept. 17, 2015) (reproduced at Murgio MTD Br., Ex. A). To the extent the CFTC's decision in *Coinflip* is relevant, it actually defines Bitcoin as "a digital representative of value that functions as a medium of exchange, a unit of account, and/or a store of value, but not does not have legal tender status." *Coinflip*, 2015 WL 5535736 at *1 n.2. That definition places bitcoins squarely within the plain meaning of § 1960's term "funds."

9

SPA-18

Finally, Murgio invokes the rule of lenity and the doctrine of constitutional avoidance. Murgio MTD Br. 11-12. Like the other federal courts to have considered the issue, this Court rejects the claim that applying the plain meaning of "funds" to encompass bitcoins runs afoul of the rule of lenity or the Constitution.[3] First, the rule of lenity is reserved "for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute." *Moskal v. United States*, 498 U.S. 103, 108 (1990) (emphasis in original) (internal quotation marks and citation omitted). Here, "[h]aving considered the text, purpose, and legislative history of § 1960, there is no ambiguity that would require resort to the rule of lenity." *Budovsky*, 2015 WL 5602853, at *14; *see also Faiella*, 39 F. Supp. 3d at 547 (finding no "irreconcilable ambiguity" in § 1960 that would require "resort to the rule of lenity"). Second, Murgio's invocation of the doctrine of constitutional avoidance presumably relies on the risk that interpreting "funds" in § 1960 to encompass bitcoins would constitute "an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964). But Murgio "does not point to any prior law that failed to apply § 1960 to virtual currencies," nor does he explain how its application here would constitute an unforeseeable statutory enlargement. *Budovsky*, 2015 WL 5602853, at *15. To the contrary, the analysis above reinforces that applying § 1960 to Bitcoin is consistent with the statute's plain meaning. Bitcoins are "funds," and treating them as such is constitutional.

**B.**     **The Indictment Alleges that Coin.mx was a "Money Transmitting Business" Within the Meaning of § 1960**

---

[3] A Florida trial court recently dismissed an information against a defendant accused of unlawfully selling bitcions. *See Florida v. Espinoza*, No. F14-293 (Fla. Cir. Ct. July 22, 2016). In reaching that decision, the court expressed its view that "Bitcoin has a long way to go before it is the equivalent of money." *Id.* at 6. As explained *infra*, this Court disagrees with much of the *Espinoza* court's analysis, which in any event rests on an interpretation of state law and does not purport to apply the rule of lenity. Moreover, as the Supreme Court has explained, "a division of judicial authority" is not "sufficient to trigger lenity." *Moskal v. United States*, 498 U.S. 103, 108 (1990). If the rule were otherwise, then "one court's unduly narrow reading of a criminal statute would become binding on all other courts." *Id.*

10

In order for Murgio to be charged under § 1960, Coin.mx must qualify as a "money transmitting business." 18 U.S.C. § 1960(b). Murgio contends that Coin.mx does not fall within the statute's ambit because the Government has failed to allege that it *transmitted* money or funds. Instead, Murgio argues, the Government has alleged only that Coin.mx acted as a "seller of bitcoins." Murgio MTD Br. 15. The Court disagrees.

Murgio does not contest that the Indictment tracks the language of § 1960 and provides approximate dates and locations where the charged conduct took place. *Compare* 18 U.S.C. § 1960, *with* S3 Indictment ¶ 15. As relevant here, the Indictment alleges that Murgio operated a "money transmitting business," namely Coin.mx, and that he did so in violation of each of the three subsections of § 1960(b)(1). S3 Indictment ¶ 15. The Indictment therefore satisfies the pleading requirements of Rule 7(c)(1). *See Stringer*, 730 F.3d at 124. Murgio argues though that because the Indictment is a "speaking indictment," the fact that it does not include specific allegations about transmission is fatal. Murgio MTD Reply Br. 12. Murgio cites no authority for this enhanced pleading requirement. And "[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (internal quotation marks and citation omitted). Accordingly, the Court holds that the Indictment is sufficient with respect to allegations that Coin.mx was a money transmitting business.

In any event, both parties acknowledge (putting aside the question of whether bitcoins are funds) that if the evidence at trial demonstrates that Coin.mx "transmitted bitcoins to another location or person for its customers," then that evidence would establish that Coin.mx was a money transmitting business. Murgio MTD Br. 15; *see also* Opp. Br. 23-24. Such evidence would also alleviate Murgio's concern that classifying Coin.mx's conduct as "money transmitting" under § 1960 would raises serious constitutional questions. *See* Murgio MTD Br. 19 (arguing that such questions would be raised if Coin.mx did not "transfer . . . bitcoins to a third-party or location"). To that end, the Government claims that its evidence will show "a

11

variety of different ways Coin.mx operated as a money transmitter" and that Coin.mx did more than just sell bitcoins "to customers in two-party transactions." Opp. Br. 23.

Finally, Murgio suggests that even if Coin.mx engaged in money transmitting, it does not qualify as a "business" under the statute because the Government does not allege that Coin.mx sold "money transmitting services to others *for a profit*." Murgio MTD Br. 14 (emphasis added). It is unclear from Murgio's brief whether he believes that the Government must allege a "profit" element in order to charge Murgio under § 1960. If that is in fact Murgio's position, it is unavailing. Murgio points to no authority suggesting that the Court must read a "profit" requirement into § 1960, and even if such a requirement existed, the allegation that Coin.mx "charg[ed] a fee for [its] service" would be sufficient. *See* S3 Indicmtent ¶ 3.

For the foregoing reasons, the Indictment sufficiently alleges that Coin.mx was a "money transmitting business" under § 1960.

### C.   The Indictment Alleges that Coin.mx was "Unlicensed" Within the Meaning of § 1960

As explained above, the Indictment provides three statutory bases for concluding that Murgio operated an *unlicensed* money transmitting business. *See* S3 Indictment ¶ 15. Murgio challenges the Indictment's sufficiency with respect to two of those bases—namely, the allegation that Murgio operated Coin.mx without a required state money transmitting license, in violation of 18 U.S.C. § 1960(b)(1)(A), and the allegation that Coin.mx failed to comply with federal money transmitting business registration requirements, in violation of 18 U.S.C. § 1960(b)(1)(B).[4] The Court concludes, however, that the S3 Indictment is sufficient in charging Murgio under those two subsections.

#### 1.   The Indictment Sufficiently Alleges that Coin.mx Failed to Comply with Florida Licensing Requirements

---

[4] Murgio does not dispute, however, that the Indictment adequately alleges that he operated Coin.mx with knowledge that transmitted funds were "derived from a criminal offense or [were] intended to be used to promote or support unlawful activity." 18 U.S.C. § 1960(b)(1)(C).

SPA-21

A money transmitting business that operates "without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony" is "unlicensed." 18 U.S.C. § 1960(b)(1)(A). The state at issue here is Florida, and Florida law provides that "[a] person may not engage in the business of a money services business . . . in this state unless the person is licensed or exempted from licensure under this chapter." Fla. Stat. § 560.125(1). Chapter 560 defines a "money services business" as "any person" who "acts as a . . . money transmitter." *Id.* § 560.103(22). And the statute further defines "money transmitter" as an entity that "receives currency, monetary value, or payment instruments for the purpose of transmitting the same by any means, including transmission by wire, facsimile, electronic transfer, courier, the Internet, or through bill payment services." *Id.* § 560.103(23).

Murgio's arguments as to why these Florida provisions do not apply to the charged conduct principally mirror his claims about § 1960 more broadly. First, he contends that bitcoins are not covered by Florida's definition of "money transmitter" because, just as he argues that bitcoins are not "funds" under federal law, he contends that they are not "currency, monetary value, or payment instruments" under Florida law. Murgio MTD Br. 12-13. The Court disagrees. Florida defines "monetary value" as "a medium of exchange, whether or not redeemable in currency." Fla. Stat. § 560.103(21). Bitcoins, as explained previously, function as a "medium of exchange." They therefore fall within Chapter 560's express definition of "monetary value." Bitcoins also fall within the statute's express definition of "payment instruments." Chapter 560 defines "payment instrument" as "a check, draft, warrant, money order, travelers check, electronic instrument, *or other instrument*, payment of money, *or monetary value* whether or not negotiable." *Id.* § 560.103(29) (emphases added). Because bitcoins are "monetary value," they are also "payment instruments."

Murgio also invokes the rule of lenity to argue that the Court should not apply Chapter 560's definition of "monetary value" or "payment instrument" to bitcoins. *See* Murgio MTD Br. 13. But there is no "statutory ambiguity" here. *See Moskal*, 498 U.S. at 107. Again, bitcoins function as a medium of exchange, and they are therefore both monetary value and payment

13

instruments, as Florida defines those terms.  Moreover, the rule of lenity is particularly inapt in the context of Chapter 560, given that Bitcoin's raison d'être is to serve as a form of payment. *See Getting started with Bitcoin*, bitcoin, https://bitcoin.org/en/getting-started (last visited Sept. 16, 2016) ("Using Bitcoin to pay and get paid is easy and accessible to everyone."); *see also* Kevin V. Tu & Michael W. Meredith, *Rethinking Virtual Currency Regulation in the Bitcoin Age*, 90 Wash. L. Rev. 271, 277 (2015) ("Like traditional currency, virtual currencies such as Bitcoin can be used to purchase goods and services from any person that is willing to accept it as a form of payment.").  It does not raise the specter of unconstitutionality to apply a law that specifically mentions "payment instruments" to a virtual currency designed to serve as a form of payment.

Murgio's second challenge to applying Florida's Chapter 560 here is that, for the "same reasons" that Coin.mx is not a "money transmitting business" under § 1960, it is not a "money transmitter" under Chapter 560.  Murgio MTD Br. 22.  Murgio points to no reason that a "money transmitting business" under federal law is not a "money transmitter" under Florida law.  And because the Indictment sufficiently alleges the former, the Court declines to hold that it is deficient with respect to the latter.

The one distinct argument that Murgio raises with respect to Florida law relates to a recently decided Florida case.  While the pending pre-trial motions in this case were being briefed, a Florida trial court issued an opinion addressing the applicability of Chapter 560 to Bitcoin.  *See Florida v. Espinoza*, No. F14-293 (Fla. Cir. Ct. July 22, 2016).  The court in *Espinoza* dismissed the information, which charged the defendant with operating an unlicensed money services business because he sold bitcoins to an undercover officer.  *Id.* at 2-3.  Relying on many of the arguments that Murgio raises here, the Florida court held that bitcoins are not "payment instruments" under Florida law.  *Id.* at 5.  It also held that the defendant did not "transmit" bitcoins because he was only a seller of bitcoins, rather than a middleman, and therefore did not transmit bitcoins "from one person or place to another."  *Id.* at 4 (internal quotation marks and citation omitted).  The court explained that although "[t]he Florida

14

Legislature may choose to adopt statutes regulating virtual currency in the future," applying existing law regulating money services business to Bitcoin would be "like fitting a square peg in a round hole." *Id.* at 6. This Court respectfully disagrees.

To the Court's knowledge, the *Espinoza* court is the first Florida court to have considered the reach of Chapter 560 in the context of Bitcoin, and neither the state's Supreme Court nor the District Courts of Appeal have weighed in. This Court is therefore not bound by the decision in *Espoinoza*, though it owes the decision "proper regard." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1190 (2d Cir. 1992) (quoting *C.I.R. v. Bosch's Estate*, 387 U.S. 456, 465 (1967)). After carefully considering the analysis in *Espinoza*, the Court determines that the Florida Supreme Court, if faced with the question, would hold that Murgio is properly charged with violating Chapter 560. As an initial matter, the Court finds that there is no plausible interpretation of "monetary value" or "payment instruments," as the terms are used in Chapter 560, that would place bitcoins outside the statute's ambit. With respect to "monetary value," the Court has already explained that Bitcoin plainly is "a medium of exchange, whether or not redeemable in currency" (though Bitcoin *is* in fact redeemable in currency). Fla. Stat. § 560.103(21). The *Espinoza* court did not contemplate the possibility that bitcoins qualify as "monetary value"—the court limited its discussion to "currency" and "payment instruments." *See Espinoza*, slip op. at 4-5. *Espinoza* therefore does not squarely address this Court's reasoning for holding that Chapter 560's definition of "money transmitter" applies to businesses that transmit bitcoins. Moreover, with respect to the meaning of "payment instrument," the only reason the *Espinoza* court cites for concluding that bitcoins are not "payment instruments" is that the IRS "has decided to treat virtual currency as property for federal tax purposes." *Id.* at 5. As an initial matter, this argument ignores the fact that Chapter 560 defines "payment instrument" as including "monetary value." Fla. Stat. § 560.103(29). But more to the point, the *Espinoza* court offers no explanation as to why a decision *by the IRS* is relevant to the question of whether bitcoins, which are used as (and designed to be) an instrument of payment, qualify as "payment instruments" under Florida law. The IRS's classification is divorced from the basic statutory

15

SPA-24

interpretation question at issue here. Accordingly, the Court remains persuaded that Chapter 560 regulates businesses that transmit bitcoins.

Additionally, the *Espinoza* court's holding that the defendant in that case did not "transmit" bitcoins because he was only a seller of bitcoins, rather than a middleman, does not alter this Court's conclusion that the Indictment sufficiently alleges a failure to comply with Chapter 560. *See Espinoza*, slip op. at 4. As explained above, the fact that the Indictment alleges that Coin.mx was a "money transmitting business" is sufficient to survive a motion to dismiss, and the Court therefore does not need to reach the question of whether the *Espinoza* court's "middleman" requirement is correct. Moreover, the evidence at trial may in fact show that Coin.mx "operate[d] much like a middleman in . . . financial transaction[s]," which would satisfy the standard set forth by *Espinoza* and advocated by Murgio. *Id.* Finally, there are key factual differences between this case and Murgio's that cast doubt on the applicability of the *Espinoza* court's holding. The defendant in *Espinoza* was an individual who did nothing more than sell bitcoins to one undercover officer on several occasions. *Id.* at 2-3. There were no allegations in that case about running a website, transfers between Bitcoin wallets, or processing credit card payments. In other words, it appears that the conduct charged in *Espinoza* is meaningfully different from the allegations against Murgio. In light of those considerations, the Court holds that the Indictment properly charges Murgio with failing to comply with Florida's licensing requirements for money transmitters.

      **2.**      **The Indictment Sufficiently Alleges that Coin.mx Failed to Comply with Federal Registration Requirements for Money Transmitting Businesses**

The Indictment alleges that Coin.mx "failed to comply with the money transmitting business registration requirements set forth in [31 U.S.C. § 5330] and the regulations prescribed thereunder," in violation of 18 U.S.C. § 1960(b)(1)(B). S3 Indictment ¶ 15. Section 5330 requires the owner of a money transmitting business to register with the Secretary of the Treasury, and one of the Treasury Department's implementing regulations outlines when a

16

business qualifies as a "money transmitter." *See* 31 C.F.R. § 1010.100(ff)(5). Under that regulation, an entity is a "money transmitter" if it accepts "currency, funds, or other value that substitutes for currency from one person and [transmits] currency, funds, or other value that substitutes for currency to another location or person by any means." *Id.* That regulation further provides that a "money transmitter" is also "[a]ny other person engaged in the transfer of funds." *Id.* In other words, 31 C.F.R. § 1010.100(ff)(5) is at least as broad as 18 U.S.C. § 1960(b)(2), which (again) defines "money transmitting" as "transferring funds on behalf of the public by any and all means." Accordingly, because the Indictment sufficiently alleges that Coin.mx was a money transmitting business under § 1960, it sufficiently alleges that Coin.mx failed to comply with the applicable federal regulations.

Murgio argues though that the Indictment's failure to provide a specific *mention* of 31 C.F.R. § 1010.100(ff)(5) is also grounds for dismissal. *See* Murgio MTD Br. 15 n.10. Murgio declines to explain, however, why mentioning a particular implementing regulation is necessary, given that the Indictment tracks the statutory language. *Budovsky*, which held that "an indictment need only allege a violation of § 5330's implementing regulations to sufficiently allege a violation of 18 U.S.C. § 1960(b)(1)(B)," is not to the contrary. 2015 WL 5602853, at *8.

Because the Indictment sufficiently alleges a violation of each of § 1960's three subsections, Murgio's motion to dismiss Counts One and Two is denied.

## III.   GROSS'S MOTION TO DISMISS COUNT FIVE

Trevon Gross moves to dismiss Count Five of the Indictment, which charges him with receiving corrupt payments as an officer of a financial institution, in violation of 18 U.S.C. § 215(a)(2). S3 Indictment ¶ 23. Section 215 prohibits "an officer . . . of a financial institution" from "corruptly accept[ing] or agree[ing] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution." 18 U.S.C. § 215(a)(2). Gross contends that Count Five must be dismissed because it fails to state

17

an offense. The Court evaluates Gross's motion under the same standard it applied to Murgio's motion to dismiss Counts One and Two. For the reasons that follow, Gross's motion is denied.

The allegations in Count Five of the S3 Indictment closely "track the language of the statute," which is generally sufficient to survive a motion to dismiss. *Stringer*, 730 F.3d at 124. As relevant here, the Indictment alleges that Gross (1) was "an officer, director, employee, agent [or] attorney"; of (2) "a financial institution"; that (3) he "accepted and agreed to accept . . . a sum of money greater than $1,000"; and (4) that he did so "corruptly" and "with the intent to be influenced and rewarded in connection with a . . . transaction of . . . HOPE FCU." S3 Indictment ¶ 23. Gross contends, however, that the Indictment must do more than track the language of § 215(a) because the meaning of the word "corruptly" is "sufficiently uncertain and ambiguous." Gross Br. 8. The Court disagrees, for two principal reasons, discussed at greater length below. First, using the term "corruptly" does not render the Indictment deficiently ambiguous. Second, even if "corruptly" were ambiguous in the abstract, the additional factual allegations pertaining to Count Five in the Indictment are more than sufficient to inform Gross of the nature of the accusations against him.

The Second Circuit has expressly held that "[t]he conduct prohibited by § 215(a), which is limited to acts that are done 'corruptly,' is described in sufficiently plain terms to permit an ordinary person to understand what conduct is prohibited." *United States v. McElroy*, 910 F.2d 1016, 1021 (2d Cir. 1990). That holding defeats Gross's charge that the Indictment fails to "fully, directly, and expressly" set forth the necessary elements of § 215(a). Gross Br. 7 (quoting *Russell v. United States*, 369 U.S. 749, 765 (1962)). To be sure, the Second Circuit reached its conclusion as to the plain meaning of § 215(a) in the context of an opinion that rejected a challenge to § 215 as unconstitutionally vague, not in the context of a challenge to an indictment's sufficiency. *See McElroy*, 910 F.2d at 1022. But the holding from *McElroy* applies with force here, given that the thrust of Gross's argument is that the tem "corruptly" is too vague

18

to stand on its own in the Indictment.[5]  Gross points to no case in this circuit where an indictment was deemed insufficient by virtue of using "corruptly" to describe the *mens rea* element of a § 215 bribery offense, and this Court has found none.

Despite the lack of on-point authority in favor of his position, Gross points to the alleged difficulty the Second Circuit has held in precisely defining "corruptly."  No such difficulty has existed in the context of § 215, where the Second Circuit held in *McElroy* that "[t]he term 'corruptly' is ordinarily understood as referring to 'act[s] done voluntarily and intentionally and with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means.  The motive to act corruptly is ordinarily a hope or expectation of either financial gain or other benefit to oneself or some profit or benefit to another.'" 910 F.2d at 1021 (alteration in original) (quoting *United States v. Brunson*, 882 F.2d 151, 154 n. 2 (5th Cir.1989)).  Gross does not challenge this definition—and in fact relies on it for one of his other arguments in favor of dismissing Count Five.  Instead, he points to the Second Circuit's definition of "corruptly" in the context of a different statute, the Foreign Corrupt Practices Act (FCPA).  In interpreting that statute, the Second Circuit has put forward a similar, albeit more focused, definition of "corruptly," holding that the term means "a bad or wrongful purpose and an intent to influence a foreign official to misuse his official position." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173, 183 (2d Cir. 2003).

Gross does not claim that there is any tension between the definitions of "corruptly" in § 215 and the FCPA.  Rather, he emphasizes the court's observation in *Stichting* that "[i]t is difficult to determine the meaning of the word 'corruptly' simply by reading it in context," and the fact that the court "look[ed] outside the text of the statute to determine its intended meaning." *Id.* at 181.  This, Gross argues, is evidence that the word "corruptly" "does not fully express [an]

---

[5] Gross also argues that *McElroy* is inapposite because the court assessed § 215(a) after a trial, whereas here, Gross is challenging the sufficiency of the Indictment pre-trial. *See* Gross Reply Br. 4-5.  But that procedural distinction did not bear on the *McElroy* court's interpretation of § 215(a), which rested on the text of the statute, not the fact that the challenge to the statute was brought after a trial. *See McElroy*, 910 F.2d at 1021.

19

element" of § 215—after all, if the Second Circuit did not know precisely what "corruptly" means without resort to extra-textual tools of statutory interpretation, then how can we be confident that the grand jury sufficiently understood the term when it indicted Gross? *See* Gross Reply Br. 3-4. This argument proves too much. It suggests that every time a court resorts to extra-textual tools of statutory interpretation when defining a particular term, any future indictment that relies on that term must descend into additional specifics. But if that were so, it would eviscerate the rule that "an indictment need do little more than to track the language of the statute charged." *Stringer*, 730 F.3d at 124 (internal quotation marks and citation omitted). Although courts may have cause to examine the nuances of a *mens rea* element like "corruptly," the fact that a court engages in such statutory interpretation does not change the fact that reciting a *mens rea* element is generally sufficient to identify for the defendant "the 'core of criminality' the Government intends to prove at trial." *Budovsky*, 2015 WL 5602853, at *3. That core of criminality has been sufficiently alleged here.

In addition to arguing that the term "corruptly" is itself ambiguous, Gross contends that the Indictment is ambiguous because it fails to specify a particular law that Gross intended to violate when he allegedly accepted a bribe in exchange for taking actions in his capacity as an officer of HOPE FCU. *See* Gross Br. 9-10. This argument is meritless. As explained above, to act "corruptly" in the context of § 215 means to act with "the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means." *McElroy*, 910 F.2d at 1021 (quoting *Brunson*, 882 F.2d at 154 n. 2). Seizing on this language, Gross claims that § 215 is subject to the rule that "where an indictment charges a crime that depends in turn on violation of another statute, the indictment must identify the underlying offense." Gross Br. 9 (alteration omitted) (quoting *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000)). This argument conflates, without any justification, a *crime* that turns on violating another statute and a *mental state* that requires an unlawful purpose. Gross's own wording highlights this confusion—he claims that when "an unlawful *purpose* is an element of the statute, the alleged unlawful *conduct* must be identified." Gross Br. 9 (emphases added). Here, the

20

Indictment specifies all of the allegedly unlawful conduct that Gross engaged in—namely, accepting a bribe in exchange for certain acts that Gross took as an officer of HOPE FCU. Because § 215 does not depend on the violation of another statute, the Indictment need not allege such a violation to be sufficient. *Compare United States v. Thompson*, 141 F. Supp. 3d 188, 195–96 (E.D.N.Y. 2015) (finding several counts of an indictment partially deficient because those counts all included the element that the defendant persuaded the victims to engage in "any sexual activity for which a person could be charged with a criminal offense," but failed to specify any particular such sexual activity).

Even if this Court had doubts as to whether it is sufficient for Count Five of the Indictment to track the language of § 215, the Indictment would nonetheless be sufficient in light of the additional allegations that pertain to the bribery scheme. The Indictment alleges that Gross, who was chairman of the board of HOPE FCU, a federal credit union, "allowed and assisted" Murgio, Michael Murgio, Lebedev, and their co-conspirators to "take control of HOPE FCU in exchange for bribes." S3 Indictment ¶ 10. Gross allegedly "directed" Murgio and Michael Murgio to pay those bribes "to bank accounts under Gross's control," and Gross allegedly proceeded to spend at least some of that money on "personal expenses." *Id.* The bribes allegedly totaled "over $150,000." *Id.* Following the payment of the bribes, Gross allegedly provided his "assistance" in installing Murgio's co-conspirators on the board of HOPE FCU and in "transferr[ing] Coin.mx's banking operations to HOPE FCU." *Id.* Additionally, Michael Murgio allegedly "executed an agreement on behalf of 'Collectables Club' with Trevon Gross," and the agreement provided "that individuals chosen by the 'Collectables Club' would be nominated for positions on the Board of HOPE FCU." *Id.* ¶ 19(b). Finally, Murgio, Michael Murgio, Lebedev, and others allegedly met with Gross in November 2014 "and discussed the payment of an additional $50,000 bribe to induce Gross to relinquish control of HOPE FCU." *Id.* ¶ 19(g).

These allegations leave no ambiguity as to the conduct that allegedly violated § 215: Gross is accused of accepting bribes in exchange for helping to place certain individuals on

21

HOPE FCU's board and for helping to transfer Coin.mx's banking operations to HOPE FCU. Gross offers several red herrings to distract from these straightforward allegations. First, he notes that there are no allegations that Gross knew that Murgio, Michael Murgio, and Lebedev allegedly wanted to acquire HOPE FCU to facilitate the operation of an unlawful Bitcoin exchange. Gross Br. 10. This is true but irrelevant. Gross need not have known the precise reasons for the alleged conspirators' interest in HOPE FCU to have known that he was accepting bribes in exchange for abusing his position as an officer of a federal credit union.

Second, Gross challenges the premise that the allegations amount to an abuse of his position as an officer of HOPE FCU. He claims that there "is nothing *inherently* corrupt or unlawful about placing the names of individuals in nomination for a position on the Board of Directors of a credit union." Gross Br. 11 (emphasis added). Perhaps. But Gross is not charged with nominating individuals to serve on HOPE FCU's board. He is charged with doing so *in exchange for more than $150,000 in bribes*. Section 215 does not criminalize the actions that Gross allegedly took in the abstract; it criminalizes them in the context of a *quid pro quo* bribery arrangement. Gross in fact illustrates this point in his attempt to distinguish this case from the facts of *Brunson*, where the Fifth Circuit rejected a claim that § 215 is unconstitutionally vague. 882 F.2d at 154; *see also* Reply Br. 5-6. As recounted by Gross, the Indictment in *Brunson* charged that the director and attorney of a bank "corruptly solicited and demanded sexual favors from his victim in exchange for influencing repayments of her overdrawn banking account." Gross Reply Br. 6. The manner in which the defendant wielded this influence consisted of "obtaining time for [the victim] to repay the overdrawn account" by "explain[ing] to the bank officer that [the victim] was having marital problems which was the cause of the delay." *Brunson*, 882 F.2d at 155. In other words, the defendant convinced the bank to be lenient and to allow the victim more time to make required payments. That act may not be illegal in the abstract, but the Fifth Circuit had little trouble concluding that "all of the requisite elements" of § 215 were met when the defendant's assistance was offered *in exchange* for sexual favors. *Id.*

22

SPA-31

at 154. The same is true here, where Gross's assistance in placing conspirators on HOPE FCU's board was allegedly obtained in exchange for multiple bribes.

Finally, Gross criticizes the Indictment's use of the term "bribes" because the Indictment does not specify any particular law or duty that Gross intended to violate. Gross contends that the intent to violate such a law or duty is integral to any bribery claim. Gross Br. 12; *see also U.S. ex rel. Sollazzo v. Esperdy*, 285 F.2d 341, 342 (2d Cir. 1961) ("Bribery in essence is an attempt to influence another to disregard his duty while continuing to appear devoted to it or to repay trust with disloyalty."). Assuming that Gross is correct in his characterization of bribery law, his argument nonetheless fails. As an initial matter, Gross again points to no authority holding that the Indictment must go further than alleging that he acted "corruptly," which, as explained above, constitutes an allegation that he acted with the intent of "accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means." *McElroy*, 910 F.2d at 1021. But even if alleging the intent to violate a *particular* law or duty were required, the allegations in the Indictment are sufficient because they plainly amount to a charge that Gross intentionally took actions that violated the duties he owed in his capacity as Chairman of the Board of HOPE FCU. Every federal credit union director must "[c]arry out his or her duties as a director in good faith, in a manner such director reasonably believes to be in the best interests of the membership of the Federal credit union as a whole, and with the care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." 12 C.F.R. § 701.4(b)(1). The Indictment alleges that Gross accepted more than $150,000 bribes, at least some of which he spent on "personal expenses,"[6] and in return helped Murgio, Michael Murgio, and Lebedev take control of HOPE FCU. S3 Indictment ¶ 10. In other words, Gross allegedly helped individuals take over the credit union where he

---

[6] In his reply brief, Gross suggests that the allegations pertaining to the payments that the conspirators allegedly made to Gross are too vague to infer a violation of any fiduciary duty because the Indictment says only that the payments went to "accounts under Gross's control." S3 Indictment ¶ 10; *see also* Gross Reply Br. 9. This argument is meritless in light of the additional allegation that Gross spent some of that money on personal expenses, "including payments on his personal credit cards." S3 Indictment ¶ 10.

23

served as chairman because they paid him money to do so, not because it was in the interests of the credit union's membership. Although the Indictment does not spell out the particular regulations that govern the duties of federal credit union directors, the Court is mindful that "common sense must control" in assessing the sufficiency of an indictment and that "[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made." *Stavroulakis*, 952 F.2d at 693 (internal quotation marks and citation omitted). Bearing those principles in mind, it is obvious that the Indictment here sufficiently alerts Gross that he allegedly intended to take actions that breached his duties as Chairman of the Board of HOPE FCU. The Indictment is therefore sufficient.

## IV.    MOTIONS FOR BILLS OF PARTICULARS

Both Lebedev and Gross have moved for a bill of particulars. Gross has moved for a bill of particulars to ascertain the laws or duties he allegedly intended to violate and to understand the basis for the Government's venue allegations in Count Five. Lebedev has moved for a bill of particulars as to the identity of unindicted co-conspirators, the details of any bribes that he allegedly made to Gross, and the basis for the Government's venue allegations in Count Four.

Pursuant to Federal Rule of Criminal Procedure 7(f), a defendant may move for a bill of particulars "to identify with sufficient particularity the nature of the charge pending against him." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam). A bill of particulars is intended to "enable[] a defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 150 (2d Cir. 2008) (internal quotation marks and citation omitted). But a bill of particulars "is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004) (internal quotation marks and citation omitted). And the decision whether to order a bill of particulars

"rests within the sound discretion of the district court." *United States v. Bin Laden*, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings*, 552 F.3d 93.

In deciding whether to exercise that discretion, a court must "examine the totality of the information available to the defendant—through the indictment, affirmations, and general pre-trial discovery—and determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted." *Id.* A bill of particulars is not necessary when "the government has made sufficient disclosures concerning its evidence and witnesses by other means." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999). "A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." *United States v. D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) (internal quotation marks and citation omitted). Accordingly, "the proper test in deciding whether a bill of particulars should be required of the Government is whether the bill of particulars is *necessary* for the defense, not whether it would aid the defendant in his preparation." *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (emphasis added).

For the reasons that follow, both defendants' requests for particulars are granted in part and denied in part.

### A.     Gross's Motion for a Bill of Particulars

Gross seeks a bill of particulars to identify the laws or duties he intended to violate when he allegedly accepted bribes and to identify the basis for the government's claim that venue is proper in the Southern District of New York. Gross Br. 15-16. The Court considers each category of particulars in turn.

First, the Court grants Gross's request to require the Government to produce a list of the laws or duties he allegedly intended to violate. As the Court has already explained, the Indictment's allegations that Gross attempted to place particular individuals on HOPE FCU's board in exchange for bribes plainly implicate Gross's duties as Chairman of the Board of a federal credit union. Such allegations are therefore sufficient to survive a motion to dismiss the

25

Indictment, but they leave open important questions as to which of those duties Gross allegedly violated. The Government attempts to minimize such questions, in light of communications it has had with Gross as to its theory of the case. Specifically, the Government has apparently told Gross that it "intends to establish at trial, among other things," that Gross violated National Credit Union Administration ("NCUA") regulations by allowing individuals not within HOPE FCU's "Field of Membership" to be installed on the board, by failing to disclose the charged *quid pro quo* arrangement to the NCUA, and by undermining the financial safety and soundness of HOPE FCU. Opp. Br. 48-49. But the Government declines to specify *which* NCUA regulations Gross may have violated, and its use of "among other things" leaves open the possibility that there are additional laws or duties that it may claim Gross violated. *See id.* Specifying any such laws or duties is necessary to enable Gross "to prepare for trial [and] to prevent surprise." *In re Terrorist Bombings*, 552 F.3d at 150. Accordingly, the Government is ordered to provide a bill of particulars with respect to those laws, regulations, and duties.

Second, the Court denies Gross's request for a bill of particulars with respect to venue. In his opening brief, Gross argued that a bill of particulars is necessary because the Indictment does not allege that he accepted or solicited bribes in the Southern District of New York and because Gross had not identified any materials produced in discovery suggesting that he had reached out to the Southern District in connection with the charged crimes. Gross Br. 16. The Government contends that this request is now moot because it has provided two reasons why venue lies in this district. First, the Government notes that the Indictment alleges that on May 9, 2014, Murgio "caused $15,000 to be transferred via wire through the Southern District of New York to a particular bank account . . . at the request of Gross." S3 Indictment ¶ 19(c). Relatedly, the Government claims that bank and wire transfer records produced in discovery further show that "many" of the alleged payments from Murgio to Gross were transferred through this district. Opp. Br. 50. Second, the Government proffers that the evidence at trial will show that "Gross communicated with Murgio about the takeover of HOPE FCU . . . while Gross was in this District." *Id.* at 51.

26

Gross shifts gears in his reply brief in response to this proffer. He principally argues that the allegations contained in the Government's proffer are insufficient to confer venue, and he should therefore be permitted to file a motion to dismiss the Indictment for lack of venue. Gross Reply Br. 14-16. This argument is unavailing at this stage. Although the Government must "demonstrate the propriety of the chosen venue by a preponderance of the evidence" at trial, courts apply a more liberal standard when assessing whether an indictment's venue allegations survive a pre-trial motion to dismiss. *United States v. Motz*, 652 F. Supp. 2d 284, 290 (E.D.N.Y. 2009). Generally, "the Government need only allege that criminal conduct occurred within the venue, even if phrased broadly and without a specific address or other information, in order to satisfy its burden with regard to pleading venue." *United States v. Ohle*, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010) (internal quotation marks and citation omitted). The Indictment does so here, alleging that Gross accepted bribes "in the Southern District of New York and elsewhere." S3 Indictment ¶ 23. A pre-trial motion to dismiss the Indictment for lack of venue would therefore be futile.

Moreover, the arguments Gross advances as to why the Government's venue proffer is insufficient raise questions reserved for trial. Specifically, he claims that wire transfers through the Southern District of New York are insufficient to confer venue because the Government has failed to show that it would be reasonably foreseeable to Gross that the wire transfers would pass through this district—an argument that hinges on the factual question of what was, or was not, reasonably foreseeable to Gross. *See* Gross Reply Br. 14. Additionally, Gross downplays the significance of any communication from this district, noting that, so far, the Government has proffered only one email exchange between Murgio and Gross that allegedly concerns individuals who Gross arranged to have nominated to the HOPE FCU board. *Id.* at 15; *see also* Opp. Br. 51 n.16. In light of the Government's proffer though, it is premature to determine whether such communications are sufficient to confer venue. The Court therefore denies Gross's request for leave to file a pre-trial motion to dismiss for lack of venue. Similarly, the

27

Government's proffer as to venue, along with the discovery provided to Gross, render a bill of particulars unnecessary for Gross to prepare for trial.

**B.    Lebedev's Motion for a Bill of Particulars**

Lebedev moves for a bill of particulars with respect to three categories of information. First, he asks the Government to identify the unindicted co-conspirators referenced in the Indictment, and more specifically, to indicate whether Lebedev is an unindicted co-conspirator in any of the counts in which he is not charged. Lebedev Br. 5. Second, Lebedev asks the Government to identify the dates, locations, and amounts of any bribes that he—as distinct from Murgio—made to Trevon Gross. *Id.* And third, Lebedev asks for particulars regarding the Government's claim that venue in this district is proper. *Id.* The Court considers each request in turn.

First, the Court denies Lebedev's request to identify unindicted co-conspirators throughout the Indictment. As this Court noted in a recent Memorandum and Order, courts in this circuit frequently exercise their discretion to deny requests to identify co-conspirators through a bill of particulars. Dkt. No. 184 at 6 (citing *United States v. Mahaffy*, 446 F. Supp. 2d 115, 120 (E.D.N.Y. 2006)). That is particularly true where, as here, the allegations in the indictment are specific and the Government has provided discovery that will enable a defendant to adequately prepare his defense. *See Mahaffy*, 446 F. Supp. 2d at 120.

Lebedev's argument on this point though is principally directed at whether the Government must identify *him* as a co-conspirator in any of the counts in which he is not charged. As Lebedev notes, the Indictment's preamble indicates that "Anthony R. Murgio and Yuri Lebedev . . . and *their* co-conspirators engaged in substantial efforts to evade detection of *their* unlawful Bitcoin exchange scheme." S3 Indictment ¶ 5 (emphases added). But of the Indictment's four conspiracy counts—which charge conspiracies to operate an unlicensed money transmitting business, commit wire fraud, launder money, and engage in bribery—Lebedev is charged only in the bribery conspiracy. Lebedev argues that failing to specify whether he is an unindicted co-conspirator in these other conspiracies leaves him "in the dark" and forces him "to

28

guess as to the nature of the *charges* against him." Lebedev Br. 5 (emphasis added).  But there is no ambiguity as to what Lebedev is *charged* with—he is indicted only for conspiring to bribe, and bribing, Trevon Gross.  S3 Indictment ¶¶ 16-21.  He cannot be convicted at trial for conspiring to operate an unlicensed money transmitting business, or for conspiring to engage in money laundering or wire fraud, because he does not stand accused of those crimes.  Put differently, the question of what Lebedev is charged with is distinct from the question of how the Government will prove those charges at trial.  And on the latter front, the Government acknowledges that it intends to introduce evidence of Lebedev's involvement in Coin.mx to provide background on the bribery scheme and to explain the allegedly criminal relationship between Lebedev and Murgio.  Opp. Br. 52.  The question of whether the Government considers Lebedev an unindicted co-conspirator is certainly relevant to the Government's theory as to the nature of Lebedev's relationship with Murgio, but "it is not the function of a bill of particulars to allow defendants to preview the Government's . . . theory of its case."  *United States v. Abakporo*, 959 F. Supp. 2d 382, 389 (S.D.N.Y. 2013).  Moreover, the Indictment clearly alleges that Murgio and Lebedev, along with co-conspirators, "engaged in substantial efforts to evade detection of their unlawful Bitcoin exchange scheme by," among other things, "operating through phony front companies."  S3 Indictment ¶ 5.  This allegation, and similar ones in the Indictment's preamble, give Lebedev enough information to prepare for trial.

Lebedev's final argument on this point is that he needs to know whether he is an unindicted co-conspirator so that he may object to the admission of co-conspirator statements that should not be admitted against him under Federal Rule of Evidence 801(d)(2)(E).  Lebedev Br. 6.  This argument misunderstands the hearsay exception for the statements of co-conspirators—an exception that is rooted in agency law and is not constrained by the text of an indictment.  *See United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002).  In fact, the declarations of a co-conspirator are admissible even if the object of the conspiracy between the defendant and the co-conspirator is not "the crime charged in the indictment (or the objective of the conspiracy charged in the indictment)."  *Id.*; *see also United States v. Lyles*, 593 F.2d 182, 194 (2d Cir.),

29

*cert. denied*, 440 U.S. 972 (1979) ("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment.").[7]  If the Government is not even required to mention a conspiracy in the Indictment in order to introduce co-conspirator testimony against Lebedev, then Lebedev is not entitled to a bill of particulars with respect to a conspiracy that *is* mentioned.

Second, the Court grants Lebedev's request to order the Government to identify the dates, locations, and amounts of any bribes that he in particular paid to Trevon Gross.  Lebedev is charged with corruptly offering "a sum of money greater than $1,000" to Trevon Gross.  S3 Indictment ¶ 21.  He is charged under the statute that directly prohibits such conduct, 18 U.S.C. § 215(a)(1), as well as under 18 U.S.C. § 2, which permits Lebedev to be found guilty as a principal if he aided or abetted a violation of § 215(a)(1) or willfully caused another to violate § 215(a)(1).  The Indictment identifies five specific dates on which Murgio allegedly directed payments to bank accounts at the request of Gross.  S3 Indictment ¶¶ 19(c), (d), (e), (h), (j).  By contrast, the Indictment identifies no payments directly from Lebedev to Gross.  The Government's briefing suggests that this is because no such payments exist, as the Government characterizes the Indictment as already setting forth "the approximate dates and amounts of *the* bribes that were paid, or attempted to be paid, to Gross."  Opp. Br. 54 (emphasis added).  It therefore appears that the Government will not introduce evidence that Lebedev directly paid bribes to Gross, and that it will proceed primarily on an aider-and-abettor theory.[8]  In the event that characterization is inaccurate, however, Lebedev is entitled to know.  If the Government plans to introduce evidence of a bribe that is not already mentioned in the Indictment, then a bill of particulars as to such bribe(s) is appropriate to enable Lebedev to "prepare for trial [and]

---

[7] In his reply brief, Lebedev mistakes the Government's reliance on this line of cases as an argument that "any co-conspirator statement is admissible against Lebedev, regardless of whether he was involved in the particular conspiracy."  Lebedev Reply Br. 6.  The Government of course must prove that Lebedev is involved in a particular conspiracy in order to admit the testimony of a co-conspirator against him.  What it need not do is allege the existence of that conspiracy in the Indictment.

[8] Lebedev *is* mentioned in the Indictment in the context of what the Government may argue is an "attempted" bribe, whereby he allegedly offered Murgio $41,000 that was to be used to pay Gross.  *See* S3 Indictment ¶ 19(i).  No additional particulars are required as to that allegation.

30

prevent surprise." *In re Terrorist Bombings*, 552 F.3d at 150. The preparation necessary to defend against a claim that Lebedev aided and abetted a bribe looks very different from the preparation necessary to defend against a charge that he personally paid one. *See, e.g., United States v. Failla*, No. CR-93-00294 (CPS), 1993 WL 547419, at *7 (E.D.N.Y. Dec. 21, 1993) (ordering the government to provide particulars as to whether each defendant in a racketeering case was charged in each count "as (1) an aider and abettor or accomplice, (2) a principal, or (3) both"). Accordingly, the Government is ordered to provide the approximate date, location, and amount of any bribe that it alleges Lebedev paid.[9] Providing that information will also address Lebedev's third request for particulars, in which he asks the Government to "specify which substantive bribery offenses Lebedev participated in within this District." Lebedev Br. 8.

## V. REMAINING MOTIONS

### A. Lebedev's Motion to Strike Surplusage from the Indictment

Pursuant to Federal Rule of Criminal Procedure 7(d), Lebedev moves to strike several mentions of his name in the preamble of the Indictment as surplusage. "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (internal quotation marks and citation omitted). Accordingly, so long as the "evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Id.* (internal quotation marks and citation omitted). This standard "is an 'exacting' one," and "only rarely is alleged surplusage stricken from an indictment." *United States v. Smith*, 985 F. Supp. 2d 547, 610 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).

---

[9] The Court's reasoning in granting Lebedev's request for particulars with respect to bribes that *he* allegedly paid applies with equal force to Michael Murgio, who has requested to join in Lebedev's demand for a bill of particulars. *See* Dkt. No. 148. The Government is therefore ordered to provide the same information (approximate date, location, and amount) about Michael Murgio's alleged bribes. Comparable information is not required for Anthony Murgio, as the Indictment clearly alleges facts that would make him liable as a principal.

31

Lebedev is charged only in Counts Three and Four, which allege that he conspired to bribe, and did bribe, Trevon Gross. Lebedev argues that the mentions of his name in the preamble of the Indictment should be struck because those mentions suggest he committed other crimes that he is not charged with. Lebedev Br. 8-9. The allegedly offending statements are as follows: First, that "Coin.mx was operated by Anthony R. Murgio . . . with the assistance of other individuals, including Yuri Lebedev." S3 Indictment ¶ 3. Second, that "[t]hrough Coin.mx, Anthony R. Murgio, Lebedev, and their co-conspirators enabled customers to exchange cash for Bitcoins, charging a fee for their service." *Id.* Third, that "Anthony R. Murgio and Yuri Lebedev . . . and their co-conspirators engaged in substantial efforts to evade detection of their unlawful Bitcoin exchange scheme by operating through phony front companies . . . and by maintaining corresponding phony websites for those companies." *Id.* ¶ 5. And fourth, that "Murgio, Lebedev, and their co-conspirators sough to trick the financial institutions through which Coin.mx operated and processed transactions into believing their unlawful Bitcoin exchange business was simply a members-only association of individuals" interested in collectables. *Id.*

Lebedev's request to strike his name from these portions of the Indictment is denied. Each of the above allegations is "relevant to the crime[s] charged," *Scarpa*, 913 F.2d at 1013, in that they provide background on how Lebedev allegedly came to enter into a conspiracy to bribe Gross. They also, if proven, constitute evidence of Lebedev's intent—it is more plausible that he bribed Gross to place particular individuals on the HOPE FCU board if doing so is consistent with other actions he took on behalf of Coin.mx. Thus, "regardless of how prejudicial" the allegations may be, Lebedev's name should not be stricken from the preamble at this time. *Id.* The Court therefore denies Lebedev's motion, but without prejudice to renewal.

### B.   Lebedev's Renewed Motion to Sever

Lebedev moves to sever his trial from the trial of his co-defendants or, in the alternative, to sever the trial of the bribery counts from the other counts in the Indictment. Lebedev made a similar motion, which this Court denied, prior to the filing of the S2 Indictment. *See* Dkt. Nos.

32

35, 72. Lebedev does not advance new grounds for severance. Instead, he reiterates his view that evidence of crimes for which he is not charged "will inflame the jury and make it difficult to compartmentalize the evidence." Lebedev Br. 10. But as the Court explained at a March 4, 2016 conference, the evidence that Lebedev cites as potentially prejudicial is relevant to proving the counts that he *is* charged with in the Indictment. Dkt. No. 72 at 13. If the Government would seek to establish the background of Lebedev's involvement with Coin.mx in a separate trial of Lebedev (or of the bribery counts), then there is no need for a severance. Accordingly, for the reasons explained orally at the March 4, 2016 conference, Lebedev's motion to sever is denied.

### C. Murgio's Motion to Give Notice of Co-Defendants' Admissions or Confessions

Murgio asks the Court to order the Government to provide pre-trial notice of any post-arrest statements, admissions, or confessions from his co-defendants that the Government intends to introduce at trial. Murgio Omni. Br. 3. Murgio seeks the early disclosure of this information so that he can determine whether he has any motions to bring pursuant to *Bruton v. United States*, 391 U.S. 123 (1968). In *Bruton*, the Court held that it violates a defendant's rights under the Confrontation Clause to introduce, at a joint trial, the confession of a non-testifying co-defendant that links the defendant to the charged crime. *Id.* at 135-37. There is ample authority in this circuit, however, holding that *Bruton* and its progeny "do not mandate pretrial disclosure of such statements to the defense." *United States v. Stein*, 424 F. Supp. 2d 720, 727 (S.D.N.Y. 2006). Murgio does not address any of this authority. *See* Murgio Omni. Reply Br. 1 n.1. Accordingly, his motion to require the pre-trial production of co-defendant post-arrest statements, admissions, or confessions is denied. The Court notes though that it would be "wise" for the Government to adhere to its pledge "to produce such materials in sufficient time for issues regarding such statements to be resolved pre-trial." *United States v. Robles*, No. 04-CR-1036 (GEL), 2005 WL 957338, at *1 (S.D.N.Y. Apr. 22, 2005); *see also* Opp. Br. 58.

33

SPA-42

**D.      Murgio's Motion to Compel the Disclosure of Confidential Informants or Cooperating Co-Defendants**

Murgio "demands" that the Government disclose the "names and criminal histories of the confidential informants or cooperating co-defendants" that it has relied on. Murgio Omni. Br. 11. As the Government notes, it "generally enjoys a 'privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law.'" *United States v. Jackson*, 345 F.3d 59, 69 (2d Cir. 2003) (quoting *Roviaro v. United States*, 353 U.S. 53, 59 (1957)). That privilege "must give way" if, "absent such disclosure, [the defendant] will be deprived of his right to a fair trial." *United States v. Fields*, 113 F.3d 313, 324 (2d Cir. 1997). But it is the defendant who "bears the burden of showing the need for disclosure of an informant's identity." *Id.* And that burden can be met only if the defendant makes "a specific showing that 'the disclosure of an informant's identity . . . is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause.'" *United States v. Philippeaux*, No. 13-CR-277 (RWS), 2015 WL 405240, at *4 (S.D.N.Y. Jan. 30, 2015) (alteration in original) (quoting *United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988)); *see also Saa*, 859 F.2d at 1073 ("[D]isclosure of the identity or address of a confidential informant is not required unless the informant's testimony is shown to be material to the defense.").

Murgio makes no attempt to put forward the showing required to compel the Government to disclose the identity of any informants or cooperating co-defendants. Rather, he asserts, without explanation, that "it strongly appears that informants or co-defendants were participants in critical events, and may be key witnesses against the defendant." Murgio Omni. Br. 12. This does not constitute a showing that he "will be deprived of his right to a fair trial" absent the requested disclosure. *Fields*, 113 F.3d at 324. That is particularly true in light of the Government's indication that it will "turn over Section 3500 and *Giglio* material for its witnesses," including any confidential informants or cooperating co-defendants, "sufficiently in

34

advance of trial to permit defense counsel adequate time to prepare." Opp. Br. 64. Accordingly, Murgio's motion is denied.

### E.   Requests for the Early Production of *Brady* and *Giglio* Material

Both Murgio and Lebedev move for the immediate disclosure of all material that falls within the ambit of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). The material that must be provided under *Brady* and *Giglio* "is material, which, if not disclosed, creates a reasonable probability of altering the outcome" of trial. *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001). But such material need not be disclosed immediately "upon request by a defendant," so long as it is disclosed "in time for its effective use at trial." *Id.*

The Government acknowledges its obligations under *Brady* and *Giglio* in its opposition brief, and it pledges to provide such materials in a timely manner. Opp. Br. 60. This Court generally will not compel the immediate or early production of *Brady* or *Giglio* material in the face of "the Government's 'good-faith representation to the court and defense counsel that it recognizes and has complied with its disclosure obligations under *Brady*'" and its progeny. *United States v. Thompson*, No. 13-CR-378 (AJN), 2013 WL 6246489, at *9 (S.D.N.Y. Dec. 3, 2013) (quoting *United States v. Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996)). There is no reason to depart from that practice here. The Court notes, however, consistent with both Lebedev's and Murgio's requests, that the Government "should resolve doubts as to the usefulness of evidence to the defense in favor of full disclosure," as failure to do so "risks the validity of any conviction." *Stein*, 424 F. Supp. 2d at 726 (internal quotation marks, alterations, and citation omitted).

### F.   Requests for Early Production of Rule 404(b) Evidence

The requests by Murgio and Lebedev for early production of evidence that the Government may seek to introduce pursuant to Federal Rule of Evidence 404(b) are moot in light of the deadline the Court has set for 404(b) motions and motions *in limine*. *See* Dkt. No. 156 (requiring such motions to be filed more than six weeks in advance of trial).

## VI.    CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part Gross's motion for a bill of particulars and Lebedev's motion for a bill of particulars.  The Government shall supply the particulars described in this Memorandum and Order no later than September 26, 2016.  The Court GRANTS the requests of Murgio, Michael Murgio, and Gross to join in the motions of their co-defendants.  The Court DENIES the other pre-trial motions.

This resolves Docket Nos. 130, 132, 134, 138, 141, 147, and 148.

SO ORDERED.

Dated: September **19**, 2016
      New York, New York

                ALISON J. NATHAN
                United States District Judge